HONORABLE JUDGE ROBERT J. BRYAN

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA**

| | |
|---|---|
| C. P., by and through his parents, Patricia Pritchard and Nolle Pritchard; and PATRICIA PRITCHARD, <br><br> Plaintiff, <br><br> vs. <br><br> BLUE CROSS BLUE SHIELD OF ILLINOIS, <br><br> Defendants. | Case No. 3:20-cv-06145-RJB <br><br> **MOTION TO DISMISS** |

## I.    INTRODUCTION

Defendant Blue Cross and Blue Shield of Illinois ("BCBSIL"), an unincorporated division of Health Care Service Corporation, a Mutual Legal Reserve Company, moves to dismiss Plaintiffs' Complaint for failure to state a claim on which relief can be granted under Fed. R. Civ. P. 12(b)(6).

This action is a claim for health care benefits under the Catholic Health Initiative's ERISA Welfare Benefit Plan ("Plan"), a self-insured plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA") and sponsored by CommonSpirit Health (f/k/a Catholic Health Initiatives).[1]  Plaintiff CP is a fifteen-year-old transgender boy.  Plaintiffs claim "coverage for CP's

---

[1] Plaintiffs' Complaint refers to Catholic Health Initiatives as the plan sponsor, but Catholic Health Initiatives changed its name to CommonSpirit Health effective February 1, 2019. For ease of reference, throughout the pleading we have retained the references to Catholic Health

MOTION TO DISMISS – 1

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

surgical care including the implantation of his second Vantas implant, mastectomy and chest reconstruction." BCBSIL is the Plan's claim administrator and denied the claim because the Plan excludes "treatment, drugs, medicines, therapy, counseling services and supplies for, or leading to, gender reassignment surgery" (the "Exclusion"). Plaintiffs allege that this Court should invalidate the Exclusion because it violates prohibitions against discrimination on the basis of sex in the Affordable Care Act ("ACA"), which incorporates Title IX of the federal Civil Rights Act of 1964.

The Court should dismiss this action for three independent reasons. First, Plaintiffs lack Constitutional standing. Even were Plaintiffs to persuade this Court to invalidate the Exclusion, to obtain coverage, they still must establish that the treatments they seek for CP are medically necessary, which they cannot do. BCBSIL's Medical Policy requires that to be eligible for gender realignment surgery, the individual must have reached the age of majority and have the "capacity to make a fully informed decision and to consent for treatment." CP is a minor and, even absent the Exclusion, BCBSIL would deny the claimed benefits as not medically necessary. Therefore, Plaintiffs' claim that the Exclusion is invalid fails to allege the injury, causation, or redressability required by Article III.

Second, the federal regulations interpreting the ACA and case law upholding those regulations establish that categorical exclusions precluding benefits for gender-affirming surgery and related treatments do not discriminate on the basis of sex. Therefore, the Exclusion does not violate Title IX or the ACA.

Third, Plaintiffs' Complaint alleges that the Exclusion exists because the Plan is sponsored by a faith-based entity. This alone mandates dismissal of the complaint. Courts have held that the Religious Freedom Restoration Act allows the exclusion exactly like the one at issue here.

---

Initiatives despite the legal name change.

MOTION TO DISMISS – 2

## II.   PLAINTIFFS' COMPLAINT

**A.   Plaintiffs' Factual Allegations.**

      **1.   The Parties.**

Plaintiffs are CP, a fifteen-year-old transgender boy, and his mother, Patricia Pritchard. Complaint, ¶ 1.  Plaintiffs are covered under the Catholic Health Initiatives Medical Plan (the "Plan").  *Id.*  Plaintiff CP is enrolled in the Plan as a dependent of Pritchard.  *Id.*  The Plan is a self-funded employee welfare benefits plan under ERISA, 29 U.S.C. §1132(a)(1)(B), 29 U.S.C. §1132(a)(3).  *See generally* Dkt. 1-8.  Catholic Health Initiatives is the Plan Sponsor.  Dkt. 1-1 at 2, 117.  BCBSIL is the Plan's third-party claims administrator.  Complaint, ¶ 13.  The Plan is self-insured so the Plan, not BCBSIL, is responsible for paying all health care benefits to its members.  Dkt. 1-1 at 8.

      **2.   BCBSIL Denied Coverage for Treatments For or Leading to Gender Reassignment Surgery for CP Because of the Exclusion.**

CP was diagnosed with gender dysphoria.  Complaint, ¶ 45.  He has identified and lived as male since 2015, when he was ten.  Complaint, ¶¶  44-45.

Plaintiffs allege that "[BCBSIL] has denied coverage for CP's surgical care including the implantation of his second Vantas implant, mastectomy and chest reconstruction."  Complaint ¶ 6; *see also* Complaint, ¶¶ 58–68.  Plaintiffs allege that BCBSIL has denied coverage for some of CP's services because it is "for or leading to gender reassignment surgery."  Complaint ¶ 47.

The Exclusion in the Plan provides as follows:

> Transgender Reassignment Surgery
> Not Covered:
> Benefits shall not be provided for treatment, drugs, medicines,
> therapy, counseling services and supplies for, or leading to,
> gender reassignment surgery.

Complaint, ¶5 (citing App. A, p. 61 (hereinafter the "Exclusion")).  Plaintiffs allege that the Exclusion was included in the Plan because the plan sponsor is a faith-based organization.  Dkt. 1-13 at 10 (citing Exh. 23 thereto).

MOTION TO DISMISS – 3

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

KILPATRICK TOWNSEND 74549166 1

1

2

**3.      The Plan Covers Only Medically Necessary Treatments.**

3
     The Plan covers only medically necessary treatments.  Dkt. 1-1 at 37, 52, 67, 73.  The

4
Plan defines "Medically Necessary" as follows:

5

6
> A Medically Necessary health care service is one that a Provider, exercising prudent clinical judgment, provides to a patient for the purpose of preventing, evaluating, diagnosing, or treating an Illness, Accidental Injury, disease, or its symptoms, and is:

7
>     • Provided in accordance with generally accepted standards of medical practice. Generally accepted standards of medical practice are based on:

8
>     • Credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community; and

9
>     • Physician Specialty Society recommendations and the views of Physicians practicing in the relevant clinical area; and

10
>     • Any other relevant factors; and

11
>     • Clinically appropriate in terms, type, frequency, extent, site, and duration, and considered effective for the patient's Illness, Accidental Injury, or disease; and

12
>     • Not provided primarily for the convenience of the patient, Physician, or other health care Provider.

13
Dkt. 1-1 at 73.

14
     For Plans without the Exclusion, BCBSIL has a Medical Policy that states when gender

15
reassignment surgery is medically necessary.  Dkt. 1-7 at 2–3.  Under the specific terms of the

16
Medical Policy, surgery on minors does not meet the medical necessity requirement:

17

18
> Gender reassignment surgery -- also known as transsexual surgery or sex reassignment surgery -- and related services **may be considered medically necessary when meeting the criteria for gender dysphoria listed below. Otherwise, gender reassignment surgery and related services will be considered not medically necessary.**

19

20
> <u>Criteria for Coverage of Gender Reassignment Surgery and Related Services</u>:

21

22
> The individual being considered for surgery and related services must meet ALL the following criteria. The individual must have:
> • Reached the age of majority; AND

23
> • The capacity to make a fully informed decision and to consent for treatment. . . .

24
Dkt. 1-7 at 2-3 (bold, underlining and caps type in original).

25

26
**4.      Plaintiffs Rely on the Standards of Care formulated by the World Professional Association for Transgender Health.**

27
     Plaintiffs' Complaint alleges that gender dysphoria should be treated in accordance with

MOTION TO DISMISS – 4

internationally recognized Standards of Care formulated by the World Professional Association for Transgender Health ("WPATH"). Complaint, ¶¶ 30–31. "Under the WPATH Standards of Care, medically necessary treatments may include, among other things, '[h]ormone therapy' and '[s]urgery to change primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring).'" Complaint, ¶ 31.

**B.    Plaintiffs' Single Cause of Action—Violation of the Affordable Care Act.**

Plaintiffs allege a single cause of action, a violation of the Affordable Care Act § 1557, 42 U.S.C. § 18116. Complaint, ¶¶ 85–91. They allege that because BCBSIL denied coverage for treatments that WPATH states are medically necessary, BCBSIL discriminating against them on the basis of sex because Plaintiff CP is transgender. Complaint, ¶¶ 1, 85–91. Plaintiffs allege that "[b]y administering the Plan's Exclusion as an exclusion of all medically necessary care 'for, or leading to, gender reassignment surgery,' BCBSIL has drawn a classification that discriminates on the basis of 'sex.'" Complaint, ¶ 88.

### III.    ARGUMENT

**A.    Legal Standard under Rule 12(b)(6).**

"The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Com'n*, 720 F.2d 578, 581 (9th Cir. 1983). In ruling on a motion to dismiss under Rule 12(b)(6), the Court analyzes the complaint and takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007). "A pleading that offers 'labels and conclusions' or 'a

MOTION TO DISMISS – 5

formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  Rather, the claim must be "'plausible on its face'"—the plaintiff must plead sufficient factual allegations to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

## B. Plaintiffs Lack Constitutional Standing to Bring this Action.

Plaintiffs do not have Constitutional standing to bring their claim here.  Even were they to prevail here, CP would still not be entitled to coverage under the Plan because he is a minor.  BCBSIL's Medical Policy, incorporated in the Complaint as an exhibit, states that gender reassignment surgery for minors is not medically necessary.  Therefore, Plaintiffs fail to allege and cannot establish injury, causation, or redressability as required by Article III.

"Just like any other plaintiff, a plaintiff bringing an ERISA claim must have standing pursuant to Article III of the United States Constitution." *J.T. v. Regence BlueShield*, 291 F.R.D. 601, 609 (W.D. Wash. 2013) (citing *Paulsen et al. v. CNF, Inc., et al.*, 559 F.3d 1061, 1072 (9th Cir. 2009)).  "To have standing under Article III, a plaintiff must demonstrate that (1) she has suffered an actual or threatened injury in fact; (2) the injury is causally connected to the conduct complained of; and (3) it is likely, and not merely speculative, that her injury will be redressed by a favorable decision." *Id.*  (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  "The party invoking jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561.

Even were Plaintiffs to persuade this Court to invalidate the Exclusion, they would still have to establish that the treatments they seek for CP are medically necessary under the Medical Policy.  *Cruz v. Zucker*, 195 F. Supp. 3d 554 (S.D.N.Y.), *reconsideration on other grounds,* 218 F. Supp. 3d 246 (S.D.N.Y. 2016).  In *Cruz*, the court held that the plaintiff lacked standing to challenge a state Medicaid ban on coverage for gender dysphoria for individuals under 18

MOTION TO DISMISS – 6

because the surgery she sought was not medically necessary for her.  *Id.* at 570.

Here, Plaintiffs seek to have the Court declare the Exclusion illegal.  But even if Plaintiffs were to prevail, CP would not be entitled to coverage under the Plan because he is a minor and BCBSIL's Medical Policy criteria states that such surgery on minors is not medically necessary.

A plaintiff does not have standing to challenge an exclusion if it is clear from the complaint that he is otherwise not entitled to the service for other reasons.  In *J.T.*, plaintiff sought to invalidate an age exclusion, but "her speech therapy would not be covered by the neurodevelopmental therapy benefit regardless of her age."  *J.T.*, 291 F.R.D. at 611.  Therefore, the plaintiff lacked standing to challenge the exclusion.  *Id.*

Here, Plaintiff does not have standing to challenge the Exclusion because the Plan would not otherwise cover the procedure for him because he is a minor.  *See* Complaint ¶ 58; Dkt. 1-7 at 2–3 ("for surgery and related services . . . The individual must have: Reached the age of majority; AND The capacity to make a fully informed decision and to consent for treatment. . . .")  Because CP is a minor, BCBSIL's Medical Policy precludes the coverage that Plaintiffs seek regardless of the Exclusion.  Therefore, the Complaint fails to allege redressable injury.  Accordingly, Plaintiffs lack standing because the Complaint shows lack of injury, causation, or redressability as required by Article III.

## C.    The Exclusion Does Not Violate the ACA Because it Does Not Discriminate on the Basis of Sex.

Plaintiffs claim that the Exclusion violates the ACA because it discriminates on the basis of sex.  Plaintiffs, quoting outdated 2016 Department of Health and Human Services ("HHS") regulations ("the 2016 Rule"), allege in their Complaint that "BCBSIL continues to administer the Exclusion, despite the warning from the U.S. Department of Health and Human Services that '[a]n explicit, categorical (or automatic) exclusion or limitation of coverage for all health services related to gender transition is unlawful on its face.'"  Complaint, ¶ 89 (81 Fed. Reg. 31,429).  This allegation is not correct.  The part of the 2016 Rule Plaintiffs rely upon has been repealed by 2020 HHS regulations (the "2020 Rule").  Further, courts have upheld the 2020 Rule to the

MOTION TO DISMISS – 7

extent applicable here, and confirmed that the ACA does not require that health plans cover gender reassignment surgery. Therefore, the Exclusion does not violate the ACA's prohibition of discrimination on the basis of sex. Plaintiffs' complaint should be dismissed for this reason alone.

The current HHS regulations explicitly permit categorical exclusion of gender-affirming treatments, and the courts have upheld these regulations. *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, No. CV 20-1630 (JEB), --- F.Supp.3d ----, 2020 WL 5232076 (D.D.C. Sept. 2, 2020) (quoting 85 Fed. Reg. at 37,198, 37,199); *Franciscan Alliance v. Burwell*, 227 F. Supp. 3d 660, 687 (N.D. Tex. 2016); *Religious Sisters of Mercy v. Azar*, No. 3:16-CV-00386, --- F.Supp.3d ---, 2021 WL 191009, at *6 (D.N.D. Jan. 19, 2021).

Section 1557 of the ACA, 42 U.S.C. § 18116, provides that "an individual shall not, on the ground prohibited under ... title IX of the Education Amendments of 1972 ... be excluded from participation in, denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance...."

The 2016 Rule determined that this requirement required healthcare providers and carriers to perform and cover gender-transition procedures. In *Franciscan Alliance v. Burwell*, 227 F. Supp. 3d 660, 687 (N.D. Tex. 2016), the court invalidated this portion in the 2016 Rule. *Id.* Catholic health plans and hospitals sought to enjoin enforcement of the 2016 Rule. *Id.* at 687. The court concluded that the regulations violated the Administrative Procedures Act by impermissibly expanding the scope of sex discrimination under Title IX to encompass gender identity. *Id.* at 689. The Court invalidated the 2016 Rule's mandate requiring that healthcare entities perform and insure gender-transition and abortion procedures. *Id.* HHS did not appeal the decision. *See Religious Sisters of Mercy v. Azar*, No. 3:16-CV-00386, ---F.Supp.3d---, 2021 WL 191009, at *6 (D.N.D. Jan. 19, 2021).

In 2020, HHS finalized new regulations to replace the invalid 2016 Rule and comply with *Franciscan*. *Id.* (citing Nondiscrimination in Health and Health Education Programs or

MOTION TO DISMISS – 8

Activities, 85 Fed. Reg. 37,160 (June 19, 2020) (2020 Rule)).  The 2020 Rule eliminates "the 2016 Rule's prohibition on 'categorical coverage exclusion[s] or limitation[s] for all health services related to gender transition.'"  *See Whitman-Walker*, 2020 WL 5232076, at \*29  (quoting 81 Fed. Reg. at 31,471–72).  In the 2020 Rule, HHS acknowledged it lacked authority to mandate coverage for gender reaffirming services. *Religious Sisters*, 2021 WL 191009, at \*6.  HHS also noted that the coverage mandate in the repealed 2016 Rule "had improperly preempted legitimate medical debate."  *Id.*  HHS explained that "the medical community is divided on many issues related to gender identity, including the value of various 'gender-affirming' treatments for gender dysphoria." *Id.*

After HHS issued the 2020 Rule, certain health-care facilities, providers and interest groups brought a suit seeking to invalidate the portions of the 2020 Rule declining to mandate gender reaffirming services.  The *Whitman-Walker* court upheld the 2020 Rule, recognizing the Agency's interpretation that "'[t]here is no statutory authority to require the provision or coverage of such procedures under Title IX protections from discrimination on the basis of sex.'"  *Whitman-Walker*, 2020 WL 5232076 at \*29 (quoting 85 Fed. Reg. at 37,198, 37,199).

The *Whitman-Walker* plaintiffs relied on the Supreme Court's decision in *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731 (2020), which prohibited termination of employees on the basis of transgender status.  The plaintiffs claimed that *Bostock* required invalidation of the 2020 Rule and mandated the conclusion that exclusions for gender reassignment services discriminate on the basis of sex.  *Whitman-Walker*, 2020 WL 5232076 at \*5.  The *Whitman-Walker* court rejected the claim that *Bostock* prohibits exclusions such as the Exclusion.  *Id.*

The court also noted that "HHS expressly confronted its prior policy regarding prohibitions on categorical coverage exclusions and delivered a sufficiently reasoned explanation for its new position.  In promulgating the 2020 Rule, the agency consulted scientific studies, government reviews, and comments from a host of medical professionals regarding treatment for gender dysphoria."  *Id.*  "The upshot, according to HHS, was that 'the medical community is

MOTION TO DISMISS – 9

divided on many issues related to gender identity, including the value of various "gender-affirming" treatments for gender dysphoria (especially for minors).'" *Id.* "That division counseled against a blanket prohibition on categorical coverage exclusions of gender-affirming care.  According to the agency, eliminating the prohibition would enable providers and insurers 'to use their best medical judgment' when delivering and covering care, as informed by 'ongoing medical debate and study' regarding gender-affirming treatment." *Id.* (citing at 85 Fed. Reg. 37,187).

The court also found reasonable HHS's finding that "the 2016 Rule's assumption that entities offering categorical coverage exclusions for gender-affirming care were relying on medical judgments that were 'outdated and not based on current standards of care'" "was 'erroneous' and that there was 'a lack of scientific and medical consensus to support.'" *Id.* (quoting 81 Fed. Reg. at 31,429).

The court noted three categories of evidence supporting the 2020 Rule: "First, HHS pointed to a 2016 CMS decision declining to issue a National Coverage Determination that would have mandated coverage for sex-reassignment surgery for Medicare beneficiaries with gender dysphoria." *Id.* "There, CMS determined, '[b]ased on an extensive assessment of the clinical evidence,' that 'there is not enough high quality evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria and whether patients most likely to benefit from these types of surgical intervention can be identified prospectively.'" *Id.* (citing CMS, Decision Memo for Gender Dysphoria and Gender Reassignment Surgery (CAG-00446N) (Aug. 30, 2016), https://perma.cc/9S73-4WQB)).

"Second, HHS referenced a 2018 Department of Defense report," which included input from civilian medical professionals with experience treating gender dysphoria, "and found that there is 'considerable scientific uncertainty and overall lack of high quality scientific evidence demonstrating the extent to which transition-related treatments ... remedy the multifaceted mental health problems associated with gender dysphoria.'" *Id.* (quoting Department of Defense, Report

MOTION TO DISMISS – 10

and Recommendations on Military Service by Transgender Persons at 5 (Feb. 22, 2018), https://perma.cc/7369-K2VC)).

Finally, the court found that HHS properly relied on scientific research which concluded "that children who socially transition in childhood faced dramatically increased likelihood of persistence of gender dysphoria into adolescence and adulthood." *Id.* at *31. "[T]he study found that boys who transitioned during childhood experienced 'significantly' greater gender dysphoria in later years, a finding consistent with HHS's characterization." *Id.*.

The court in *Whitman-Walker* also addressed the WPATH standards cited here in Plaintiffs' Complaint. *Id.* The court noted that "HHS explicitly considered these standards in promulgating the 2020 Rule, referencing submissions from various commenters who agreed with [WPATH's] approach." *Id.* The court found that HHS's rejection of WPATH's advocacy was not arbitrary and capricious. "HHS also agreed with comments it received that the 2016 Rule relied exclusively on WPATH," and WPATH is "an advocacy group." *Id.* In developing the 2016 regulations, HHS should have relied on "independent scientific fact-finding" such as the CMS decision discussed above that, following an "extensive assessment of the clinical evidence," found insufficient evidence "'to determine whether gender reassignment surgery improves health outcomes' for individuals with gender dysphoria.'" *Id.*

In conclusion, the 2020 Rule allows the Exclusion. The 2016 Rule was overturned, and courts have upheld the new rule to the extent of allowing exclusions such as the Exclusion. *Religious Sisters*, 2021 WL 191009 at *6, 8. The currently effective HHS regulations, and case law upholding those regulations, establish that the categorical exclusions for gender-affirming surgery and related treatments do not discriminate on the basis of sex.

**D.     The Religious Freedom Restoration Act Allows the Exclusion.**

Plaintiffs' Complaint alleges that the Exclusion exists because the Plan is sponsored by a faith-based entity. Dkt. 1-13 at 10 (citing Exh. 23 thereto). The courts hold that the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb-1 ("RFRA"), protects the Exclusion.

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA 98101
(206) 626-7713  FAX: (206) 260-8946

KILPATRICK TOWNSEND 74549166 1

The RFRA protects an individual's exercise of religion and prohibits the federal government from substantially burdening a person's religious beliefs.  42 U.S.C. § 2000bb-1(a). The RFRA "applies in full" to the ACA.  *Whitman-Walker,* 2020 WL 5232076, at *42 (citing 45 C.F.R. § 92.6(b)).  Thus, the RFRA prohibits the interpretation of Section 1557 alleged by the Plaintiffs here because it could impair the religious freedom of the Plan sponsor.  *See generally Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682 (2014).

Congress enacted the RFRA "to provide very broad protection for religious liberty."  *Id.* at 693.  The RFRA forbids government from "substantially burden[ing] a person's exercise of religion" unless the burden (1) "is in furtherance of a compelling governmental interest" and (2) "is the least restrictive means of furthering that compelling interest." 42 U.S.C. § 2000bb-1(b). If a substantial burden exists, then the government assumes the obligation to meet the "exceptionally demanding" strict scrutiny standard.  *Hobby Lobby*, 573 U.S. at 728.

The Supreme Court's decision in *Hobby Lobby* controls here and protects the Exclusion. In *Hobby Lobby*, the Supreme Court applied the RFRA and held that requiring the plaintiff (a private corporation) to comply with ACA's contraceptive mandate would impermissibly burden the company's exercise of religion.  *Id.* at 729–30.  The Court held that requiring Hobby Lobby to cover certain contraception would directly conflict with the owners' religious belief that life begins at conception when a fertilized egg is created.  *Id.* at 698–703.  The Court also noted that if the plaintiffs refused to comply with the mandate, the companies would incur severe monetary penalties up to $475 million each year.  *Id.* at 726.  The Court concluded that for all these reasons, the coverage mandate substantially burdened Hobby Lobby's religious beliefs.  *Id.*

The Court also found that the contraceptive mandate was not the least restrictive means to achieve the government's interest in ensuring that women have access to contraceptives without cost.  *Id.* at 730–31.  The Court reasoned that the federal government could simply assume the costs of providing the contraceptives at issue if an employer objected to such coverage due to religious beliefs.  *Id.*

MOTION TO DISMISS – 12

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA 98101
(206) 626-7713  FAX: (206) 260-8946

KILPATRICK TOWNSEND 74549166 1

*Franciscan* applied *Hobby Lobby* and determined that the 2016 Rule's mandate that required healthcare entities to perform and cover gender-transition and abortion procedures imposed a substantial burden on the private plaintiffs' exercise of religion.  227 F. Supp. 3d at 692.  The court found that the 2016 Rule failed to satisfy strict scrutiny under the RFRA.  *Id.* at 693.  On this basis, the court invalidated the 2016 Rule's coverage mandate for transgender services.  *Id.*

Recently, in *Religious Sisters*, 2021 WL 191009, the court addressed the 2020 Rule, and likewise followed *Hobby Lobby* to hold that the RFRA precludes any interpretation of the ACA that requires Catholic institutions to cover gender-affirming surgery.  2021 WL 191009, at *21–23.  Applying the RFRA and *Hobby Lobby*, *Religious Sisters* held that requiring Catholic organizations to cover or perform gender affirming surgery would substantially burden their exercise of religion and was not the least restrictive means of furthering any compelling government interest, and thus failed strict scrutiny.  2021 WL 191009, at *21–23.  The court held that interpretation of the ACA as requiring a Catholic institution to cover gender reassignment surgery would substantially burden Catholic institutions' exercise of religion:  "refusal to perform or cover gender-transition procedures would result in the Catholic Plaintiffs losing millions of dollars in federal healthcare funding and incurring civil and criminal liability."  *Id.* at *22.  "An 'imposition of significant monetary penalties' indisputably qualifies as a substantial burden."  *Id.* (quoting *Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, 801 F.3d 927, 937 (8th Cir. 2015)).  Likewise, to "threaten to penalize the Catholic Plaintiffs for adhering to their beliefs, a substantial burden weighs on the exercise of religion."  *Id.*

With respect to the government's interest, the court in *Religious Sisters* stated that it "harbors serious doubts that a compelling interest exists."  *Id.*  The court noted that the government's own healthcare programs are not required to cover gender reassignment surgery.  *Id.* (citing *Franciscan*, 227 F. Supp. 3d at 692–93).  "In the 2020 Rule, HHS conceded to lacking a 'compelling interest in forcing the provision, or coverage, of these medically controversial

MOTION TO DISMISS – 13

[gender-transition] services by covered entities.'" *Id.*   Nevertheless, the court concluded that even if there were a compelling government interest, requiring gender reassignment services cannot "meet the rigors of the least-restrictive-means test." *Id.* (citing *Hobby Lobby*, 573 U.S. at 728).  "In the RFRA context, a regulation may constitute the least restrictive means of furthering the government's compelling interests if 'no alternative forms of regulation' would accomplish those interests without infringing on a claimant's religious-exercise rights." *Id.* at *23 (quoting *Sharpe Holdings*, 801 F.3d at 943).   The court identified a litany of less restrictive means including the government providing direct reimbursement for gender-transition procedures for those "unable to obtain them under their health-insurance policies due to their employers' religious objections," *id,* (quoting *Hobby Lobby*, 573 U.S. at 728), "providing 'subsidies, reimbursements, tax credits, or tax deductions to employees' or paying for services 'at community health centers, public clinics, and hospitals with income-based support'" or through the ACA exchanges. *Id.* (quoting *Sharpe Holdings*, 801 F.3d at 945).

Accordingly, the court declared that "interpretation of Section 1557 that requires the Catholic Plaintiffs to perform and provide insurance coverage for gender-transition procedures violates their sincerely held religious beliefs without satisfying strict scrutiny under the RFRA." *Id.* at *27.

For the same reasons, the ACA would violate the RFRA were it to prohibit the Exclusion.

### IV.   CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint.

DATED this 25th day of February, 2021.

KILPATRICK TOWNSEND & STOCKTON LLP

By_____ */s/ Gwendolyn C. Payton*_____
            Gwendolyn C. Payton, WSBA No. 26752
            gpayton@kilpatricktownsend.com
            John R. Neeleman No. 19752
            jneeleman@kilpatricktownsend.com
            1420 Fifth Ave., Suite 3700
            Seattle, WA 98101
            Telephone: (206) 626-7714

MOTION TO DISMISS – 14

1    Facsimile: (206) 623-6793

2    *Counsel for Defendant Health Care Service Corporation,*
     *a Mutual Legal Reserve Company, doing business in*
3    *Illinois as Blue Cross and Blue Shield of Illinois*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

MOTION TO DISMISS – 15

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

1

2

## CERTIFICATE OF SERVICE

I certify that on the date indicated below I caused a copy of the foregoing document,

MOTION TO DISMISS to be filed with the Clerk of the Court via the CM/ECF system.   In

accordance with their ECF registration agreement and the Court's rules, the Clerk of the Court

will send e-mail notification of such filing to the following attorneys of record:

Eleanor Hamburger
SIRIANNI YOUTZ SPOONEMORE HAMBURGER
3101 WESTERN AVENUE STE 350
SEATTLE, WA 98121
206-223-0303
Fax: 206-223-0246
Email: ehamburger@sylaw.com

Jennifer C Pizer
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC
4221 WILSHIRE BLVD., STE 280
LOS ANGELES, CA 90010
213-382-7600
Email: jpizer@lambdalegal.org

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
120 WALL STREET
19TH FLOOR
NEW YORK, NY 10005
212-809-8585
Email: ogonzalez-pagan@lambdalegal.org

I affirm under penalty of perjury under the laws of the State of Washington and the

United States that the foregoing is true and correct to the best of my knowledge.

DATED this 25th day of February, 2021.

**Kilpatrick, Townsend & Stockton LLP**

By: */s/ Gwendolyn C. Payton*
    Gwendolyn C. Payton, WSBA #26752
    gpayton@kilpatricktownsend.com

*Counsel for Defendant Health Care Service Corporation,*
*a Mutual Legal Reserve Company, doing business in*
*Illinois as Blue Cross and Blue Shield of Illinois*

CERTIFICATE OF SERVICE – 16

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

KILPATRICK TOWNSEND 74549166 1