***C.P. v. Blue Cross Blue Shield of Illinois***
**USDC (W.D. Wash.), No. 3:20-cv-06145-RJB**

<u>**CONFIDENTIAL EXHIBIT**</u>

**Filed Under Seal**
**Pursuant to Protective Order (Dkt. No. 25)**

# Exhibit A

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF F WASHINGTON

AT TACOMA

_____

C.P., by and through his parents,  )

Patricia Pritchard and Nolle       )

Pritchard and PATRICIA PRITCHARD,  )

      Plaintiffs,                  )

  vs.                                ) No. 3:20-cv-06145-RJB

BLUE CROSS BLUE SHIELD OF          )

ILLINOIS,                          )

      Defendant.                   )

_____

ZOOM VIDEO DEPOSITION UPON ORAL EXAMINATION

OF

KIM REED 30(b)(6)

_____

10:13 a.m.

June 2, 2022

REPORTED BY:  Pat Lessard, CCR #2104

30(b)(6) Kim Reed                                    June 2, 2022

Page 11

1              Are you currently employed?

2        A.   I'm employed by HCSC.

3        Q.   And what's the relationship between HCSC and

4    Blue Cross Blue Shield of Illinois?

5        A.   My understanding is that Blue Cross

6    Blue Shield of Illinois is part of HCSC, which is five

7    different health plans:  Blue Cross of Montana,

8    Illinois, New Mexico, Oklahoma, Texas, plus other

9    subsidiary companies as well.

10             So Blue Cross Blue Shield of Illinois is a

11    part of HCSC.

12        Q.   Thank you.  What is your role at HCSC at

13    present?

14        A.   I currently serve as the vice president for

15    medical policy.  So that's my title and my role.

16        Q.   What are your responsibilities as vice

17    president for medical policy?

18        A.   So I oversee the development of medical

19    policy at HCSC.  I have a team of staff, including

20    nurses and physicians, that are involved in the

21    medical policy development process.  So I oversee that

22    process.

23             We also include physicians from other parts

24    of the company, the various state plans that

25    participate in that as well.

30(b)(6) Kim Reed                                    June 2, 2022

Page 12

1           I also oversee the clinical appeals team.

2   So I have a physician that oversees that and he has

3   other physicians on his team that work in that area.

4           And I also provide clinical support for a

5   variety of other activities, mental health parity,

6   preventative care services, you know, and provide

7   overall clinical support as needed for other

8   initiatives.

9       Q.    Thank you.   In your role overseeing the

10  development of medical policy, does that entail

11  clinical research for policy development?

12      A.    Well, when you say "clinical research," we

13  don't do clinical research here.

14          As part of our medical policy development

15  process we look at and evaluate research that has been

16  done in the medical development process.

17      Q.    What are the types of sources of information

18  that you review in developing medical policy?

19      A.    Well, there's a wide variety of resources

20  that we would use.   You know, the foundation for our

21  medical policies is based on the evidence-based

22  clinical literature that's out in the scientific

23  community.

24          So articles that are published in, you know,

25  respected journals like the New England Journal of

Page 13

1    Medicine, the Journal of the American Medical

2    Association.  A wide variety of scientific

3    publications.

4              And we look at resources that we have as

5    being part of the Blue Cross Blue Shield association

6    where we have access to their medical policy

7    resources.

8              We look at what other personal health plans

9    or government programs are looking at in terms of

10   medical policy.

11             So there's a broad scope of resources that

12   we use to look at what the current thinking is behind

13   medical policy for certain services, whether it's

14   drugs or devices or procedures or, you know, a whole

15   host of different services.

16        Q.   In what circumstances would HCSC feel the

17   need to develop a medical policy for a particular

18   service?

19             MS. PAYTON:  Object to the form.  Object to

20   the form of the question.

21        Q.   (By Mr. Gonzalez-Pagan)  Let me restate

22   that.

23             What is the purpose of a medical policy?

24        A.   Well, fundamentally the medical policy is to

25   give a statement about what our coverage position

30(b)(6) Kim Reed                                    June 2, 2022

1   would be for a certain service or procedure or device

2   or pharmaceutical.

3            In general it would not be possible to have

4   a medical policy for every single thing that could

5   possibly be considered as part of a medical service.

6            But in general we try to develop medical

7   policies for those things or those services where

8   there would be questions from providers or members or

9   whomever in terms of what our coverage position, you

10  know, might be, so that we can provide clarity in

11  terms of those things that we would consider to be

12  medically appropriate, medically necessary, and those

13  things that we would otherwise consider not to be

14  medically necessary.

15       Q.   Thank you.  And how long have you been in

16  your current role as the vice president for medical

17  policy?

18       A.   I've been at HCSC for 25 years.  As best as

19  I recall, I believe I have -- and I've been in a

20  variety of different roles -- but I believe roughly

21  seven or eight years as overseeing medical policy.

22       Q.   And you mentioned that you have been in

23  other roles prior to that.

24            Did these roles have to do with the

25  development of medical policy as well?

30(b)(6) Kim Reed                                      June 2, 2022

Page 22

1    Blue Shield of Illinois's organizational

2    representative regarding Topic 5.

3            Are you prepared to testify as to that topic

4    here today?

5       A.   Yes.

6       Q.   Previously we established that Blue Cross

7    Blue Shield of Illinois has a number of medical

8    policies the purpose of which is to provide clarity to

9    providers and members as to what is covered and how on

10   their Blue Cross Blue Shield of Illinois plans, is

11   that correct?

12      A.   Yes.

13      Q.   And then you gave us some testimony about

14   how you review a number of the scientific literature

15   and studies and standards of care in developing these

16   policies, is that correct?

17      A.   Yes.

18      Q.   In developing these policies, these medical

19   policies, do you also consult with specialists in the

20   field with regards to particular aspects of health

21   care?

22      A.   That's frequently part of our process where

23   we would actually reach out to, you know, other

24   specialists within the field or reach out in terms of

25   getting a specialized consultation from various

30(b)(6) Kim Reed                                    June 2, 2022

Page 27

1   administration of exogenous endocrine agents to induce

2   feminizing or masculinizing changes, i.e., hormone

3   replacement therapy; gender-affirming or

4   sex-reassignment surgery or procedures and other

5   medical services or preventative medical care provided

6   to treat gender dysphoria and/or related diagnoses as

7   outlined in the World Professional Association for

8   Transgender Health, Standards of Care for the Health

9   of Transsexual, Transgender and Gender nonconforming

10  people, 7th Version."

11          Do we have the same understanding of what

12  I'm referring to then when I talk about

13  gender-affirming health care?

14      A.   I think so, yes.

15      Q.   Does Blue Cross Blue Shield of Illinois have

16  a medical policy with regards to gender-affirming

17  health care?

18      A.   We have a medical policy that I believe is

19  entitled "Gender Assignment and Gender-Reassignment

20  Surgery," which I think would encompass treatment of

21  individuals who are seeking gender-affirming health

22  care.

23          MR. GONZALEZ-PAGAN:  Thank you.  I know we

24  have a couple more minutes left.

25          I think this might be a good place to stop,

30(b)(6) Kim Reed                                    June 2, 2022

                                                          Page 30

1    Gender-Assignment Surgery and Gender-Reassignment

2    Surgery with Related Services policy?

3         A.   Well, if we actually look at the policy

4    itself it has a history on it.

5              I did look at it, you know, within the past

6    couple days.  But the specific answer to that would be

7    actually in the policy.

8              I want to say it's been since around 2008

9    but I would have to look at the policy to see the

10   history.

11        Q.   Okay.

12        A.   To see how long we've had it.

13        Q.   Well, we'll look at some different

14   variations of the policy over time in a second.

15             Do you know whether Blue Cross Blue Shield

16   of Illinois had a blanket exclusion for

17   gender-affirming care at one point?

18        A.   Are you saying an exclusion based on the

19   Certificate of Benefits or an exclusion based on

20   medical policy?

21        Q.   Based on medical policy.

22        A.   My understanding is that there was a time,

23   yes, where the policy, if we look at versions of the

24   policy from a number off years ago, that there was a

25   language that indicated that it was not medically

1   necessary.

2        Q.   Let's take a look at Exhibit 31, if you can,

3   please.

4             (Marked Deposition Exhibit No. 31.)

5             MS. PAYTON:  Do you want help with that?

6             THE WITNESS:  Let me see.  I'm getting it

7   here.

8        A.   Okay.  I think I have it.

9        Q.   (By Mr. Gonzalez-Pagan)  Do you recognize

10  this document?

11       A.   Yes.

12       Q.   What is it?

13       A.   The document that I have is Gender

14  Assignment Surgery and Gender Reassignment Surgery

15  with Related Services with an effective date of

16  10/1/2016.

17       Q.   Now previously you indicated that you

18  reviewed some of Plaintiff C.P.'s medical records in

19  preparation for your testimony today, is that right?

20       A.   That's correct.

21       Q.   Would this be the policy that was in effect

22  at the time that Plaintiff C.P. was prescribed a

23  puberty blocker in November of 2016?

24       A.   This would be, based on the date of this

25  policy, October of 2016, I believe it would be the

30(b)(6) Kim Reed                                          June 2, 2022

Page 33

1        Q.   Were you the VP of medical policy in

2    November of 2015?

3        A.   I would have to pull the records to see.  I

4    mean I know that I've been, as I said, roughly around

5    that time, but I would have to look into the documents

6    to see.

7        Q.   Okay.  Based on your review of the various

8    medical policies and conversations with some

9    physicians and others at HCSC in preparation for

10   today's deposition do you know when Blue Cross

11   Blue Shield of Illinois decided to cover

12   gender-affirming care under its medical policy?

13       A.   I'm just looking here at the document,

14   looking at the history of it.  Because I think that

15   outlines basically the history of how the policy was

16   updated and changed.

17            It appears, based on what I'm looking at,

18   that it was roughly around 2015.

19       Q.   Okay.

20       A.   Because the document says that document

21   update of literature review, multiple coverage changes

22   from experimental/investigational and/or unproven to

23   medically necessary, primary and secondary gender

24   reassignment surgeries and related terms.

25            So I believe it would be roughly around that

30(b)(6) Kim Reed                                    June 2, 2022

                                                        Page 34

1    time in November of 2015 based on the history of the

2    medical policy.

3         Q.   Let's go down two entries on the History, if

4    you don't mind, or the entry dated March 15, 2013.

5              Do you see that?

6         A.   Yes, I do.

7         Q.   It states "Document updated with literature

8    review.  Coverage unchanged.  The following was added:

9    Gender reassignment surgery and related services for

10   those members with a contract or a certificate of

11   coverage that would allow for gender reassignment

12   surgery when specific criteria are met."

13             Does this mean that Blue Cross Blue Shield

14   of Illinois didn't change its policy per se but that

15   it would allow members to override it in 2013, to

16   cover, to allow for coverage?

17             MS. PAYTON:  Object to the form, "Member."

18        A.   So yes.  And in relation to your prior

19   question, the update in 2013 would indicate to me that

20   if there were groups, clients, that had decided to

21   have benefits for this type of services that there

22   would be criteria that would be included in terms of

23   determining whether they were medically necessary for

24   those individuals.

25        Q.   (By Mr. Gonzalez-Pagan)  Who would set forth

30(b)(6) Kim Reed                                    June 2, 2022

Page 35

1   those criteria?

2       A.    The criteria would be set through the

3   Medical Policy Committee.

4       Q.    I'm not trying to be obtuse here.  I'm

5   trying to understand.

6       A.    Yes.

7       Q.    There's a medical policy that was

8   established going back to 2006.  It didn't allow for

9   coverage.

10          In 2013 there was a change to allow groups

11  to provide that coverage if certain criteria are met.

12          Does that mean that the criteria was set by

13  the Medical Policy Committee, if you will -- just to

14  clarify, let me go back, actually, one basic question.

15          So does this medical policy apply to

16  non-self-funded plans sold or provided by Blue Cross

17  Blue Shield of Illinois?

18          MS. PAYTON:  Object to the form of the

19  question.

20      A.    So my understanding is that this medical

21  policy would apply for insured plans and other

22  self-insured plans that may choose to include coverage

23  under our medical policy.

24      Q.    (By Mr. Gonzalez-Pagan)  Okay.  Thank you.

25          Just to clarify the question, then, here.

30(b)(6) Kim Reed                                        June 2, 2022

Page 36

 1   Does this medical policy apply to insured plans
 2   provided by Blue Cross Blue Shield of Illinois?
 3        A.   The medical policies that we have in place,
 4   yes, typically are applicable to insured plans.  I
 5   can't speak to whether there may be some exceptions
 6   for an insured plan that wants to make some sort of
 7   other exception to it.
 8             But in general, yes.
 9        Q.   So just to go back and understand the change
10   that occurred in 2013, does this mean that members
11   with self-funded plans could choose to provide
12   coverage in accordance with certain criteria set by
13   the Medical Policy Committee but that that coverage
14   was not available for insured plans in 2013?
15             MS. PAYTON:  Object to the form of the
16   question.
17        A.   I think --
18        Q.   (By Mr. Gonzalez-Pagan)  I'm just trying to
19   understand what happened in 2013, right, so.
20        A.   Yeah.  So the best of my understanding is
21   that in 2013 the update to the policy was that there
22   were medical criteria that were established that would
23   allow coverage based on clinical criteria for those
24   groups that wanted to include coverage for this
25   condition.

Page 37

1        Q.   Thank you.  And just to clarify when we talk
2    about groups we're talking about self-funded plans,
3    not insured plans?
4        A.   Yes.
5        Q.   Thank you.  Okay.
6             So in 2013 some group members were able to
7    provide coverage in accordance with medical criteria
8    established and then the medical policy was changed in
9    2015 to apply to not just those group plans that
10   wanted it to but also to insured plans overall, is
11   that correct?
12            MS. PAYTON:  Object to the form.
13       A.   If you can give me a moment.  I'm just
14   looking at the language here.
15       Q.   (By Mr. Gonzalez-Pagan)  Sure.  Take your
16   time.
17       A.   My understanding is that in 2013 the policy
18   was updated so that those groups that chose to provide
19   services for gender reassignment would have coverage
20   available based on clinically based medical criteria.
21            In 2015, the document to me suggests that
22   there were just updates made to the policy based on
23   clinical criteria.
24       Q.   And the establishment of those medical --
25   sorry.  The establishment of those specific criteria,

30(b)(6)  Kim Reed                                June 2, 2022

Page 38

1   was it based on scientific evidence and the review of
2   medical literature?
3        A.   Yes.  All of our policies, whether it's this
4   policy or any other medical policy, are based on a
5   review of the scientific literature.
6             And specifically for this policy to see what
7   those references are they're included in the policy
8   itself to cite which references were reviewed that
9   were the basis for the policy.
10       Q.   What prompted the multiple coverage changes
11  from experimental/investigational and/or unproven to
12  medically necessary in 2015?
13            MS. PAYTON:  Object to the form.
14       A.   Well, my recollection is that -- you know,
15  as a routine process that we had in terms of medical
16  policy development we do at least an annual review of
17  the literature.
18            And, you know, similar to other policies,
19  the literature changes and there's discussion about
20  what we believe to be appropriate clinical criteria
21  either to approve or not approve coverage for certain
22  procedures.
23            And I think this was done in a similar
24  fashion where there was a routine update of the
25  policy, consideration of new and emerging literature

30(b)(6) Kim Reed                                     June 2, 2022

Page 39

1   and information from various sources.

2             I do recall that as part of those

3   discussions in around that time there was a review of

4   the WPATH recommendations or guidelines.  And WPATH,

5   I'm sure you know, is the World Association of

6   Transgender Health.

7             So that was considered as well, along with

8   other scientific literature.

9        Q.   (By Mr. Gonzalez-Pagan)  Thank you.

10            Did the passage of the Illinois legislative

11   mandate referenced on the first page of this document

12   have anything to do with the changes to medical policy

13   in 2015?

14            MS. PAYTON:  Object to the form.

15       A.   Well, as I mentioned before, we have a

16   common medical policy across the various states within

17   HCSC.  So we don't have different medical policies for

18   Montana or Illinois or New Mexico or any other state

19   because the clinical evidence is what it is.

20            If there's a legislative mandate or a

21   regulation that lies on top of the medical policy then

22   clearly we would have to adhere to any legislative

23   mandate that was in force for any of the divisions

24   within HCSC.

25       Q.   (By Mr. Gonzalez-Pagan)  So because any --

30(b)(6) Kim Reed                                          June 2, 2022

Page 41

1            "Psychological services, including but not
2     limited to psychotherapy, social therapy and family
3     counseling and/or
4            "Chest surgery for FTM individuals."
5            Did I read that correctly?
6       A.   Yes.
7       Q.   And FTM refers to individuals who are
8     assigned female at birth but identify as male, is that
9     correct?
10      A.   Yes.  It's a transition from female to male.
11      Q.   Based on what we just read, the provision of
12    puberty blockers or puberty-suppressing hormones could
13    be considered medically necessary in postdating
14    October 1st, 2016, is that right?
15      A.   Yes.
16      Q.   And based on what we just read, the
17    provision of chest surgery for individuals who are
18    transitioning from female to male could be considered
19    medically necessary even if they are an adolescent?
20      A.   Yes.
21      Q.   Are you familiar with what a Vantas implant
22    is?
23      A.   My understanding is that it's a drug
24    implanted surgically that for individuals who are
25    transitioning in terms of gender can be used as a

30(b)(6) Kim Reed                                          June 2, 2022

                                                               Page 42

1    puberty blocker.

2          So it's a type of hormonal therapy.

3    Q.    Under this policy would a Vantas implant be

4    covered as treatment for adolescent gender dysphoria

5    as being medically necessary?

6          MS. PAYTON:  I'll object to the form of the

7    question.

8          And I just -- I want to put on the record,

9    Omar, I think you know this but I want to make sure

10   it's clear that we have informed you we are not

11   raising a standing affirmative defense in the case.

12         MR. GONZALEZ-PAGAN:  That's understood.

13         MS. PAYTON:  Okay.

14         MR. GONZALEZ-PAGAN:  I will still continue

15   with the line of questioning but I appreciate that.

16         Thank you.

17         MS. PAYTON:  Okay.  So object to the form.

18   Q.    (By Mr. Gonzalez-Pagan)  Let me restate my

19   question, Doctor, if you don't mind.

20         Under this policy, the 2016 policy, under

21   this policy a Vantas implant would have been covered

22   as treatment for adolescent gender dysphoria if deemed

23   medically necessary, correct?

24   A.    Yes, as long as the other criteria within

25   the policy are met.

30(b)(6) Kim Reed                                    June 2, 2022

Page 46

1   Recap," do you see that?

2        A.   Yes.

3        Q.   The second sentence reads "Following

4   regulatory Inquiries/requirements, ACA requirements

5   and ALCU (along with others such as GLAAD)

6   involvement, the change policy became effective on

7   11/6/2015."

8             Do you see that?

9        A.   I do.

10       Q.   Is it fair to say that -- let me go back.

11            So any changes to the medical policy are

12   based on scientific review and medical literature.

13            And you indicated that that included also a

14   review of the WPATH standards of care, is that

15   correct?

16       A.   That's correct.

17       Q.   And was there a discussion also about the

18   nondiscrimination requirements contained in the

19   Affordable Care Act?

20       A.   That was part of the discussion as well,

21   yes.

22       Q.   But ultimately the policy is based on your

23   assessment of the literature and the WPATH standards

24   of care?

25       A.   Yes.

30(b)(6) Kim Reed                                    June 2, 2022

Page 50

1   characteristic services being needed to be taken to

2   the 1557 work group for rediscussion.

3              Is that right?

4       A.   That's what it indicates, yes.

5       Q.   What is the 1557 workgroup?

6       A.   I believe that the 1557 refers to what I

7   think is a federal regulation related to

8   nondiscrimination.

9       Q.   Do you know who was in the Section 1557

10  workgroup?

11      A.   I'm sorry, I didn't understand that.

12      Q.   Do you know who was on the 1557 workgroup?

13      A.   I believe there were a variety of

14  individuals from the legal and regulatory management

15  area as well as legal counsel and others within HCSC.

16      Q.   Do you know what was the charge of the

17  workgroup?

18      A.   Well, I believe the charge of the workgroup

19  was to make sure that HCSC was in compliance with any

20  regulatory requirements under 1557.

21      Q.   Since the enactment of the Affordable Care

22  Act Section 1557 have all changes to this medical

23  policy gone through the Section 1557 workgroup?

24      A.   I'm so sorry.  I didn't catch what you

25  asked.

30(b)(6) Kim Reed                                    June 2, 2022

Page 52

```
 1        A.   WPATH was a significant consideration in
 2   developing the policy.
 3        Q.   Thank you.  I appreciate that.  I guess any
 4   question is a little bit different.  Let me rephrase
 5   it.
 6             Does Blue Cross Blue Shield of Illinois
 7   consider care provided in accordance with the WPATH
 8   Standards of Care to meet its medical necessity
 9   requirements?
10             MS. PAYTON:  Object to the form.
11        A.   To the extent that if you look at our
12   medical policy it is in conformance with current WPATH
13   guidelines and recommendations.
14        Q.   (By Mr. Gonzalez-Pagan)  Thank you.  Let's
15   turn to -- let me ask you one more question before we
16   move on.
17             And we can even make reference to
18   Exhibit 31, if you want.
19             We previously established that Exhibit 31,
20   the 2016 medical policy, would have been the one in
21   effect at the time that Plaintiff C.P. was prescribed
22   a Vantas medical implant in November of 2016, is that
23   correct?
24        A.   Yes.
25        Q.   So the use of a Vantas implant to treat
```

30(b)(6) Kim Reed                                    June 2, 2022

Page 53

1   C.P.'s gender dysphoria would have been covered under

2   the 2016 medical policy, is that correct?

3           MS. PAYTON:  Object to the form.

4       A.   Based on the medical records that I reviewed

5   my opinion is that it would have been eligible for

6   coverage based on the criteria.

7           Again, I didn't review the record.  I

8   didn't, you know, make a decision on that.  But based

9   on the records that I reviewed I think it would.

10          MR. GONZALEZ-PAGAN:  Thank you.

11          If we could turn to Exhibit 33.

12              (Marked Deposition Exhibit No. 33.)

13      A.   Okay.

14      Q.   (By Mr. Gonzalez-Pagan)  It's the Medical

15  Policy -- well, do you recognize this document?

16      A.   Yes, I do.

17      Q.   Okay.  And these are the Medical Policy

18  Discussion Conference Call Minutes for February 23rd,

19  2021, is that correct?

20      A.   Yes.

21      Q.   If we go to the last page of the document.

22      A.   Okay.

23      Q.   On the third bullet point it reads "We have

24  decided as a company to follow WPATH."

25          Did I read that correctly?

30(b)(6) Kim Reed                                      June 2, 2022

Page 59

1   transgender."

2           Did I read that correctly?

3       A.   Yes.

4       Q.   Does Blue Cross Blue Shield of Illinois

5   agree with that estimate of the population of

6   transgender individuals?

7           MS. PAYTON:  Object to the form.

8       A.   It's a reference from the American Academy

9   of Pediatrics.

10          I don't think we've taken a position on

11  whether we agree or disagree.  It's simply a

12  reference.

13      Q.   (By Mr. Gonzalez-Pagan)  Sure.  Let me ask

14  that a different way.

15          Does Blue Cross Blue Shield of Illinois have

16  any reason to dispute those numbers used by the

17  American Academy of Pediatrics?

18      A.   No.

19      Q.   If we can move on to Exhibit 34

20          (Marked Deposition Exhibit No. 34.) 34.

21          MS. PAYTON:  Thirty-four?

22          MR. GONZALEZ-PAGAN:  Thirty-four, yes.

23      A.   I have it.

24      Q.   (By Mr. Gonzalez-Pagan)  Do you recognize

25  this document?

30(b)(6) Kim Reed                                    June 2, 2022

Page 60

```
 1        A.   Yes.
 2        Q.   And this is the same medical policy with an
 3   effective date of May 1st, 2019, is that right?
 4        A.   Yes.
 5        Q.   This is the policy that was in place when
 6   the Plaintiff C.P. was provided, prescribed -- let me
 7   start over.
 8             This was the policy that was in place when
 9   the Plaintiff C.P. was prescribed a second Vantas
10   implant, is that right?
11        A.   I believe so, yes.
12        Q.   And under this policy the provision of that
13   Vantas implant would have been considered medically
14   necessary.  Under this policy the provision of that
15   Vantas implant would have been covered if considered
16   medically necessary, is that correct?
17        A.   If it was being covered based on the medical
18   policy, yes.
19        Q.   Just to -- for completeness sake, let's go
20   to the page -- it doesn't have actual numbers, so
21   let's go by the Bates stamp 3369.
22        A.   Okay.
23        Q.   Are you there?
24        A.   Yes.
25        Q.   Okay.  In the middle of the page there's a
```

30(b)(6) Kim Reed                                    June 2, 2022

Page 61

1   subsection -- a heading "Gender Reassignment Surgery

2   and Related Services for Children and Adolescents," is

3   that right?

4       A.   Yes.

5       Q.   Okay.  And this reads exactly the same as

6   the one we read from 2016, is that correct?

7       A.   I believe so, yes.

8       Q.   It also states that chest surgery for female

9   to male adolescents may be considered medically

10  necessary.

11           Is that right?

12      A.   That's correct.

13      Q.   And this is the medical policy in effect in

14  the same year that Plaintiff C.P. received chest

15  reconstruction surgery as part of his treatment for

16  general dysphoria.

17           Is that right?

18      A.   I believe so, yes.

19      Q.   And you reviewed C.P.'s' medical records.

20  Given that he had a referral letter from a mental

21  health provider as well as a doctor to his surgeon for

22  a referral, C.P's chest reconstruction surgery would

23  have been covered as medically necessary under this

24  policy, is that right?

25           MS. PAYTON:  Object to the form.

30(b)(6) Kim Reed                                      June 2, 2022

Page 62

1      A.   Based on the records that I reviewed and the

2   medical policy, yes, I believe it would have been

3   covered.

4              MR. GONZALEZ-PAGAN:   Let's take a two-minute

5   break.

6              THE VIDEOGRAPHER:   We're going off the

7   record at 1:14 p.m.

8                  (Recess.)

9              THE VIDEOGRAPHER:   We're back on the record

10   at 1:16 p.m.

11             MR. GONZALEZ-PAGAN:   Dr. Reed, I'm just

12   going to refer you to Exhibit 37.

13                 (Marked Deposition Exhibit No. 37.)

14      A.   Exhibit 37?

15      Q.   (By Mr. Gonzalez-Pagan)   Yes.

16      A.   Okay.  I have it.

17      Q.   This is another version of the gender

18   assignment surgery and gender-reassignment surgery

19   with related services medical policy, is that correct?

20      A.   Yes.

21      Q.   And do you recognize this document?

22      A.   I do.

23      Q.   And if you go to page 18 you see that this

24   document was last updated on January 15, 2021 where it

25   added a couple of references based on the literature

30(b)(6) Kim Reed                                    June 2, 2022

Page 64

```
 1   following or finding the sections that are relevant.
 2        Q.   (By Mr. Gonzalez-Pagan)  And I just want to
 3   take you to page two, Note 2 of the document.
 4             And the first sentence reads "Psychotherapy
 5   is not required for gender reassignment services
 6   except when a mental health professional recommends
 7   psychotherapy based on initial assessment prior to
 8   gender reassignment surgery."
 9             Did I read that correctly?
10        A.   Yes.
11        Q.   Just to clarify, in order to obtain surgery
12   there's a requirement that there be a referral from a
13   mental health provider but there's no requirement that
14   there be ongoing psychotherapy, is that correct?
15             MS. PAYTON:  Object to the form.
16        A.   I believe that's correct, yes.
17        Q.   (By Mr. Gonzalez-Pagan)  Are you aware based
18   Blue Cross Blue Shield -- well, are you aware based on
19   HCSC's medical policies whether Vantas implants are
20   covered for other conditions separate from the
21   treatment for gender dysphoria?
22             MS. PAYTON:  Object to the form, scope.
23        A.   You know, as an emergency medicine physician
24   this isn't an area of my expertise, but I'm generally
25   aware that there could be other indications for this
```

30(b)(6) Kim Reed                                    June 2, 2022

Page 65

```
 1    type of treatment.
 2              MR. GONZALEZ-PAGAN:  Okay.  I think that's
 3    it for us unless there's any redirect.
 4              MS. PAYTON:  No redirect.  Thank you.
 5              MR. GONZALEZ-PAGAN:  Okay.  I do want to
 6    make a statement on the record just for purposes -- I
 7    just want to put on the record that there's a pending
 8    motion to compel some documents.
 9              We received some discovery from defendants
10    late last night that we have been unable to review.
11    And given that, you know, we may -- we reserve the
12    ability to recall any of today's 30(b)(6) witnesses,
13    given that there's some late-produced discovery and
14    there's an ongoing motion to compel issue.
15              But I appreciate your time today, Dr. Reed.
16              Thank you for you testimony.
17              MS. PAYTON:  Our position for that if is
18    there any unanswered question that -- I don't believe
19    that there is anything pending -- you know, we're here
20    to answer it.
21              What was produced yesterday was all that
22    privileged stuff that we are agreeing to let you
23    review under the agreement that there is no waiver.
24    It's not really germane to any of this testimony.
25              And I believe it might have also been --
```