HONORABLE JUDGE ROBERT J. BRYAN

1
2
3
4
5
6
7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

8
9
10

C. P., by and through his parents,
Patricia Pritchard and Nolle Pritchard;
and PATRICIA PRITCHARD,

11

                                              Plaintiffs,

12

         vs.

13
14

BLUE CROSS BLUE SHIELD OF
ILLINOIS,

15

                                              Defendant.

16

Case No. 3:20-cv-06145-RJB

**BLUE CROSS BLUE SHIELD OF**
**ILLINOIS'S MOTION FOR SUMMARY**
**JUDGMENT**

**ORAL ARGUMENT REQUESTED**

**NOTE ON MOTION CALENDAR:**
**SEPTEMBER 23, 2022**

17
18
19
20
21
22
23
24
25
26
27

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................1

II.   STATEMENT OF MATERIAL FACTS ................................................................2

     A.    CHI Designed the Plan and Hired BCBSIL as its Third-Party Administrator. .......2

     B.    Based on CHI's Plan Terms, BCBSIL Denied Coverage for Treatments for or Leading to Gender Reassignment Surgery for C.P. ...................................................3

     C.    BCBSIL Does Not Receive Federal Financial Assistance to Administer the CHI Plan. ...........................................................................................................................3

     D.    Plaintiffs Filed an Individual Complaint and then Added Claims for Class-Wide Relief Over a Year Later. ..........................................................................................4

III.  ARGUMENT ..........................................................................................................4

     A.    BCBSIL Cannot Be Liable for Alleged Violations of Section 1557 Because BCBSIL Is Not the Source of the CHI Plan Design. ................................................4

     B.    BCBSIL May Administer the Exclusion Because It Is Protected by RFRA. ..........7

         1.    The Exclusion Is Allowed Under RFRA. ....................................................8

         2.    BCBSIL May Administer the Exclusion Because It Is Protected by RFRA. ..........................................................................................................8

         3.    BCBSIL Has Standing to Argue that Its Administration of the CHI Plan Fully Complies with the Law. ....................................................................9

             a.    BCBSIL has Article III standing to defend its enforcement of the RFRA-Protected Exclusion. ..........................................................9

             b.    An alleged lack of prudential standing does not apply here, but even if it did, BCBSIL could satisfy its requirements. ..................10

     C.    Section 1557 Does Not Apply to BCBSIL Because It Does Not Receive Any Federal Financial Assistance for its TPA Activities. ..............................................13

     D.    The Exclusion Does Not Discriminate on the Basis of Sex Because There Is No Medical Consensus Regarding Gender-Affirming Treatment. .............................16

     E.    BCBSIL Is Entitled to Summary Judgment on Plaintiffs' Claims for Emotional Distress Damages. ..................................................................................................23

IV.  CONCLUSION .....................................................................................................23

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – i

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

# TABLE OF AUTHORITIES

**Cases**

*Bostock v. Clayton County,*
   140 S. Ct. 1731 (2020) .................................................................................. 18, 19

*Burwell v. Hobby Lobby Stores*, Inc.,
   573 U.S. 682 (2014) ...................................................................................... 8, 9, 10

*Chevron, U.S.A., Inc. v. NRDC, Inc.,*
   467 U.S. 837 (1984) ...................................................................................... 7, 17

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ...................................................................................... 10

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
   142 S. Ct. 1562, *reh'g denied*, 142 S. Ct. 2953 (2022) ............................ 2, 3, 23

*Dep't. of HHS. v. CNS Int'l Ministries,*
   No. 15-775, 2016 WL 2842448 (U.S. May 16, 2016) ................................ 5

*Doe v. Snyder,*
   28 F.4th 103 (9th Cir. 2022) ....................................................... 2, 20, 21, 22

*Epona, LLC v. County. of Ventura,*
   876 F.3d 1214 (9th Cir. 2017) ..................................................................... 12

*Estrada-Hernandez v. Holder,*
   108 F. Supp. 3d 936 (S.D. Cal. 2015) ........................................................ 7

*Franciscan All. Inc. v. Becerra,*
   No. 21-11174, 2022 WL 3700044 (5th Cir. Aug. 26, 2022) ...................... 6, 18

*Franciscan All., Inc. v. Azar,*
   414 F. Supp. 3d 928 (N.D. Tex. 2019) ....................................................... 6

*Franciscan All., Inc. v. Becerra,*
   553 F. Supp. 3d 361 (N.D. Tex. 2021), *amended*, No. 7:16-cv-00108-O, 2021 WL 6774686
   (N.D. Tex. Oct. 1, 2021) .............................................................................. 6, 18

*Franciscan All., Inc. v. Becerra,*
   843 F. App'x 662 (5th Cir. 2021) ................................................................ 6

*Franciscan All., Inc. v. Burwell,*
   227 F. Supp. 3d 660 (N.D. Tex. 2016) ....................................................... 6, 7, 17, 18

*Henry Ford Health Sys. v. Dep't of Health & Hum. Servs.,*
   654 F.3d 660 (6th Cir. 2011) ....................................................................... 13

*Hobby Lobby Stores, Inc. v. Sebelius,*
   723 F.3d 1114 (10th Cir. 2013) ................................................................... 9, 10, 11

*Kowalski v. Tesmer,*

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA 98101
(206) 626-7713  FAX: (206) 260-8946

543 U.S. 125 (2004) ........................................................................................... 11

*Kreis v. Sec'y of the Air Force,*
   406 F.3d 684 (D.C. Cir. 2005) ........................................................................ 7

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
   572 U.S. 118 (2014) ...................................................................................... 11

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
   140 S. Ct. 2367 (2020) ........................................................................... 8, 9, 10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) .......................................................................................... 7

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,*
   210 F.3d 1099 (9th Cir. 2000) ........................................................................ 4

*Peralta v. Hispanic Bus., Inc.,*
   419 F.3d 1064 (9th Cir. 2005) ...................................................................... 12

*Religious Sisters of Mercy v. Azar,*
   513 F. Supp. 3d 1113 (D.N.D. 2021) ................................................. 13, 14, 18

*Sharpe Holdings, Inc. v. U.S. Dep't of Health & Hum. Servs.,*
   801 F.3d 927 (8th Cir. 2015) .......................................................................... 5

*Takeda v. Nw. Nat. Life Ins. Co.,*
   765 F.2d 815 (9th Cir. 1985) ........................................................................ 12

*Thomas Jefferson University v. Shalala,*
   512 U.S. 504 (1994) ........................................................................................ 7

*Tovar v. Essentia Health,*
   342 F. Supp. 3d 947 (D. Minn. 2018) ............................................................. 6

*Triton Energy Corp. v. Square D Co.,*
   68 F.3d 1216 (9th Cir. 1995) .......................................................................... 4

*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP,*
   549 F.3d 100 (2d Cir. 2008) ..................................................................... 11, 12

*Washington v. United States Department of Health & Human Services,*
   482 F. Supp. 3d 1104 (W.D. Wash. 2020) ............................................... 15, 16

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.,*
   485 F. Supp. 3d 1 (D.D.C. 2020), *appeal dismissed*, No. 20-5331, 2021 WL 5537747 (D.C.
   Cir. Nov. 19, 2021) ................................................................................. passim

**Statutes**

29 U.S.C. § 1104(a)(1)(D) ................................................................................ 5, 9

42 C.F.R. § 92.3(b) ........................................................................................... 16

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – iii

42 U.S.C. § 18116(a) ............................................................................................ 16

42 U.S.C. § 2000bb-1(a) ........................................................................................ 8

42 U.S.C. § 2000bb-1(c) ........................................................................................ 9

45 C.F.R. § 147.132(a)(2)(i) .................................................................................. 9

45 C.F.R. § 147.132(a)(2)(ii) ................................................................................. 9

45 C.F.R. § 92.3(b) ......................................................................................... 13, 14

45 C.F.R. § 92.3(c) .......................................................................................... 13, 14

45 C.F.R. § 92.6(b) ................................................................................................. 8

Affordable Care Act ("ACA") ............................................................................... 1

Civil Rights Act of 1964 ........................................................................................ 1

Employee Retirement Income Security Act of 1974 ("ERISA") ........................... 1

Religious Freedom Restoration Act ("RFRA") ...................................................... 1

**Rules & Regulations**

Fed. R. Civ. P. 56 .................................................................................................. 4

**Other Authorities**

13A Wright & Miller, Federal Practice & Procedure  § 3531.9.3 (3d ed.) ...................... 12

Nondiscrimination in Health and Health Education Programs or Activities, 85 Fed. Reg. 37 (June 19, 2020) ................................................................................................. 6

Nondiscrimination in Health and Health Education Programs or Activities, 87 Fed. Reg. 47 (August 4, 2022) ................................................................................................. 5

Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31 (May 18, 2016) .............. 6

*Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (7th ed., 2011) ......................................................................................... 19

*Vantas*, RxList (Nov. 29, 2021), https://www.rxlist.com/vantas-drug.htm#indications ................ 3

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – iv

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

# I.      **INTRODUCTION**

Defendant Blue Cross and Blue Shield of Illinois ("BCBSIL") moves for summary judgment on Plaintiffs C.P. and Patricia Pritchard's ("Plaintiffs") claims.  This action is a claim for health care benefits under the Catholic Health Initiative's ERISA Welfare Benefit Plan, a self-insured plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA") and sponsored by CommonSpirit Health (f/k/a Catholic Health Initiatives) ("CHI" and the "CHI Plan").  BCBSIL is the third-party administrator ("TPA") for the CHI Plan.  Named Plaintiff C.P. is a minor transgender boy, and he and his parents have brought a claim on behalf of themselves and a class of individuals seeking coverage for transgender-related services.

BCBSIL denied Plaintiffs' claims because the CHI Plan excludes claims related to gender reassignment surgery.  Plaintiffs allege that this Court should invalidate the exclusion in the CHI Plan because it violates prohibitions against discrimination on the basis of sex pursuant to Section 1557 of the Affordable Care Act ("ACA").  The ACA incorporates Title IX of the federal Civil Rights Act of 1964.

Plaintiffs' Section 1557 claim fails as a matter of law.  First, the Department of Health and Human Services ("HHS") recently clarified its interpretation of Section 1557, explaining that TPAs cannot be liable for a plan's violation of the statute if, as here, the TPA is not the source of the plan design.  The Court must defer to this interpretation unless it is arbitrary and capricious, and it is not.

Second, BCBSIL is not liable because it is administering benefits consistent with an exclusion protected by the Religious Freedom Restoration Act ("RFRA").  CHI included the exclusion for faith-based reasons, and therefore it is protected by RFRA.  The courts and HHS agree that a TPA does not violate Title IX or the ACA if it administers a plan exempted by RFRA from compliance with Title IX or the ACA, and BCBSIL has standing to raise a RFRA defense.

Third, BCBSIL is entitled to summary judgment because the ACA does not apply to BCBSIL's activities as a TPA.  The ACA is clear that Title IX applies only to programs that receive federal funding.  As a result, BCBSIL's TPA activities are not subject to Section 1557 as a matter of law.

Fourth, the exclusion at issue does not violate Title IX or the ACA by discriminating on the basis of sex because there are sound reasons grounded in medical science that could support the CHI Plan's exclusion. There is no clear medical consensus that surgery (especially on minors) is the appropriate treatment for gender dysphoria, as demonstrated by the testimony of Dr. Michael Laidlaw, the Ninth Circuit in *Doe v. Snyder*, and the Centers for Medicare & Medicaid Services ("CMS").

Finally, BCBSIL is entitled to summary judgment on Plaintiffs' claims for emotional distress damages because the United States Supreme Court recently made clear that emotional distress damages categorically are not recoverable in a private action brought under the ACA. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, *reh'g denied*, 142 S. Ct. 2953 (2022).

## II.    STATEMENT OF MATERIAL FACTS

The named Plaintiffs are C.P., a minor, and his mother, Patricia Pritchard.  Dkt 38 ("Am. Compl."), ¶ 3.  Plaintiffs are covered under the CHI Plan, a self-funded employee welfare benefits plan under ERISA.  *See generally* Am. Compl., App. A.  CHI is the Plan Sponsor, and BCBSIL is the TPA.  Am. Compl. ¶ 14.  The CHI Plan is self-insured so the CHI Plan, not BCBSIL, is responsible for paying all health care benefits to its members.  Am. Compl., App. A at 8.

### A.    CHI Designed the Plan and Hired BCBSIL as its Third-Party Administrator.

Catholic Health Initiatives designed the CHI Plan.  Payton Decl., Ex. A.  This is typical because self-insured ERISA plans usually design their own coverages.  Payton Decl., Ex. B ("Burns Decl."), ¶ 18.  The employer chooses what medical services it will cover for employees and then hires an administrator, like BCBSIL, to provide employees with a network of providers, process claims, and handle provider billing.  Burns Decl., ¶ 17.[1]

---

[1] Employers, such as CHI, sponsor insurance for their workers in one of two ways.  Some employers purchase insurance from a company such as BCBSIL, which is referred to as "fully insured" because the insurance risk rests with the insurer.  *See* Burns Decl. at ¶ 17.  Other employers, including the majority of large employers, CHI among them, are "self-insured" and directly assume financial responsibility for employees' medical claims and administrative costs and use their own money to pay health care costs.  *Id.*

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – 2

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

**B.      Based on CHI's Plan Terms, BCBSIL Denied Coverage for Treatments for or Leading to Gender Reassignment Surgery for C.P.**

In 2016, C.P. was diagnosed with gender dysphoria at the age of 10.  Payton Decl., Ex. D. That same year, C.P. submitted a preauthorization request to BCBSIL for coverage for a Vantas implant.[2]  Am. Compl. ¶ 59.  In 2016, the Summary Plan Description for Plaintiffs' plan did not contain any language addressing transgender-related services.  Payton Decl., Ex. E. In its predetermination of benefits, BCBSIL initially stated that the Vantas implant would be covered under the CHI Plan, but BCBSIL later determined that the procedure had been covered in error because transgender-related services were "not covered under the terms of [Plaintiffs'] group health plan through Catholic Health Initiatives."  Payton Decl., Ex F.  Due to its error, BCBSIL itself paid for Plaintiffs' transgender-related claims but made clear that any future claims for transgender services would not be covered.  *Id.*

In 2018, CHI revised its plan to include the following exclusion:

> Benefits shall not be provided for treatment, drugs, medicines, therapy, counseling services and supplies for, or leading to, gender reassignment surgery.

Payton Decl., Ex. G at 61 (the "Exclusion").  Plaintiffs recognize that CHI itself added the exclusion in its Plan because "coverage of such procedures was 'determined not to align with the teachings and doctrine of the Catholic Church.'"  Am. Compl. ¶ 71, App. H at 4.

In 2019, C.P. submitted a pre-authorization request for a second Vantas implant and for chest reconstruction surgery, also known as "top" or "keyhole" surgery.  Payton Decl., Ex. H. BCBSIL denied the pre-authorization requests for both procedures based on the exclusion.  *Id.*

**C.      BCBSIL Does Not Receive Federal Financial Assistance to Administer the CHI Plan.**

BCBSIL does not receive federal financial assistance for any self-funded ERISA plans. *Id.*, Ex. I ("Larson Decl."), ¶ 3.  BCBSIL does receive federal financial assistance for other products, such as Medicare supplemental coverage, Medicaid, Medicare Advantage and Prescription Drug insurance coverage, and for Medicare/Medicaid dual eligibility.  Larson Decl. ¶

---

[2] Vantas is a prescription medicine originally used to treat the symptoms of advanced prostate cancer.  The Vantas medication is delivered through a non-biodegradable polymer reservoir that is surgically implanted beneath the skin by a surgeon.  *See Vantas*, RxList (Nov. 29, 2021), https://www.rxlist.com/vantas-drug.htm#indications; Payton Decl., Ex. C.

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – 3

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

4.  BCBSIL accounts for all federal payments separately from BCBSIL's administration of self-funded ERISA plans.  *Id.* ¶ 5.

**D.    Plaintiffs Filed an Individual Complaint and then Added Claims for Class-Wide Relief Over a Year Later.**

Plaintiffs filed their initial Complaint on November 23, 2020.  [Dkt. 1].  Plaintiffs sought relief as individuals and alleged a single cause of action, a violation of § 1557 of the ACA.  Plaintiffs alleged that BCBSIL discriminated against C.P. on the basis of sex because he is transgender.  *Id.*  On November 2, 2021, almost a year later, Plaintiffs expanded their Complaint to seek relief on behalf of a proposed class of individuals.  Am. Compl., ¶¶ 89-98.

## III.    ARGUMENT

Summary judgment is appropriate when, viewing the facts in the light most favorable to the non-movant, no genuine issue of material fact exists that would preclude summary judgment as a matter of law.  FED. R. CIV. P. 56.  If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of a dispute of material fact in two ways: (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  Summary judgment should be granted "where the nonmoving party fails to offer evidence from which a reasonable [factfinder] could return a [decision] in its favor."  *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).

**A.    BCBSIL Cannot Be Liable for Alleged Violations of Section 1557 Because BCBSIL Is Not the Source of the CHI Plan Design.**

HHS recently clarified its interpretation of Section 1557 and emphasized that TPAs cannot be liable for a Plan's violation of the ACA or Title IX if, as here, the TPA is not the source of the plan design.  This is because ERISA requires a TPA to administer a self-insured health plan according to its terms.[3]  *See* 29 U.S.C. § 1104(a)(1)(D) (stating benefit plan decisions are required to be made "in

---

[3] Employers like CHI often hire a TPA such as BCBSIL to administer their self-funded plans.  "A self-insured employer bears the financial risk of paying its employees' health-insurance claims rather

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – 4

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

1   accordance with the documents and instruments governing the plan").

2        TPAs therefore can be liable for violations of Section 1557 *only* if they are responsible for

3   plan design.  In its 2022 Notice of Proposed Rulemaking on Section 1557, HHS made clear that

4   "third party administrators [are] generally not responsible for the benefit designs of the self-insured

5   group health plans they administer and that enforcing Section 1557 against a third party

6   administrator for a group health plan with a discriminatory benefit design could result in holding

7   a third party administrator liable for plan designs over which it had no control."  Nondiscrimination

8   in Health and Health Education Programs or Activities, 87 Fed. Reg. 47,824, 47,876 (August 4,

9   2022) (the "2022 Proposed Rulemaking").  Thus, *only* "where the discriminatory terms of the

10  group health plan originated with the third party administrator rather than with the plan sponsor,

11  the third party administrator could be liable for the discriminatory design feature under Section

12  1557."  *Id.*

13       Here, BCBSIL is not responsible for the design of the CHI Plan, including the CHI Plan's

14  Exclusion for gender reassignment surgery.  Payton Decl., Ex. A (Q: "And who drafted [the gender

15  reassignment surgery exclusion in the CHI Plan]?" A: "Catholic Health Initiatives").  Therefore,

16  BCBSIL cannot be liable if the CHI Plan violates Section 1557.  As Plaintiffs themselves have

17  explicitly acknowledged, BCBSIL is not responsible for design of the self-insured plans it

18  administers which exclude transgender-related services.  *See* Plaintiffs' Motion for Class

19  Certification at 1 ("The key issue here is whether a covered entity may administer facially

20  discriminatory Exclusions *at the request of its customers* who may or may not be subject to the

21  ACA themselves") (emphasis added); *id.* ("An ERISA plan administrator cannot 'just follow

22  orders' to administer an illegal exclusion.").

23  _____

24  than contracting with a separate insurance company to provide the coverage and bear the financial
    risk.  A self-insured employer often hires a third-party administrator to manage administrative
25  functions like processing claims."  *Sharpe Holdings, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 801
    F.3d 927, 934 n.6 (8th Cir. 2015), *cert. granted, judgment vacated on other grounds sub nom. Dep't.*
26  *of HHS. v. CNS Int'l Ministries*, No. 15-775, 2016 WL 2842448 (U.S. May 16, 2016) (unpublished
27  opinion).

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – 5

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

1    There is no disagreement among HHS's 2016,[4] 2020, and 2022 regulations interpreting

2    Section 1557 of the ACA: a TPA who is not responsible for plan design cannot be liable under

3    Section 1557 for any purported discrimination by that plan on the basis of sex.  The 2020 Rule[5] is

4    currently in effect, and while the 2022 Proposed Rulemaking is not yet final, it states that it only

5    clarifies existing law.  As the 2022 Proposed Rulemaking explains, "[i]n the 2016 Rule, we

6    clarified that third party administrators were generally *not responsible* for the benefit designs of

7    the self-insured group health plans they administer and that enforcing Section 1557 against a third

8    party administrator for a group health plan with a discriminatory benefit design could result in

9    holding a third party administrator liable for plan designs over which it had no control" because

10   ERISA requires TPAs to enforce the Plan as designed by the plan sponsor.  *Id.*[6]

11   But apart from the agency's interpretation of its statutory authority, a "'court must give an

12   agency's interpretation of its own regulations controlling weight unless it is plainly erroneous or

13   inconsistent with the regulation.'"  *Estrada-Hernandez v. Holder*, 108 F. Supp. 3d 936, 947 (S.D.

14   Cal. 2015) (quoting *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994)).  In the

---

[4] In 2016, HHS promulgated a rule interpreting Section 1557.  *See* Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376 (May 18, 2016) (the "2016 Rule").  The 2016 Rule broadly stated that health insurers, and potentially TPAs such as BCBSIL, were engaged in providing health care and thus subject to Section 1557's discrimination requirements.  *Id.*  The 2016 Rule was successfully challenged in *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016).  In December 2016, the *Burwell* court declared the 2016 Rule invalid in relevant part and entered a nationwide preliminary injunction to prohibit the enforcement of the 2016 Rule's "prohibition of discrimination on the basis of 'gender identity.'"  *Id.* at 695-96.  In October 2019, that court then vacated the entire 2016 Rule.  *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 941, 944, 947 (N.D. Tex. 2019).  However, the court declined to issue injunctive relief, concluding that it was unnecessary because HHS did not intend to enforce the 2016 Rule.  *Id.* at 944.  The Plaintiffs appealed the denial of the injunction, and the Fifth Circuit remanded with instructions.  *Franciscan All., Inc. v. Becerra*, 843 F. App'x 662, 663 (5th Cir. 2021).  Following remand, the district court issued a permanent injunction prohibiting HHS's enforcement of the 2016 Rule.  *Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361 (N.D. Tex. 2021), *amended*, No. 7:16-cv-00108-O, 2021 WL 6774686 (N.D. Tex. Oct. 1, 2021).  On August 26, 2022, the Fifth Circuit affirmed the district court's permanent injunction.  *Franciscan All. Inc. v. Becerra*, No. 21-11174, 2022 WL 3700044, at *1 (5th Cir. Aug. 26, 2022).
[5] Nondiscrimination in Health and Health Education Programs or Activities, 85 Fed. Reg. 37,160 (June 19, 2020) (the "2020 Rule").
[6] The 2022 Proposed Rulemaking clarified that if the source of the exclusion was the TPA, rather than the plan sponsor, a TPA could potentially be liable.  *See* 87 Fed. Reg. at 47876, n.501 (citing *Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 956 (D. Minn. 2018)).  But here, unlike in *Tovar*, BCBSIL cannot be liable under Section 1557 or any of its implementing regulations because BCBSIL did not design the CHI Plan.

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – 6

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

1   2022 Proposed Rulemaking, HHS affirmed its prior interpretations that a TPA that is not

2   responsible for plan design cannot be liable for the plan design's violation of Section 1557.

3         The Court must defer to this interpretation of Section 1557 in the 2016, 2020, and 2022

4   rulemaking that has been consistent over the past three administrations. *See Chevron, U.S.A., Inc.*

5   *v. NRDC, Inc.*, 467 U.S. 837, 842-43 (1984).  This means that this Court "may not substitute its

6   own construction" for HHS's interpretations of Section 1557.  *Chevron*, 467 U.S. at 844.  This

7   Court can only overturn the 2020 Rule or 2022 Proposed Rulemaking if HHS never "'examine[d]

8   the relevant data and articulate[d] a satisfactory explanation for its action, including a 'rational

9   connection between the facts found and the choice made.'"  *Kreis v. Sec'y of the Air Force*, 406

10   F.3d 684, 686 (D.C. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*

11   *Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

12         There is no dispute here that Congress has charged HHS with administering the ACA.

13   Under *Chevron,* the Court then analyzes whether the particular statute speaks directly to the issue

14   or leaves room for agency interpretation.  *Chevron*, 467 U.S. at 841.  Here, Section 1557 leaves

15   room for interpretation.  *See Franciscan*, 227 F. Supp. 3d at 686-87 (holding that Section 1557's

16   definition of sex discrimination is ambiguous and therefore HHS may interpret the term to fill this

17   statutory gap).

18         Thus, the Court must defer to HHS's interpretation of Section 1557 that TPAs cannot be

19   liable under the statute if they are not responsible for the plan design.  87 Fed. Reg. 47824, 47876.

20   Because the exclusion in the CHI Plan originated with CHI, rather than with BCBSIL, BCBSIL is

21   not liable under Section 1557.

22   **B.**     **BCBSIL May Administer the Exclusion Because It Is Protected by RFRA.**

23         The courts and HHS agree that a TPA such as BCBSIL does not violate Title IX or the

24   ACA if it administers a plan exempted from compliance with Title IX or the ACA by RFRA.

25         Plaintiffs' claim that BCBSIL discriminates on the basis of sex proceeds from a false

26   premise: that the Exclusion is "illegal."  Am. Compl., ¶ 69.  This premise is false because RFRA

27   protects CHI's Exclusion based on its sincerely-held religious beliefs.  Federal courts and HHS

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – 7

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA 98101
(206) 626-7713 FAX: (206) 260-8946

have routinely recognized that a TPA such as BCBSIL does not violate Title IX or the ACA if it
administers a plan exempted from compliance with Title IX or the ACA by RFRA.

### 1.   The Exclusion Is Allowed Under RFRA.

RFRA supersedes any claim brought under Section 1557 of the ACA.  *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2389 (2020) (Alito, J., concurring) ("No provision of the ACA abrogates RFRA, and [the Supreme Court's] decision in [*Burwell v. Hobby Lobby Stores*, Inc., 573 U.S. 682, 736 (2014)] established that application of the [ACA] must conform to RFRA's demands.").  HHS agrees that RFRA exempts ACA requirements that conflict with the religious beliefs of plan sponsors and explicitly recognized that RFRA creates an exception to Section 1557; in fact, HHS has always "explicitly acknowledge[d] that Section 1557 is subject to RFRA's protections of religious conscience from government-imposed burdens, *see* 45 C.F.R. § 92.6(b)—protections the Supreme Court has confirmed are 'very broad.'"  *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 46 (D.D.C. 2020), *appeal dismissed*, No. 20-5331, 2021 WL 5537747 (D.C. Cir. Nov. 19, 2021).

Here, the Exclusion in the CHI Plan is faith-based.  Am. Compl. ¶ 71, App. H at 4 ("[T]his surgery has been determined not to align with the teachings and doctrine of the Catholic Church.").  Thus, RFRA prohibits the enforcement of Section 1557 here because it would impair the religious freedom of the plan sponsor, CHI.  42 U.S.C. § 2000bb-1(a).

### 2.   BCBSIL May Administer the Exclusion Because It Is Protected by RFRA.

As the U.S. Supreme Court has explained, TPAs may legally administer plans with exclusions of coverage that RFRA exempts from the ACA's requirements.  Thus, TPAs, even though they are not religious institutions, may administer plans with exclusions that would violate the ACA where the exclusion is protected by RFRA.

For example, with respect to contraception coverage required by the ACA, the Supreme Court recognized an exception for both a plan sponsor with sincerely-held religious beliefs and for the "plan, issuer, or third party administrator that provides or arranges such coverage or payments."  *Little Sisters*, 140 S. Ct. at 2395 (quoting 45 C.F.R. §§ 147.132(a)(2)(i)-(ii)).  Indeed, plans that refuse to

1  cover contraception because of religious beliefs have successfully resisted HHS's efforts to

2  commandeer their TPAs to provide contraception coverage.  *See id.*   Courts may not compel TPAs

3  to provide coverage that contravenes an exclusion that is protected by RFRA, even where the federal

4  government has agreed to reimburse TPAs for providing contraception otherwise excluded by such

5  plans.  *Id.*   Indeed, as HHS's recent notice of rulemaking emphasizes, ERISA requires a TPA to

6  administer a self-insured health plan according to its terms.  *See* 29 U.S.C. § 1104(a)(1)(D) (stating

7  benefit plan decisions are required to be made "in accordance with the documents and instruments

8  governing the plan").

9      The same is true here.  BCBSIL does not violate Section 1557 because RFRA protects the

10  Exclusion.  As a result, BCBSIL's administration of the Exclusion in the CHI Plan is legal.

11      **3.      BCBSIL Has Standing to Argue that Its Administration of the CHI Plan Fully**
            **Complies with the Law.**

12

13          **a.      BCBSIL has Article III standing to defend its enforcement of the**
                    **RFRA-Protected Exclusion.**

14      Plaintiffs allege that BCBSIL is administering an exclusion that violates the ACA and seek

15  injunctive relief and damages against BCBSIL, not against CHI.  This gives BCBSIL Article III

16  standing to raise all available defenses and make all available arguments in its own defense—

17  including that RFRA protects the Exclusion, which BCBSIL lawfully administers.

18      "Under the plain text of RFRA, standing is 'governed by the general rules of standing under

19  article III.'"  *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1155 (10th Cir. 2013) (*"Hobby*

20  *Lobby"* (concurrence), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014)

21  (quoting 42 U.S.C. § 2000bb-1(c)).  "Under the familiar three-part test for establishing Article III

22  standing, a plaintiff must show an injury that is '[1] concrete, particularized, and actual or

23  imminent; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling.'"

24  *Id.* at 1126 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

25      In *Hobby Lobby*, the plaintiffs, Hobby Lobby and Mardel, a bookstore chain, claimed that the

26  ACA's requirement that they provide contraception coverage violated the religious beliefs of their

27  shareholders.  HHS argued that the corporations lacked standing because they were not religious

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – 9

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

1  institutions; rather, their shareholders had religious beliefs that rejected contraception.  *Id.* at 1126.

2  The Tenth Circuit concluded that the corporations had Article III standing to sue HHS to invalidate

3  the regulation at issue for the simple reason that if the owners decided not to comply with the ACA,

4  it would be the corporations who would immediately suffer the consequence in any legal action by

5  HHS: "We conclude that Hobby Lobby and Mardel have Article III standing.  Both companies face

6  an imminent loss of money, traceable to the contraceptive-coverage requirement.  Both would receive

7  redress if a court holds the contraceptive-coverage requirement unenforceable as to them.  Both

8  therefore have Article III standing."  *Id.*[7]

9      Likewise, here, to find Article III standing, the Court need look no further than the fact that if

10  the Court adjudged BCBSIL liable, BCBSIL would suffer from a ruling that it is violating the law

11  and from the financial consequences of a judgment.  The same was true in *Hobby Lobby*—the

12  corporations could suffer penalties and therefore had Article III standing to challenge the subject

13  regulations even though the shareholders were the ones exercising their religious beliefs by directing

14  the corporations' actions.  *See id.*, n.4.

15      Here, Plaintiffs have sued BCBSIL to try to get an end-run around RFRA's protection of

16  CHI.  But BCBSIL itself is also protected by RFRA, and therefore BCBSIL also cannot be liable

17  for enforcing a valid exclusion.  The defense exists in this context just as it would for a TPA

18  excluding contraception coverage on religious grounds because it is enforcing the plan as required

19  by RFRA and ERISA.  *See Little Sisters*, 140 S. Ct. at 2395.

20      Plaintiffs cannot manufacture a standing argument merely by suing only BCBSIL, not CHI.

21  Plaintiffs seek a money judgment against BCBSIL as to named Plaintiff C.P., which means that

22  BCBSIL has a clear stake in the dispute and has suffered a concrete, particularized injury.

23      **b.    An alleged lack of prudential standing does not apply here, but even if it did, BCBSIL could satisfy its requirements.**

24

25  An alleged lack of "prudential standing" does not prevent BCBSIL from defending its

26  enforcement of the Exclusion based on RFRA.  Plaintiffs have in the past invoked prudential

27  [7] When the Supreme Court reviewed *Hobby Lobby*, the government abandoned the standing argument and it was no longer an issue.  *Hobby Lobby*, 573 U.S. 682.

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – 10

1  standing's limitation on Article III standing in challenging BCBSIL's right to argue that RFRA

2  protects the exclusion.  Plaintiffs argued that BCBSIL is raising CHI's legal rights protected by RFRA

3  and, as a secular institution, it has no standing to do so.[8]  But the prudential standing limitation does

4  not apply to RFRA, and BCBSIL satisfies its requirements.[9]

5         Plaintiffs' prudential standing argument fails for two reasons.  First, RFRA itself precludes

6  application of prudential standing limitations: "the text [of RFRA] expressly tells us to apply the rules

7  of standing under Article III and makes no mention of prudential (non-Article III) standing rules.  In

8  this way, the plain language seems to suggest prudential standing doctrine failed to make its way into

9  RFRA." *Hobby Lobby*, 723 F.3d at 1155.  Second, BCBSIL satisfies prudential standing: "(1) a close

10  relationship to the injured party and (2) a barrier to the injured party's ability to assert its own

11  interests." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 109–10 (2d

12  Cir. 2008) (citing *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (stating a party seeking third-party

13  standing must demonstrate a "'close' relationship with the person who possesses the right" and a

14  "hindrance" to the possessor's ability to protect his own interest (citation omitted))).

15         The first factor is easily met.  As the CHI Plan's TPA and fiduciary, BCBSIL possesses the

16  requisite close relationship with CHI.  "When enacting ERISA, Congress invoked and incorporated

17  the common law of trusts, which had governed most benefit plans before ERISA, to broadly define

18  the general scope of an ERISA administrator's fiduciary duty." *Peralta v. Hispanic Bus., Inc.*, 419

19  F.3d 1064, 1070 (9th Cir. 2005) (citation omitted)).  Courts historically have "permitted '[t]rustees

20  [to] bring suits to benefit their trusts; guardians ad litem [to] bring suits to benefit their wards;

21  receivers [to] bring suit to benefit their receiverships; assignees in bankruptcy [to] bring suit to benefit

22  bankrupt estates; [and] executors [to] bring suit to benefit testator estates.'" *W.R. Huff*, 549 F.3d at

23

24  ───────────────
   [8] The Court denied BCBSIL's Motion to Dismiss based on prudential standing, not Article III,
   principles.  *See* Dkt. 23.
25  [9] The Supreme Court has described "prudential standing" as "encompassing . . . three broad
   principles": "the general prohibition on a litigant's raising another person's legal rights, the rule
26  barring adjudication of generalized grievances more appropriately addressed in the representative
   branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected
27  by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126
   (2014) (citations omitted).

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – 11

1   110 (citation omitted); *see also Epona, LLC v. County. of Ventura*, 876 F.3d 1214, 1219 (9th Cir.

2   2017) ("[V]endors and those in like positions have been uniformly permitted to resist efforts at

3   restricting their operations by acting as advocates of the rights of third parties who seek access to their

4   market or function."); 13A Wright & Miller, Federal Practice & Procedure § 3531.9.3 (3d ed.)

5   ("Vendors are routinely accorded standing to assert the constitutional rights of customers and

6   prospective customers.").  As the CHI Plan's TPA and fiduciary, BCBSIL has the requisite close

7   relationship to CHI to argue that the CHI Plan is not illegal.

8           The second element for prudential standing—a barrier to the injured party's ability to assert

9   its own interests—is likewise satisfied because CHI is not a party to this lawsuit.  Plaintiffs have

10  put CHI's RFRA rights at issue by suing BCBSIL, yet they have failed to name as a defendant the

11  party with the sincerely-held religious beliefs.  Indeed, it appears the reason Plaintiffs only sued

12  BCBSIL was to try to avoid confronting CHI's clearly-established rights under RFRA.  But the

13  Court cannot compel BCBSIL to take any action concerning C.P.'s claims for gender reassignment

14  surgery without impairing CHI's rights under its own plan. *Takeda v. Nw. Nat. Life Ins. Co.*, 765

15  F.2d 815, 819-20 (9th Cir. 1985) (noting that the absent defendant, Microdata, the employer who

16  sponsored the plan, was a necessary party because, as here, the plan was self-funded "and in the

17  event of an adverse result, Microdata would satisfy the judgment or would indemnify

18  Northwestern").  For this reason as well, BCBSIL must be able to make every available argument

19  to protect CHI's interests, as well as its own.  BCBSIL moved for dismissal of this case because

20  Plaintiffs failed to join CHI, a necessary party, and the Court denied the motion. *See* Dkt. 23.

21  Plaintiffs cannot have it both ways—they cannot only sue BCBSIL to avoid CHI's RFRA defense

22  while simultaneously challenging BCBSIL's RFRA defense for lack of standing.

23          BCBSIL has Article III standing to argue it is not violating the ACA because it

24  administered an exclusion protected by RFRA.  Prudential standing does not apply, but if even it

25  did, BCBSIL has the requisite close relationship with CHI, and CHI cannot vindicate its own

26  rights.

27

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – 12

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

**C.    Section 1557 Does Not Apply to BCBSIL Because It Does Not Receive Any Federal Financial Assistance for its TPA Activities.**

Section 1557 also does not apply here because BCBSIL's TPA operations do not receive federal financial assistance.  Section 1557 only applies to TPAs whose operations receive federal financial assistance.  *See Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1128 (D.N.D. 2021) (citing 2020 Rule, 85 Fed. Reg. at 85 Fed Reg. 37, 160).

The 2020 Rule, which is currently in effect,[10] explicitly exempts TPAs for this reason:  it clarified that the provision of health *insurance coverage* (whether as an insurer or through administering a self-funded plan as a TPA) is not *per se* engaged in the provision of "healthcare." *Id.* at 37,244-45 (45 C.F.R. § 92.3(c)).

Under the 2020 Rule, "an entity principally or otherwise engaged in the business of providing health *insurance* shall not, by virtue of such provision, be considered to be principally engaged in the business of providing *healthcare*." *Id.* (emphases added).  The 2020 Rule specifies that insurers and TPAs like BCBSIL remain subject to Section 1557 *only* for the specific parts of their operations that receive and are earmarked for federal financial assistance.  *See id.* § 92.3(b) ("For any entity not principally engaged in the business of providing healthcare, the requirements applicable to a 'health program or activity' under this part shall apply to such entity's operations *only to the extent any such operation receives Federal financial assistance*.") (emphasis added). The 2020 Rule also states that "to the extent that employer-sponsored group health plans do not receive Federal financial assistance and are not principally engaged in the business of providing healthcare (as set forth in the rule), they would not be covered entities." *Id.* at 37,173-74.

In an analogous context, a health insurer offering an employer group waiver plan ("EGWP") is only "subject to the [2020] rule *for its EGWP plan*, due to receipt of either Medicare Part C or Part D Funding."  2020 Rule, 85 Fed. Reg. at 37, 174 (emphasis added).  In other words,

---

[10] To the extent that the 2022 Proposed Rulemaking would change the 2020 Rule on this issue, the 2022 Proposed Rulemaking cannot be imposed retroactively to impair BCBSIL's rights.  *Henry Ford Health Sys. v. Dep't of Health & Hum. Servs.*, 654 F.3d 660, 667 (6th Cir. 2011) ("Only express congressional authorization for the agency to regulate retroactively will defeat this presumption.")  Congress has not authorized HHS to regulate under the ACA retroactively.

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – 13

both for self-funded plans administered by TPAs and for EGWP plans, the "entirety of federally funded insurers' operations no longer automatically qualifies for regulation merely by virtue of selling *or administering* health insurance plans." *Religious Sisters*, 513 F. Supp. 3d at 1128 (emphasis added).

Courts have likewise recognized that insurers and TPAs may *only* be subject to Section 1557 for the portions of their operations that receive federal funding.  In *Religious Sisters*, the plaintiffs included the "Religious Sisters of Mercy Plaintiffs," a Catholic order of religious sisters operating a non-profit health care clinic, and the "Catholic Benefits Association Plaintiffs," a nonprofit corporation and Catholic ministry.  *Id.* at 1131-33.  The court determined that the Religious Sisters of Mercy Plaintiffs were subject to the requirements of Section 1557 because they were "entities that operate health programs receiving federal financial assistance."  *Id.* at 1136.  However, the Catholic Benefits Association Plaintiffs were not subject to Section 1557 because the statute only caused them "secondhand injury."  *Id.*

As the court in *Religious Sisters* explained, "[w]ith the 2020 Rule's arrival, however, health insurers now remain subject to Section 1557 *only for the parts of their operations that receive federal funding.*"  *Id.* (emphasis added) (citing 45 C.F.R. § 92.3(b)-(c)).  As a result, "[t]o the extent that employer-sponsored group health plans do not receive Federal financial assistance . . . they would not be covered entities."  *Id.* (quoting 85 Fed. Reg. at 37,173).  Because none of the Catholic Benefits Association Plaintiffs "aver[red] that their own health plans receive federal funding," the court concluded that for their health plans, the "prevailing interpretation of Section 1557 does not require insurers or TPAs to cover gender-transition procedures."  *Id.* at 1336-37.

Likewise, in *Washington v. United States Department of Health & Human Services*, 482 F. Supp. 3d 1104, 1111 (W.D. Wash. 2020), the court recognized that the 2020 Rule makes health insurers and TPAs subject to Section 1557 only for the parts of their operations that are earmarked to receive federal financial assistance:

> The 2020 Rule also repeals the 2016 Rule's definition of "health program or activity" and replaces that provision with the following definition:

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – 14

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

> As used in this part, "health program or activity" encompasses all of the operations of entities principally engaged in the business of providing healthcare that receive Federal financial assistance as described in paragraph (a)(1) of this section. *For any entity not principally engaged in the business of providing healthcare*, the requirements applicable to a "health program or activity" under this part shall apply to such entity's operations *only to the extent any such operation receives Federal financial assistance* as described in paragraph (a)(1) of this section.
>
> For purposes of this part, *an entity principally or otherwise engaged in the business of providing health insurance shall not, by virtue of such provision, be considered to be principally engaged in the business of providing healthcare.*

*Id.* (quoting 85 Fed. Reg. at 37,244-45) (emphases added).  Thus, because TPAs like BCBSIL are not "principally engaged in the business of healthcare"—rather, they are engaged in the business of administering self-funded plans that underwrite health care for members—they are only subject to Section 1557 for the portions of their operations that receive federal funding.

Plaintiffs in this matter and their same counsel moved to intervene in the *Washington* case. Their brief directly acknowledged that TPAs like BCBSIL are exempt from the requirements of Section 1557 based on the 2020 Rule:

> Despite the plain language of the statute, the 2020 HHS Final Rule impermissibly **reads out** 'contracts of insurance' from the ACA in order to limit the scope of Section 1557.  The new rule declares that health insurance companies are **_not_** principally engaged in providing healthcare in order to generally excuse them from the anti-discrimination obligations of the statute.

Payton Decl., Ex. J (emphases in original).[11]  Thus, as Plaintiffs themselves have previously conceded, Section 1557 does not apply to BCBSIL's actions as a TPA because the 2020 Rule determined that TPAs and health insurance companies are not "principally engaged in providing healthcare" and are only liable for the portions of their operations that receive federal financial assistance.

Because BCBSIL does not receive any federal financial assistance for its administration of

---

[11] The court in *Washington* permitted Plaintiffs' amicus brief but did not reach the merits of the State of Washington's substantive claim, concluding that Washington lacked standing to challenge the 2020 Rule.

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – 15

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

1    self-funded ERISA plans, including the CHI Plan, Plaintiffs' claims against BCBSIL should be

2    dismissed in their entirety.   BCBSIL does not receive federal financial assistance for any self-

3    funded ERISA plans.  Larson Decl. at ¶ 3.  BCBSIL does receive federal financial assistance for

4    other products, such as Medicare supplemental coverage, Medicaid, Medicare Advantage and

5    Prescription Drug insurance coverage, and for Medicare/Medicaid dual eligibility.  *Id.* ¶ 4.  Any

6    funding that BCBSIL receives for its other operations is earmarked away from its funding-free

7    administration of self-insured ERISA plans.  *Id.* ¶ 5.

8            For example, BCBSIL provides an Assurance of Compliance to the federal government in

9    consideration for and for the purpose of receiving certain federal financial assistance from HHS.

10   Larson Decl. ¶¶ 6-7 and Ex. A.  In that Assurance, BCBSIL states *only* that it is in compliance

11   with Section 1557 for all "health program[s] or activit[ies] for which [BCBSIL] receives Federal

12   financial assistance." *Id.*  Because BCBSIL does not receive any federal financial assistance for

13   its third-party administration of the CHI Plan and other ERISA self-insured plans, Section 1557

14   does not apply to BCBSIL.  Plaintiffs' sole claim, which is premised wholly on Section 1557, must

15   be dismissed.[12]

16   **D.    The Exclusion Does Not Discriminate on the Basis of Sex Because There Is No Medical Consensus Regarding Gender-Affirming Treatment.**

17           The medical literature contains a lack of consensus regarding the value of various "gender-

18   affirming" treatments for gender dysphoria.  Indeed, the Federal Government's own Tri-Care

19

20   [12] Under the 2020 Rule, BCBSIL is not "principally engaged in the business of providing health
     care" in its operations as a TPA.  A TPA is not a healthcare provider – it provides administrative
21   services to self-insured plans that underwrite healthcare coverage. For an entity to be liable under
     Section 1557, it must both administer a "program or activity" as defined under 42 C.F.R. § 92.3(b),
22   and receive "Federal financial assistance."  42 U.S.C. § 18116(a).  HHS has consistently
     interpreted the definition of "program or activity" under Section 1557 to encompass "all of the
23   operations of entities principally engaged in the business of providing healthcare that receive
     Federal financial assistance."  42 C.F.R. § 92.3(b). Thus, because BCBSIL is not "principally
24   engaged in the business of providing healthcare" as a TPA and does not receive any federal
     financial assistance as a TPA, Section 1557 does not apply to BCBSIL. To the extent that the 2022
25   Proposed Rulemaking may attempt to modify the scope of "federal financial assistance," the Court
     should, under *Chevron*, reject the proposed rule as to this issue as arbitrary and capricious because
26   it is contrary to the ACA and to the *Franciscan* line of authority. *See infra*, footnote 4.

27

1  health plans do not generally cover gender reassignment surgery.[13]  This lack of consensus

2  establishes that the CHI Plan's Exclusion does not discriminate on the basis of sex.  The 2020 Rule

3  interpreted Section 1557 as not prohibiting "categorical coverage exclusions" in health plans of

4  gender-affirmative surgery—that is, that such exclusions did not discriminate on the basis of sex

5  in violation of Title IX.  *Whitman-Walker*, 485 F. Supp. 3d at 14 ("HHS similarly eliminated the

6  2016 Rule's prohibition on insurers' having or implementing categorical coverage exclusions for

7  gender-affirming care").  HHS concluded that "no statutory authority existed for such a prohibition

8  in the first place, and it pointed to evidence indicating division among the medical community 'on

9  many issues related to gender identity, including the value of various 'gender-affirming' treatments

10  for gender dysphoria.'"  *Id.* (quoting 2020 Rule, 85 Fed. Reg. 37,198).

11         In *Whitman-Walker*, the court upheld the 2020 Rule's interpretation of Section 1557 that

12  categorical coverage exclusions for gender-affirming care do not discriminate on the basis of sex

13  because HHS "delivered a sufficiently reasoned explanation" and "consulted scientific studies,

14  government reviews, and comments from a host of medical professionals regarding treatment for

15  gender dysphoria" and concluded that "'the medical community is divided on many issues related

16  to gender identity.'"  *Id.* at 47.

17         To the extent that HHS's 2022 Proposed Rulemaking may attempt to revive the 2016

18  Rule's prohibition on exclusions for gender affirmative care, this Court should reject that

19  component of the 2022 Proposed Rulemaking for three reasons.  First, in *Franciscan*, the Fifth

20  Circuit affirmed the district court's permanent injunction of the 2016 Rule out of concern that HHS

21  would attempt to revive the 2016 Rule's prohibitions on exclusions for transgender treatment.

22  *Franciscan*, 2022 WL 3700044 at *5.  The Fifth Circuit was clear that the order vacating the 2016

23  Rule's prohibition on exclusions for gender affirmative care must stand because "[j]ust months

24  ago HHS issued the 2022 Notice, which warned covered entities like Franciscan Alliance that

25  refusing to offer gender-reassignment surgeries violates Section 1557."  *Id.*  As the Fifth Circuit

26  ───────────────────────
27  [13]https://tricare.mil/CoveredServices/IsItCovered/GenderDysphoriaServices#:~:text=TRICARE
%20generally%20doesn%27t%20cover,and%20adequate%20for%20your%20condition (last
visited Aug. 28, 2022) ("TRICARE generally doesn't cover surgery for gender dysphoria.")

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – 17

1   explained, "the failure to grant the injunction [would] result in irreparable injury" to Franciscan if

2   HHS reverted to the 2016 Rule.  *Id*. at *8 (brackets in original).

3          Second, to the extent that the 2022 Proposed Rulemaking would change the 2020 Rule on

4   this issue, the 2022 Proposed Rulemaking cannot be imposed retroactively to impair BCBSIL's

5   rights.  *See* fn. 9.

6          Third, the 2020 Rule, which *Whitman-Walker* found persuasive, still applies.  In the 2020

7   Rule, HHS concluded that, before issuing the prior 2016 Rule, it should have previously relied on

8   "independent scientific fact-finding" that, following an "extensive assessment of the clinical

9   evidence," found insufficient evidence "'to determine whether gender reassignment surgery

10  improves health outcomes' for individuals with gender dysphoria,'" but it failed to do so. 85 Fed.

11  Reg. at 37,187, 37,198. Other cases addressing the legality of categorical exclusions of coverage

12  for gender surgery have reached the same conclusion.  *See Religious Sisters*, 513 F. Supp. 3d at

13  1130-31; *Franciscan*, 227 F. Supp. 3d at 687 (holding that the 2016 Rule's "expanded definition

14  of sex discrimination exceeds the grounds incorporated by Section 1557").

15         This Court should hold the CHI Plan's Exclusion does not violate the ACA for the same

16  reasons: because the science is inconclusive and the medical community is divided.  Any new and

17  different opinion from HHS would be arbitrary and capricious.  As BCBSIL expert Dr. Laidlaw

18  testifies, "[t]here is ongoing debate and study in the medical community regarding gender

19  affirmative treatment."  Payton Decl. Ex. K ("Laidlaw Decl."), ¶ 14.  "The medical community is

20  divided on many issues related to the appropriate medical care for gender identity, and the

21  necessity or value of gender affirmative care.  This is especially true for minors."  *Id.*

22         Plaintiffs have previously relied on *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020),

23  which prohibited termination of employees on the basis of transgender status.  But here, where the

24  issue is the medical necessity of health care, the considerations are different, and *Bostock* is easily

25  distinguished.  485 F. Supp. 3d at 14, 47.  In *Whitman-Walker*, the Plaintiffs alleged that *Bostock*

26  required invalidation of the 2020 Rule's allowance of exclusions for gender-affirmative treatments

27  because they discriminate on the basis of sex.  *Id*. at 41-42.

1    The court disagreed, concluding that in promulgating the 2020 Rule, HHS "delivered a

2    sufficiently reasoned explanation" and "consulted scientific studies, government reviews, and

3    comments from a host of medical professionals regarding treatment for gender dysphoria." *Id.* at

4    47.  The court explained that "according to HHS, . . . 'the medical community is divided on many

5    issues related to gender identity, including the value of various "gender-affirming" treatments for

6    gender dysphoria (especially for minors).'" *Id.*  That division "counsel[s] against a blanket

7    prohibition on categorical coverage exclusions of gender-affirming care." *Id.*  Instead, the 2020

8    Rule's reversal of the 2016 Rule's ban on categorical exclusions for transgender services

9    "enable[d] providers and insurers 'to use their best medical judgment' when delivering and

10   covering care, as informed by 'ongoing medical debate and study' regarding gender-affirming

11   treatment." *Id.* (citing 85 Fed. Reg. 37,187).

12       Moreover, the court in *Whitman-Walker* rejected the plaintiffs' reliance on World

13   Professional Association for Transgender Health ("WPATH").  Here, Plaintiffs' experts are all

14   closely affiliated with WPATH.  *See* Laidlaw Decl. ¶¶ 12-25.  Plaintiffs' expert reports all rely on

15   WPATH's *Standards of Care for the Health of Transsexual, Transgender, and Gender*

16   *Nonconforming People* (7th ed., 2011) and Plaintiffs' complaint quotes them extensively.  *Id.*; Am.

17   Compl. ¶¶ 31-33.  WPATH contends hormone blockers, followed by hormone therapy, followed

18   by irreversible surgery is the "only effective treatment" for the psychological issues these children

19   face. *Id.*; *Whitman-Walker,* 485 F. Supp. 3d at 48-49.

20       The court in *Whitman-Walker* noted that "HHS explicitly considered these standards in

21   promulgating the 2020 Rule, referencing submissions from various commenters who agreed with

22   [WPATH's] approach." *Id.* at 48.  The court found that HHS's reasoned consideration of and

23   subsequent rejection of WPATH's advocacy was not arbitrary and capricious: "HHS also indicated

24   its agreement with certain commenters 'that the 2016 Rule relied excessively on . . . . WPATH,"

25   and that WPATH is "an advocacy group." *Id.*[14]

26

27   [14] While BCBSIL's medical policy relies in part on WPATH's guidelines, among other sources,
     that does not change the fact that "the medical community is divided on many issues related to

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – 19

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

1      In *Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022), the Ninth Circuit echoed HHS's conclusions

2  regarding disagreements in the medical community regarding the value of gender-affirming care.

3  *See id.* at 110-113.  The court affirmed the lower court's refusal to grant a preliminary injunction

4  precluding enforcement of an exclusion for gender-affirmative surgery.  *Id.*  The lower court had

5  held that (1) the exclusion was not discriminatory and did not violate Section 1557, and (2) the

6  plaintiffs failed to prove irreparable harm if the plaintiff, a minor, did not receive the surgery for

7  which benefits were sought.  *Id.* at 110.  The Ninth Circuit affirmed, denying injunctive relief

8  because the plaintiffs failed to prove irreparable harm from Arizona's enforcement of its Medicaid

9  program's exclusion of gender-affirmative surgery.  *Id.* at 112-13.  The Ninth Circuit did not need

10  to reach whether the exclusion for gender affirming treatment was discriminatory and violated

11  Section 1557.  But it affirmed the injunction based on the same evidence and reasoning that led

12  HHS and the court in *Whitman-Walker* to conclude that categorical coverage exclusions did not

13  discriminate on the basis of sex.  The district court in *Snyder* concluded that the medical consensus

14  did not support the value of gender-affirmative treatments, and the Ninth Circuit affirmed that this

15  decision was not clearly erroneous, emphasizing that the evidence offered by the defendants

16  contradicted testimony from the plaintiffs' WPATH-affiliated experts:

17      Defendant proffered competing expert testimony that WPATH's Standards of Care
18      are not universally endorsed and questioning whether there have been any high-
        quality studies showing that male chest reconstruction surgery is safe, effective, or
19      optimal for treating gender dysphoria.  For example, Defendant's expert noted that,
        as of 2016, the Centers for Medicare & Medicaid Services declined to issue a
20      National Coverage Determination for gender reassignment surgery for Medicare
        patients with gender dysphoria "because the clinical evidence is inconclusive for
21      the Medicare population."  In its order, the district court explicitly noted that
        testimony in describing the evidence from Defendant's expert.
22

23      . . . . [G]ender dysphoria often resolves itself by adulthood and, specifically citing
        the Diagnostic and Statistical Manual of Mental Disorders Fifth Edition, that "[i]n
24      natal females, persistence has ranged from 12% to 50%."  The district court
        explicitly noted that testimony as well in describing the evidence from Defendant's
25      expert.  Also, given the evidence presented that the human brain continues to

26

27  gender identity, including the value of various 'gender-affirming' treatments for gender
    dysphoria."  *Whitman-Walker*, 485 F. Supp. 3d at 48-49.

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – 20

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

1
2
mature well into a person's twenties, it was reasonable for a district court to question whether Doe appreciated the impact of irreversible surgery and to require further counseling before "authorizing" surgery.

3
4
. . . . Doe failed to provide a declaration from any psychiatrist or medical doctor who is treating him that attested to the necessity and suitability of the surgery in his particular case.

5   *Id.* at 112.  Here, Plaintiffs likewise offered no testimony from a psychiatrist who treated C.P. or
6   who was part of the team recommending surgery.  Laidlaw Decl. ¶¶ 185-89.

7       The Ninth Circuit also noted that the scientific community has questioned WPATH's
8   scientific processes, ability to capture clinical experiences, and the rigors of WPATH's medical
9   research.  "WPATH's Standards of Care are not universally endorsed and questioning whether
10  there have been any high-quality studies showing that male chest reconstruction surgery is safe,
11  effective, or optimal for treating gender dysphoria."  *Snyder*, 28 F.4th at 112.

12      The Ninth Circuit also relied on the fact that CMS concludes that the clinical evidence
13  regarding gender reassignment surgery is "inconclusive."  *Id.* at 109.  In 2016, CMS issued a
14  Decision Memo declining to issue a National Coverage Determination on gender reassignment
15  surgery for Medicare beneficiaries with gender dysphoria "because the clinical evidence is
16  inconclusive for the Medicare population."  CMS Decision Memo for Gender Dysphoria and
17  Gender Reassignment Surgery (CAG-0046N) (Aug. 30, 2016); *see Snyder*, 28 F.4th at 112
18  (affirming district court's reliance on CMS Decision Memo in determining there was insufficient
19  evidence that gender reassignment surgery was safe and effective for minors).

20      The Ninth Circuit also expressed "twin concerns" where, as here, the beneficiary is a
21  minor: (1) whether the minor's "gender dysphoria [was] permanent"; and (2) whether the minor
22  "sufficiently appreciate[d] the consequences of irreversible surgery," particularly given the
23  evidence that "some individuals who present as transgender during adolescence revert to their natal
24  gender later on, regardless of whether they have had top surgery."  *Snyder*, 28 F.4th at 112.  Given
25  "the evidence presented that the human brain continues to mature well into a person's twenties,"
26  the Ninth Circuit concluded "it was reasonable for a district court to question whether Doe
27  appreciated the impact of irreversible surgery and to require further counseling before

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – 21

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

1   'authorizing' surgery." *Id.*

2       BCBSIL's expert Dr. Laidlaw, who testified in *Snyder*, has provided similar testimony

3   here.   Laidlaw Decl. ¶¶ 176-248.   Dr. Laidlaw warns about the insufficient quality of medical

4   care received by minors who undergo irreversible gender-affirming treatments.  This appears to

5   result at least in part because gender dysphoria treatments are so entangled with advocacy.  *Id.* ¶¶

6   16, 247.  WPATH itself recognizes that it is not only a scientific organization but also an advocacy

7   organization, and these two objectives are not compatible.  *Id.*  Dr. Laidlaw has testified that the

8   treatment of C.P. is indicative of these quality-of-care problems that he has observed.  *Id.*   In

9   *Snyder*, the Ninth Circuit affirmed based in part on concerns about Doe being a minor and thus

10  unable to give informed consent.  *Snyder*, 28 F.4th at 110.  This is because "Doe failed to provide

11  a declaration from any psychiatrist or medical doctor who is treating him that attested to the

12  necessity and suitability of the surgery in his particular case." *Id.* at 112.

13      The same is true here.  No treating psychiatrist examined C.P. to determine his ability to

14  give informed consent nor examined him for underlying psychiatric conditions as part of

15  determining the necessity and suitability of surgery here.  *See* Laidlaw Decl. at ¶¶ 16-17, 187 *et*

16  *seq.*  And C.P. appears to have suffered some of the common side effects of gender-affirmative

17  care, including mood changes and recurring headaches.  *Id.* at ¶¶ 150-51, 237-39.

18      The medical community is divided on many issues related to gender identity and the

19  necessity or value of gender-affirmative care, and the opinions of Plaintiffs' experts in this matter

20  do not represent the medical consensus.  The CHI Plan's Exclusion does not discriminate on the

21  basis of sex because there is ongoing debate and study in the medical community regarding gender-

22  affirmative treatment.

23

24

25

26

27

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – 22

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

**E.     BCBSIL Is Entitled to Summary Judgment on Plaintiffs' Claims for Emotional Distress Damages.**

Even assuming, *arguendo*, that BCBSIL received federal funding for its third-party administration of the CHI Plan and ACA applied here, BCBSIL cannot be held liable under the ACA for any emotional distress damages allegedly incurred by Plaintiffs.  Am. Compl. ¶ 112.  The U.S. Supreme Court recently made clear that emotional distress damages categorically are not recoverable in a private action brought under the ACA.  *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1571-72 (2022) (concluding that because the ACA is silent as to available remedies and as emotional distress damages are not traditionally available in breach of contract suits, federal funding recipients could not be liable for emotional distress damages because they did not receive sufficient notice that they could face liability under the ACA for emotional distress).

Here, Plaintiffs seek a "garden variety" of emotional distress damages under Section 1557 for "suffering, embarrassment, humiliation, pain and anguish" and "violations of their dignity." Am. Compl. ¶ 112; Payton Decl., Ex. L, at 11-12.  But even if BCBSIL was subject to the ACA for administering the CHI Plan—which it is not—Plaintiffs are categorically barred from recovering emotional distress damages based on *Cummings*.

## IV.     <u>CONCLUSION</u>

For these reasons, BCBSIL respectfully requests this Court grant BCBSIL's motion for summary judgment in its entirety.

Dated this 1st day of September, 2022.

KILPATRICK TOWNSEND & STOCKTON LLP

By_____*/s/ Gwendolyn C. Payton*_____
      Gwendolyn C. Payton, WSBA No. 26752
      gpayton@kilpatricktownsend.com
      John R. Neeleman, WSBA No. 19752
      jneeleman@kilpatricktownsend.com
      1420 Fifth Ave., Suite 3700
      Seattle, WA 98101
      Telephone: (206) 626-7714
      Facsimile: (206) 623-6793

*Counsel for Blue Cross Blue Shield of Illinois*

BLUE CROSS BLUE SHIELD OF ILLINOIS'S
MOTION FOR SUMMARY JUDGMENT – 23

KILPATRICK TOWNSEND & STOCKTON LLP
1420 FIFTH AVENUE, SUITE 3700
SEATTLE, WA  98101
(206) 626-7713  FAX: (206) 260-8946

# CERTIFICATE OF SERVICE

I certify that on the date indicated below I caused a copy of the foregoing document, BLUE CROSS BLUE SHIELD OF ILLINOIS'S MOTION FOR SUMMARY JUDGMENT, to be filed with the Clerk of the Court via the CM/ECF system.  In accordance with their ECF registration agreement and the Court's rules, the Clerk of the Court will send e-mail notification of such filing to the following attorneys of record:

| | |
|---|---|
| **Eleanor Hamburger**<br>SIRIANNI YOUTZ SPOONEMORE HAMBURGER<br>3101 WESTERN AVENUE STE 350<br>SEATTLE, WA 98121<br>206-223-0303<br>Fax: 206-223-0246<br>Email: ehamburger@sylaw.com | ☑ by CM/ECF<br>☐ by Electronic Mail<br>☐ by Facsimile Transmission<br>☐ by First Class Mail<br>☐ by Hand Delivery<br>☐ by Overnight Delivery |
| **Jennifer C Pizer**<br>LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC<br>4221 WILSHIRE BLVD., STE 280<br>LOS ANGELES, CA 90010<br>213-382-7600<br>Email: jpizer@lambdalegal.org | ☑ by CM/ECF<br>☐ by Electronic Mail<br>☐ by Facsimile Transmission<br>☐ by First Class Mail<br>☐ by Hand Delivery<br>☐ by Overnight Delivery |
| **Omar Gonzalez-Pagan**<br>LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC. (NY)<br>120 WALL STREET<br>19TH FLOOR<br>NEW YORK, NY 10005<br>212-809-8585<br>Email: ogonzalez-pagan@lambdalegal.org | ☑ by CM/ECF<br>☐ by Electronic Mail<br>☐ by Facsimile Transmission<br>☐ by First Class Mail<br>☐ by Hand Delivery<br>☐ by Overnight Delivery |

DATED this 1st day of September, 2022.

KILPATRICK TOWNSEND & STOCKTON LLP

By:/s/ Gwendolyn C. Payton
Gwendolyn C. Payton, WSBA #26752

*Counsel for Blue Cross Blue Shield of Illinois*

CERTIFICATE OF SERVICE – 24