The Honorable Robert J. Bryan

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

C.P., by and through his parents, Patricia Pritchard and Nolle Pritchard; and PATRICIA PRITCHARD,

               Plaintiffs,

     v.

BLUE CROSS BLUE SHIELD OF ILLINOIS,

             Defendant.

NO. 3:20-cv-06145-RJB

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**Note on Motion Calendar: November 21, 2022 (***see*** Dkt. No. 90)**

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303 FAX (206) 223-0246

**Table of Contents**

I.     INTRODUCTION ...................................................................................1

II.    STATEMENT OF FACTS .....................................................................4

    A.    Undisputed Material Facts .............................................................4

    B.    Gender-Affirming Care is Medically Necessary. ..........................8

        1.    Background on Gender Dysphoria. ........................................8

        2.    Generally Accepted Medical Standards Establish
            Gender Affirming Care as the Standard Treatment
            for Gender Dysphoria. .......................................................10

        3.    The Gender Affirming Care Described in the
            WPATH Standards of Care Is Accepted by Every
            Major Medical Association in the United States. ................12

    C.    BCBSIL Concludes that Gender-Affirming Care, Including
        Chest Surgery for Transgender Males, Is Medically
        Necessary. ....................................................................................13

    D.    Plaintiff C.P.'s Gender-Affirming Care was Medically
        Necessary under the BCBSIL Medical Policy. ............................15

III.   LAW AND ARGUMENT ......................................................................16

    A.    Legal Standard for Section 1557 Claims of Sex
        Discrimination. ............................................................................16

    B.    BCBSIL's Administration of Gender-Affirming Care
        Exclusions Unlawfully Discriminates on the Basis of Sex. ..........17

    C.    Both Plan Design and Administration of the Exclusions
        are Discriminatory. .......................................................................25

    D.    BCBSIL Is a "Health Program or Activity" that is Subject
        to the ACA's Non-Discrimination Requirements. .........................26

    E.    BCBSIL's TPA Activities are Subject to Section 1557. .....................34

    F.    HHS Rulemaking Does Not Permit BCBSIL to Administer
        a Discriminatory Exclusion. .........................................................34

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT – ii
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

G.    RFRA Does Not Protect BCBSIL From Liability. ................................................38

    1.    RFRA Does Not Apply When the Government Is Not a Party. ................................................................................38

    2.    Additionally, BCBSIL is a Secular Entity and Cannot "Borrow" CHI's Alleged RFRA Protections. ..............................39

    3.    The Court Should Decline to Adjudicate Whether CHI Has a RFRA Defense against Governmental Action. ................................................................................42

    4.    Assuming Arguendo, if the Court Were to Permit BCBSIL to "Borrow" CHI's RFRA Defense, Such a Defense Would Fail. ...............................................................43

H.    Named Plaintiffs Are Entitled to Compensatory Damages of $12,122,50. ........................................................................46

IV.    CONCLUSION ................................................................................46

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303 FAX (206) 223-0246

## Table of Authorities

### Cases

*Am. Friends Serv. Comm. Corp. v. Thornburgh*, 951 F.2d 957 (9th Cir. 1991) .................................................................................................44

*Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*,
821 F.3d 352 (2d Cir. 2016) ...........................................................40

*Bostock v. Clayton Cty.*,
140 S. Ct. 1731 (2020) .........................................................18, 19, 39

*Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health & Hum. Servs.*,
No. 20-cv-11297, 2021 WL 3667760 (D. Mass.)...............................31

*Boyden v. Conlin*,
2018 U.S. Dist. LEXIS 79753 (W.D. Wis. May 11, 2018) ...............42

*Boyden v. Conlin*,
341 F. Supp. 3d 979 (W.D. Wis. 2018)...................18, 19, 34, 35, 43

*Brandt v. Rutledge*,
47 F.4th 661 (8th Cir. 2022) ...................................................18, 19, 20

*Brandt v. Rutledge*,
551 F. Supp. 3d 882 (E.D. Ark. 2021), *aff'd*, 47 F.4th 661 (8th Cir. 2022).........................................................................................23

*Bray v. Alexandria Women's Health Clinic*,
506 U.S. 263 (1993) .........................................................................38

*Briscoe v. Health Care Serv. Corp.*,
281 F. Supp. 3d 725 (N.D. Ill. 2017) ..............................................29

*Burwell v. Hobby Lobby Stores, Inc.*,
134 S. Ct. 2751 (2014) .....................................................................45

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) .....................................................................31, 33

*Christian Legal Soc'y v. Martinez*,
561 U.S. 661 (2010) .........................................................................37

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT – iv
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303 FAX (206) 223-0246

*City of Boerne v. Flores*,
    521 U.S. 507 (1997) ...................................................................... 38

*Clark v. Newman Univ., Inc.*,
    2022 U.S. Dist. LEXIS 164360 (D. Kan. Sep. 12, 2022) .................... 40

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
    142 S. Ct. 1562 (2022) .................................................................... 46

*Doe v. CVS Pharm., Inc.*,
    2022 U.S. Dist. LEXIS 139684 (N.D. Cal. Aug. 5, 2022) .................. 28

*Doe v. CVS Pharm., Inc.*,
    982 F.3d 1204 (9th Cir. 2020) ........................................... 26, 34, 35

*Doe v. Salvation Army in U.S.*,
    685 F.3d 564 (6th Cir. 2012) .......................................................... 28

*Doe v. Snyder*,
    28 F.4th 103 (9th Cir. 2022) ......................................... 17, 18, 23, 24

*Doe v. United Behavioral Health*,
    523 F. Supp. 3d 1119 (N.D. Cal. 2021) ................................... 3, 4, 36

*East v. Blue Cross & Blue Shield of La.*,
    2014 U.S. Dist. LEXIS 23916 (M.D. La. Feb. 24, 2014) .................. 30

*Edmo v. Corizon, Inc.*,
    935 F.3d 757 (9th Cir. 2019) .......................................................... 22

*EEOC v. Pac. Press Publ'g Ass'n*,
    676 F.2d 1272 (9th Cir. 1982), *abrogation on other grounds*
    *recognized by Am. Friends Serv. Comm. Corp. v. Thornburgh*, 951
    F.2d 957, 960 (9th Cir. 1991) ........................................................ 44

*Equal Emp. Opportunity Comm'n v. R.G. &. G.R. Harris Funeral Homes,*
    *Inc.*,
    884 F.3d 560 (6th Cir. 2018) , *aff'd on other grounds sub nom.*,
    *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731 (2020) ........... 39, 44

*Fabian v. Hosp. of Cent. Conn.*,
    172 F. Supp. 3d 509 (D. Conn. 2016) .............................................. 20

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT – v
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303 FAX (206) 223-0246

*Fain v. Crouch,*
    2022 U.S. Dist. LEXIS 137084 (S.D.W. Va. Aug. 2, 2022) ...............................16, 18, 37

*Fain v. Crouch,*
    545 F. Supp. 3d 338 (S.D.W. Va. 2021) ..........................................................27, 28, 32, 33

*Fernandez v. Wynn Oil Co.,*
    653 F.2d 1273 (9th Cir. 1981)................................................................................2, 39

*Flack v. Wisconsin Dep't of Health Servs.,*
    395 F. Supp. 3d 1001 (W.D. Wis. 2019)..........................................................18, 19, 20, 23

*Fletcher v. Alaska,*
    443 F. Supp. 3d 1024 (D. Alaska 2020) ...........................................................18, 19, 20, 37

*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ............................................................................................32

*Fox v. Pittsburg State Univ.,*
    257 F. Supp. 3d 1112 (D. Kan. 2017) ....................................................................29

*Gen. Conf. Corp. of Seventh-Day Adventists v. McGill,*
    617 F.3d 402 (6th Cir. 2010).................................................................................38

*George v. McDonough,*
    142 S. Ct. 1953 (2022) ........................................................................................28

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006) ............................................................................................45

*Grimm v. Gloucester Cnty. Sch. Bd.,*
    972 F.3d 586 (4th Cir. 2020), as amended (Aug. 28, 2020), *cert.
    denied,* 141 S. Ct. 2878 (2021)..............................................................................23

*Holt v. Hobbs,*
    574 U.S. 352 (2015) ............................................................................................17

*Kadel v. Folwell,*
    2022 U.S. Dist. LEXIS 103780 (M.D.N.C. June 10, 2022) (as
    corrected Aug. 10, 2022)...........................................18, 19, 20, 21, 22, 23, 31

*Kadel v. Folwell,* 446 F. Supp. 3d 1 (M.D.N.C. 2020), *aff'd sub nom.
    Kadel v. N.C. State Health Plan Teachers & State Emples.,* 12 F.4th

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT – vi
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

422 (4th Cir. 2021), as amended (Dec. 2, 2021), *cert. denied*, 142 S.
Ct. 861 (2022) ...................................................................................................17, 20

*King v. Burwell,*
135 S. Ct. 2480  (2015) ...............................................................................32

*King v. Burwell*, 759 F.3d 358 (4th Cir. 2014),  *aff'd*, 576 U.S. 473 (2015)...........................26

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
572 U.S. 118 (2014) ....................................................................................40

*Listecki v. Off. Comm. of Unsecured Creditors,*
780 F.3d 731 (7th Cir. 2015)........................................................................38

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
140 S. Ct. 2367 (2020) ...........................................................................40, 41

*Louisiana Pub. Serv. Comm'n v. FCC,*
476 U.S. 355 (1986) ....................................................................................31

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n,*
138 S. Ct. 1719 (2018) ................................................................................43

*Munoz v. Giumarra Vineyards Corp.,*
2015 U.S. Dist. LEXIS 122450 (E.D. Cal. Sep. 11, 2015) ...............................14

*N. Coast Women's Care Med. Grp., Inc. v. Super. Ct.,*
189 P.3d 959 (Cal. 2008) .............................................................................45

*N.Y. State Psychiatric Ass'n v. UnitedHealth Grp.,*
798 F.3d 125 (2d Cir. 2015).........................................................................37

*Nebraska v. United States HHS,*
877 F. Supp. 2d 777 (D. Neb. 2012) ........................................................17, 40

*Plumb v. Fluid Pump Serv., Inc.,*
124 F.3d 849 (7th Cir. 1997)..........................................................................2

*Prescott v. Rady Children's Hosp.-San Diego,*
265 F. Supp. 3d 1090 (S.D. Cal. 2017) .........................................................35

*Religious Sisters of Mercy v. Azar,*
513 F. Supp. 3d 1113 (D.N.D. 2021) ........................................................29, 43

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

*Schmitt v. Kaiser Found. Health Plan of Wash.*,
    965 F.3d 945 (9th Cir. 2020).................................................................................16, 29

*Schroer v. Billington*,
    577 F. Supp. 2d 293 (D.D.C. 2008) ...............................................................................20

*Schwake v. Arizona Bd. of Regents*,
    967 F.3d 940 (9th Cir. 2020)..........................................................................................17

*Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*,
    770 F.3d 1282 (9th Cir. 2014)........................................................................................37

*Stamford Bd. of Educ. v. Stamford Educ. Asso.*,
    697 F.2d 70 (2d Cir. 1982)...............................................................................................4

*Survjustice Inc. v. Devos*,
    2019 U.S. Dist. LEXIS 54616 (N.D. Cal. Mar. 29, 2019) ..............................................43

*Sutton v. Providence St. Joseph Med. Ctr.*,
    192 F.3d 826 (9th Cir. 1999).....................................................................................38, 40

*T.S. v. Heart of CarDon*,
    2021 U.S. Dist. LEXIS 49119 (S.D. Ind. Mar. 16, 2021) ...............................................34

*T.S. v. Heart of Cardon, LLC*,
    43 F.4th 737 (7th Cir. 2022) ......................................................................27, 28, 29, 35

*Tomic v. Catholic Diocese of Peoria*,
    442 F.3d 1036 (7th Cir. 2006) *cert. denied*, 549 U.S. 881 (2006) ....................................40

*Toomey v. Arizona*,
    2019 U.S. Dist. LEXIS 219781 (D. Ariz. Dec. 20, 2019) ..........................................20, 21

*Tovar v. Essentia Health*,
    342 F. Supp. 3d 947 (D. Minn. 2018)........................................................................34, 35

*Tovar v. Essentia Health*,
    857 F.3d 771 (8th Cir. 2017)..........................................................................................26

*United States v. Cantu*,
    12 F.3d 1506 (9th Cir. 1993)..........................................................................................10

*United States v. Motamedi*,
    767 F.2d 1403 (9th Cir. 1985)........................................................................................32

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

*United States v. Ron Pair Enters., Inc.*,
    489 U.S. 235 (1989) ........................................................................................30

*United States v. Wilgus*,
    638 F.3d 1274 (10th Cir. 2011) ....................................................................45

*UNUM Life Ins. v. Ward*,
    526 U.S. 358 (1999) ..........................................................................................2

*Werft v. Desert Sw. Ann. Conf. of United Methodist Church*,
    377 F.3d 1099 (9th Cir. 2004) ......................................................................44

*Whitaker v. Kenosha Unified Sch. Dist. No.1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017) ...............................................................20, 37

*Whitman-Walker Clinic, Inc. v. United States HHS*,
    485 F. Supp. 3d 1 (D.C. 2020) ...............................................................31, 40

*Yeager v. Bowlin*,
    693 F.3d 1076 (9th Cir. 2012) ......................................................................14

## STATUTES

28 U.S.C. § 2201(a) ...............................................................................................3

29 U.S.C. § 1132(a)(3) ..........................................................................................3

29 U.S.C. § 1144(d) .........................................................................................2, 40

42 U.S.C. § 18051 ................................................................................................36

42 U.S.C. § 18113 ................................................................................................36

42 U.S.C. § 18116(a) ...........................................................1, 2, 16, 29, 35, 39

42 U.S.C. § 2000bb-1(a) ......................................................................................18

42 U.S.C. § 2000bb-1(b) ...............................................................................18, 49

42 U.S.C. § 2000bb-1(c) ...............................................................................42, 44

42 U.S.C. § 300gg-1 .............................................................................................37

42 U.S.C. § 300gg-13(a) .......................................................................................47

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT – ix
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303 FAX (206) 223-0246

42 U.S.C. § 300gg-2 .................................................................................37

42 U.S.C. § 300gg-3 .................................................................................37

42 U.S.C. § 300gg-4 .................................................................................37

5 U.S.C. § 706 .........................................................................................33

## REGULATIONS

45 C.F.R. § 84.3(h) ..................................................................................35

## RULES

FRE 201 ...................................................................................................10

FRE 802 .....................................................................................................7

LCR 7(e)(3) ................................................................................................1

## OTHER AUTHORITIES

87 Fed. Reg. 47844 ..................................................................................32

87 Fed. Reg. 47876 .............................................................................40, 41

87 Fed. Reg. 47877 ..................................................................................40

Blake, Valarie K., *An Opening for Civil Rights in Health Insurance After
    the Affordable Care Act,*
    36 B.C. J.L. & Soc. Just. 235 (June 2016) ...........................................37

Carol Bayley, *Transgender Persons and Catholic Healthcare*, Health
    Care Ethics USA, Vol. 24, No. 1 (Winter 2016): 1-5,
    https://www.chausa.org/docs/default-
    source/hceusa/transgender-persons-and-catholic-healthcare.pdf
    (last visited 10/24/22) ..........................................................................7

Health Care and Education Reconciliation Act of 2010,
    156 Cong. Rec. S. 1821, 1842 (daily ed. Mar. 23, 2010)..................36

Nat'l Acad. of Sciences, Engineering, and Medicine, *Understanding
    the Well-Being of LGBTQI+ Populations* (2020),
    https://perma.cc/XH5G-MT3L  (last visited 10/6/2022) ........................15

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT – x
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

Pub. L. No. 100-259, 102 Stat. 28 (Mar. 22, 1998) ..................................................................31

*Standards of Care for the Health of Transgender and Gender Diverse
    People,*
    *https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644*
    *(last visited 10/23/22)* ......................................................................................................10

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT – xi
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303 FAX (206) 223-0246

# I.  INTRODUCTION[1]

This case thus turns on relatively straightforward question:  May a third-party administrator ("TPA") that is also a recipient of federal financial assistance, and therefore subject to the Affordable Care Act's ("ACA") health anti-discrimination law, administer a discriminatory exclusion contained in a self-funded plan?  The answer is likewise straightforward: "No." TPAs cannot engage in rank discrimination by claiming to be "just following the orders" of employers that chose to discriminate.  The law is unambiguous: a health program that accepts federal funds cannot engage in discrimination in *any* of its operations, including as a TPA for others.

Defendant Blue Cross Blue Shield of Illinois ("BCBSIL") is one of the largest administrators of insured and self-funded health plans in the United States.  An arm of the Health Care Services Corporation ("HCSC"), BCBSIL is part of a health coverage enterprise that serves over 17 million people.[2]  As an administrator of health plans, BCBSIL acts as a gatekeeper for people's access to essential and critical health care.  And, as a recipient of federal financial assistance, BCBSIL is a health program or activity subject to the health anti-discrimination law, also known as Section 1557 of the ACA.  *See* 42 U.S.C. § 18116(a); Dkt. No. 84-2, pp. 27:24-29:17.

Section 1557 promises broad protection against discrimination for people requiring health care and health coverage. It prohibits discrimination in "***all operations***" of a covered entity.  42 U.S.C. § 18116(a) (emphasis added).  There is no "TPA" or "just following orders" exception.   BCBSIL violates Section 1557 when it administers

---

[1] This consolidated opposition and cross motion for summary judgment is less than the combined total page limit of 48 pages had two separate briefs been filed.  *See* LCR 7(e)(3).

[2] *See* HCSC, *Who We Are: HCSC by the Numbers*, https://www.hcsc.com/who-we-are/statistics (noting that HCSC is "the country's largest customer-owned health insurer" and has "17 million+ members across five states") (last visited 10/18/2022).

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 1
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

discriminatory exclusions of coverage for the treatment of gender dysphoria[3] (the "Exclusion" or "Exclusions"), even when it does so at the direction of the various employers with whom it contracts as a TPA. When BCBSIL administered the Exclusion to deny medically necessary treatment for Plaintiff C.P.'s gender dysphoria, it discriminated against C.P. on the basis of sex and in violation of the ACA.

BCBSIL claims it had "no choice" but to administer the Exclusions because its customers included them in their health plans. *See* Dkt. No. 87, p. 10. But under ERISA, a TPA must always obey federal law, even when doing so would be inconsistent with a specific plan term or benefit design. Customer preferences do not override federal anti-discrimination law. As the Ninth Circuit previously concluded, "customer preference based on sexual stereotype cannot justify discriminatory conduct." *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1277 (9th Cir. 1981).

When the literal terms of a plan require discriminatory administration by a contracting TPA in violation of Section 1557, the TPA must follow the law, not the plan terms. *See* 29 U.S.C. § 1144(d). In fact, the requirements of law literally override and supplant any illegal provisions thereby becoming the "terms of the plan" that the TPA is bound to administer. *See UNUM Life Ins. v. Ward*, 526 U.S. 358, 376-77 (1999); *Plumb v. Fluid Pump Serv., Inc.,* 124 F.3d 849, 861 (7th Cir. 1997) (the relevant law enters into the plan and modifies non-conforming terms); *see e.g., Doe v. United Behavioral Health,* 523 F. Supp. 3d 1119, 1127 (N.D. Cal. 2021) (TPA may not administer plan terms including a blanket exclusion of certain treatment for people with autism, when doing so would violate federal law). Because BCBSIL is prohibited from discriminating on the basis of sex in all of its operations, BCBSIL's "just following orders" defense must be rejected.

---

[3] This treatment is also referenced herein as gender-affirming care.

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 2
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303 FAX (206) 223-0246

BCBSIL still has options.  When an employer asks BCBSIL to administer the discriminatory Exclusions, BCBSIL had at least three legal choices it could make:

(1)  It could simply refuse to administer the Exclusions because it would be illegal discrimination to do so.  Those employers would then have to either abandon the Exclusions in order to contract with BCBSIL or to find other TPAs that are not subject to Section 1557;

(2)  BCBSIL could administer the plans without the Exclusions, consistent with Section 1557's requirements.  BCBSIL could then ask each employer to pay for the cost of the excluded treatment, or, as BCBSIL did with C.P.'s first Vantas implant, it could pay for the cost of the treatment on its own, thus avoiding any illegal discrimination; or

(3)  BCBSIL could always seek judicial guidance as to whether or how it could administer the Exclusions, pursuant to 29 U.S.C. § 1132(a)(3) and/or under 28 U.S.C. § 2201(a), the Declaratory Judgment Act.

BCBSIL took *none* of these non-discriminatory actions.  Instead, BCBSIL chose to administer the discriminatory Exclusions for nearly 400 employers, improperly placing its financial interests above the fiduciary and legal obligations it owed to Plaintiff C.P. and other transgender enrollees.  This Court should not countenance such discrimination.  TPAs cannot "hide behind the plan terms" when they have independent legal and fiduciary obligations to comply with federal law.  *See Doe*, 523 F. Supp. 3d at 1127.

Finally, BCBSIL complains that Plaintiffs brought this litigation as an "end run" around the Religious Freedom Restoration Act ("RFRA"), in order to hold the Catholic Health Initiatives ("CHI") plan liable.  Dkt. No. 87, p. 12.  Not so.  Plaintiff and the proposed class only seek to hold BCBSIL—and only BCBSIL—liable for *its*

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT – 3
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

discrimination.[4]   This case is brought to ensure that Section 1557 is meaningfully enforced.  Entities that are subject to Section 1557 cannot discriminate in any part of their business.  If Section 1557 is to have teeth, it must apply to covered entities in all of their operations — even when they act as TPAs.

## II.   STATEMENT OF FACTS[5]

### A.   Undisputed Material Facts

The following facts are undisputed and material to deciding this dispute:

- BCBSIL is part of HCSC, which receives federal financial assistance for its health programs and activities.  Dkt. No. 84-1, p. 11:5-9; Dkt. No. 84-2, pp. 9:2-12; 17:14-18:9; 18:16-21:8.

- All of BCBSIL's activities are health related.  *Id.*, pp. 16:20-17:10.

- BCBSIL, through HCSC, signed an assurance with the federal government, promising to comply with Section 1557.  Dkt. No. 84-3, ¶5.

- Consistent with Section 1557, and its medical necessity determination, BCBSIL removed its categorical exclusion of coverage for gender-affirming care from its insured policies in 2015.  Dkt. No. 84-1, pp. 33:7-18, 35:15-36:8, 46:11-21; Dkt. No. 84-4, p. 20; Dkt. No. 84-6, pp. 163:15-164:11.

---

[4] BCBSIL actually seeks to engage in an "end run" around federal law with the indemnification provision it puts in place every time the Exclusion is requested by an employer. Hamburger Decl., *Exh. 1*, pp. 131:15-133:3.  By contractual indemnification, BCBSIL improperly attempts to avoid responsibility for its own discriminatory administration.  *See, e.g., Stamford Bd. of Educ. v. Stamford Educ. Asso.*, 697 F.2d 70, 74 (2d Cir. 1982) ("[A] party may not indemnify himself against his own willful, reckless or criminal misconduct").

[5] This Motion incorporates by reference the facts asserted in Plaintiff's Motion for Class Certification, Dkt. No. 78.

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 4
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

- Nonetheless, when acting as a TPA, BCBSIL agreed to administer exclusions of gender-affirming care when requested by employers.  Dkt. No. 84-2, pp. 28:19-29:17; Dkt. No. 84-6, p. 165:8-12.

- BCBSIL has consistently administered the Exclusion in the CHI plan and similar Exclusions for nearly **400 other employers**, denying hundreds of claims for medically necessary gender-affirming care solely because the care was sought for gender dysphoria, a condition with which only transgender people are diagnosed.  Dkt. No. 87-17, p. 7 (Answer to Interrogatory No. 8).

- When an employer asks to include a gender-affirming care exclusion in its plan, the overwhelming majority of the employers use the categorical exclusion **drafted and proffered by BCBSIL.**  Dkt. No. 86-17, Addendum A, p. 13; Dkt. No. 84-6, pp. 34:16-22, 41:12-24; Dkt. No. 84-9, pp. 25:4-27:15 (378 plans use the BCBSIL standard language for the Exclusion, while the handful of variations from BCBSIL's standard Exclusion in Addendum A are "represented uniquely in one plan" each).

- BCBSIL never asks employers for a justification or reason when the employers ask to add the Exclusion to their plan. Dkt. No. 84-6, pp. 72:21-73:7; Dkt. No. 84-9, p. 28:14-17 (BCBSIL will administer the Exclusions based upon nothing more than the "personal preference of that particular client").

- BCBSIL would administer the Exclusion even if the employer expressed overtly discriminatory reasons for it.  *Id.*, p. 29:4-16.  BCBSIL does not require employers to have a genuine medical, scientific, or even a religious

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 5
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

basis for asking it to administer the Exclusion. *See id.,* pp. 28:20-23, 29:17-25.

- When administering a gender-affirming care exclusion, BCBSIL's actions are the same:  It reviews claims to determine if the service is related to "gender dysphoria,"  based on the diagnostic and procedural codes used. Dkt. No. 84-6, pp. 69:8-71:4;  *see e.g.,* Dkt. No. 84-9, pp. 22:2-24:11 (when BCBSIL's legal team identified plans that contained the Exclusions, it looked for denials of claims that included a gender dysphoria diagnosis); 40:17-22 (gender dysphoria is the condition that triggers the application of the Exclusions).  If so, the service is denied under the Exclusions.

- At the same time, BCBSIL covers most services for gender-affirming care when provided for other conditions.  *See* Dkt. No. 84-6, pp. 124:10-125:14, 127:5-22; Dkt. No. 84-14, Dkt. No. 84-1, pp. 64:17-65:1.

- BCBSIL is not a religious entity. Dkt. No. 41, ¶14.  Nor does it ask any employer if the employer has a religious reason for applying the Exclusion. Dkt. No. 84-9, pp. 28:20-23, 29:17-25.  BCBSIL does not ask employers to attest to any "sincerely held religious belief."  *See id.*  In sum, there is no evidence before the Court that any employer that contracts with BCBSIL could be entitled to a religious exemption under RFRA.[6]

---

[6] BCBSIL cannot create an issue of fact on this point by its reference to an inadmissible, unauthenticated hearsay statement by counsel for CHI as the "source" of CHI's ostensible "sincerely held religious belief."  Dkt. No. 87, p. 8:15, *citing to* Dkt. No. 38-8; FRE 802.  This is not material evidence required to invoke a RFRA defense.

*(continued)*

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT – 6
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

- BCBSIL's denial of coverage for Plaintiff C.P.'s claims reflects its standard administration of the Exclusions.   Plaintiff C.P. is a young man who is transgender.  Hamburger Decl., *Exh. 12*, p. 27:1-5.  He has been diagnosed with gender dysphoria by treating and evaluating providers.  *Id., Exhs. 3-5; Exh. 13*, pp. 43:21-44:24, 65:4-20, 105:10-106:4; *Exh. 14*, pp. 53:24-54:16, 55:3-21.  He is enrolled in a BCBSIL-administered self-funded plan that contains an Exclusion. *Id., Exh. 12*, p. 15:2-12; Dkt. No. 81, ¶2; Dkt. No. 84-13, p. 67 of 142.

- BCBSIL covered and paid for C.P.'s first Vantas implant as medically necessary, consistent with its own medical policy.  Dkt. No. 84-1, pp. 52:19-53:9, 59:20-60:18; Dkt. No. 84-10, pp. 2-3 of 3; *See* Hamburger Decl., *Exh. 16*, pp. 20:11-21, 23:12-17.  BCBSIL later claimed that the coverage was in error, not because the treatment was not medically necessary, but rather because BCBSIL claimed that such coverage was not permitted in the CHI plan.  Dkt. No. 84-11.  A second Vantas implant was denied by BCBSIL based upon the Exclusion.  Hamburger Decl., *Exh. 1*, pp. 125:18-127:22; *Exh. 20.*

- After undergoing medically necessary treatment for gender dysphoria (prescribed by his doctor in accordance with the standards of care, and

---

BCBSIL could have, but did not, obtain admissible evidence directly from CHI.  Dkt. No. 87, p. 8:15, *citing to* Dkt. No. 38-8.  BCBSIL's failure to do so may be because Ms. Pritchard's employer (formerly known as the secular hospital, Harrison Medical Center) is part of the "for-profit" arm of CHI and not subject to a religious exemption.  *See* Hamburger Decl., *Exh. 1*, pp. 166:9-169:4, *Exh. 2*, p. 33; Dkt. No. 84-13, p. 41 of 142 ("Our non-profit business lines fall under a religious exemption…" while indicating that Harrison Medical Center is part of the "for-profit CHI markets" that is not subject to religious exemption).   And the fact that CHI may be "catholic" is insufficient on its own. *Cf.* Carol Bayley, *Transgender Persons and Catholic Healthcare*, Health Care Ethics USA, Vol. 24, No. 1 (Winter 2016): 1-5, https://www.chausa.org/docs/default-source/hceusa/transgender-persons-and-catholic-healthcare.pdf (last visited 10/24/22).

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 7
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303 FAX (206) 223-0246

including more than a year of prescribed hormone therapy covered by his health plan), C.P.'s treatment team recommended he undergo gender-affirming surgery in the form of a mastectomy and male chest reconstruction. Hamburger Decl., *Exhs. 3-5.* Prior to the surgery, C.P. was assessed not only by his treating primary care physician, who has over 15 years of experience with treating gender dysphoria, but also by a licensed mental health provider who confirmed his gender dysphoria diagnosis and also deemed the surgery to be medically necessary. Hamburger Decl., *Exhs. 3-4, Exh. 16,* pp. 22:7-23:11, 33:1-20, 39:18-40:9l; *Exh. 11,* pp. 9:1-11:7, 12:1-13:10.

- When C.P. sought pre-authorization for his chest surgery, it was denied by BCBSIL based solely upon the Exclusion. Dkt. No. 84-14; Hamburger Decl., *Exh. 1,* pp. 124:13-125:14. BCBSIL's Rule 30(b)(6) witness agreed that the surgery was medically necessary under BCBSIL's own medical policy. Dkt. No. 84-1, pp. 60:19-62:3 ("Based on the records that I reviewed and the medical policy, yes, I believe it [C.P.'s chest surgery] would have been covered.").

- C.P. and his parents spent $12,122.50 to pay for the second Vantas implant and chest surgery. Hamburger Decl., *Exh. 19,* p. 11.

**B.    Gender-Affirming Care is Medically Necessary.**

   **1.    Background on Gender Dysphoria.**

Gender identity is a person's internal sense of their sex. Hamburger Decl., *Exh. 6,* Ettner Expert Report ("Ettner") ¶22; *id., Exh. 7,* Karasic Expert Report ("Karasic") ¶21; *Id., Exh. 8,* Schechter Expert Report ("Schechter") ¶20. Every person has a gender identity, and it does not always align with their sex assigned at birth. *See* Ettner, ¶¶20–

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 8
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

22; Karasic, ¶21. A person's sex assigned at birth is generally based on a visual assessment of external genitalia. Ettner, ¶¶20–22; Karasic, ¶21; Schechter, ¶20. People who have a gender identity that aligns with their sex assigned at birth are cisgender, while people who have a gender identity that does not align with their sex assigned at birth are transgender. Ettner, ¶20; Karasic, ¶20. A transgender boy or man was assigned a female sex at birth but has a male gender identity. A transgender girl or woman was assigned a male sex at birth but has a female gender identity. Gender identity is innate, has biological underpinnings, and is not a matter of choice. Ettner, ¶¶ 22, 25–26; Karasic, ¶21. Being transgender is a well-recognized variation of human development. *See* Ettner, ¶¶23-25; Karasic, ¶31.

The incongruence between a transgender person's gender identity and their sex assigned at birth can result in clinically significant distress or significant impairment in functioning. Ettner, ¶27; Karasic, ¶¶22, 24; Schechter, ¶21. The medical diagnosis for that incongruence and the attendant distress or impairment is gender dysphoria. Ettner, ¶27; Karasic, ¶23; Schechter, ¶21. Gender dysphoria is a serious medical condition, the diagnosis of which is codified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-5"). Ettner, ¶27; Karasic, ¶23; Schechter, ¶21. It is also recognized as "gender incongruence" in the International Classification of Diseases (World Health Org., 11th rev.) ("ICD-11"). Ettner, ¶27; Schechter, ¶21.

Gender dysphoria, if left untreated, may result in debilitating anxiety, severe depression, self-harm, and even suicidality. Ettner, ¶¶32, 52; Karasic, ¶24; Schechter, ¶21. When an individual goes without appropriate treatment for gender dysphoria, they are put at risk of significant harm to their health and wellbeing. Ettner, ¶27; Karasic, ¶23; Schechter, ¶21.

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT – 9
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303 FAX (206) 223-0246

### 2.     Generally Accepted Medical Standards Establish Gender Affirming Care as the Standard Treatment for Gender Dysphoria.

The WPATH developed and has continuously maintained the "*Standards of Care for the Health of Transgender, Transsexual, and Gender-Nonconforming People*" ("WPATH Standards of Care") since 1979.[7]  Ettner, ¶33; Karasic, ¶25; Schechter, ¶24.  The Endocrine Society also publishes comprehensive guidelines entitled "*Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*" ("Endocrine Society Guidelines"), which are consistent with the WPATH Standards of Care.  Karasic, ¶27; Schechter, ¶26.  The goal of these generally accepted treatment standards is to eliminate the distress of gender dysphoria by bringing a patient's body into better alignment with their gender identity.  Ettner, ¶65; Karasic, ¶¶32, 56; Schechter, ¶25.  Gender-affirming care may include counseling, hormone therapy, surgery, and other medically necessary treatments.  Ettner, ¶¶38–48; Karasic, ¶¶36–42; Schechter, ¶¶25, 28–30.  *See also generally* Dkt. No. 84-4 (BCBSIL Medical Policy on gender-affirming care).  The precise treatments are determined by an individual person's health care team in collaboration with the patient, and, if the patient is an adolescent, with the patient's parents or guardians.  Ettner, ¶37; Karasic, ¶50.

For adolescents with gender dysphoria who experience severe distress with the onset of puberty, puberty-delaying medication may be indicated.  Ettner, ¶¶39–42; Karasic, ¶38.  Puberty-delaying medications pause endogenous puberty, limiting the

---

[7] Since discovery closed in this case, WPATH published Version 8 of the "*Standards of Care for the Health of Transgender and Gender Diverse People.*"  *See* https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 (last visited 10/23/22), and contained in Hamburger Decl., *Exh. 9*.  Like prior versions, Version 8 of the WPATH Standards of Care recommends the provision of gender-affirming care, as medically necessary for the treatment of gender dysphoria. The Court may take judicial notice of Version 8 of the WPATH Standards of Care, whose authenticity may not reasonably be questioned.  FRE 201; *see United States v. Cantu*, 12 F.3d 1506, 1509 n.1 (9th Cir. 1993).

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 10
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

influence of endogenous hormones on the body.  Ettner, ¶39; Karasic, ¶38.  Such interventions afford the adolescent time to better understand their gender identity while delaying the development of secondary sex characteristics.  Ettner, ¶39; Karasic, ¶38.

Treatment with puberty-delaying medications is reversible, meaning that if an adolescent discontinues the treatment, puberty will resume.  Ettner, ¶39; Karasic, ¶38.  Treatment with puberty-delaying medication can drastically minimize gender dysphoria during adolescence and later in adulthood, and in some cases may eliminate the need for future surgery.  Ettner, ¶40.  Both the Endocrine Society Guidelines and WPATH Standards of Care recommend the use of puberty delaying medication at the earliest stages of puberty.  Ettner, ¶41.

For some adolescents with gender dysphoria, however, initiating puberty consistent with their gender identity through hormone therapy may be medically necessary.  Karasic, ¶39.  For adults, hormone therapy may also be medically necessary.  Karasic, ¶39.  If a patient is assessed to have a medical need for hormone therapy, gender-affirming hormone therapy involves administering steroids of the experienced sex (i.e., their gender identity), such as testosterone in transgender male individuals and estrogen in transgender female individuals.  Ettner, ¶42; Karasic, ¶39.  The purpose of this treatment is to attain the appropriate masculinization or feminization of the transgender person to achieve a gender phenotype that matches as closely as possible to their gender identity.  Ettner, ¶¶43–44; Karasic, ¶39.  For adolescents, this treatment allows patients to have pubertal changes and development consistent with their gender identity.  Karasic, ¶39.  Gender-affirming hormone therapy is a partially reversible treatment in that some of the effects produced by the hormones are reversible (e.g., changes in body fat composition, decrease in facial and body hair) while others are irreversible.  Karasic, ¶39.

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT – 11
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

Some transgender individuals need surgical interventions to help bring their body into alignment with their gender.  Ettner, ¶¶45–46; Karasic, ¶40; Schechter, ¶¶26–27.  Though not all transgender people require gender-affirming surgery, such care is necessary when medically indicated.  Ettner, ¶46; Karasic, ¶40; Schechter, ¶32.  Surgical interventions may include vaginoplasty, breast implants, and orchiectomy for transgender female individuals and chest reconstruction, hysterectomy, or phalloplasty for transgender male individuals.  Ettner, ¶¶46–48; Karasic, ¶40; Schechter, ¶¶28–29.  The WPATH Standards of Care recognize that male chest reconstruction surgery may be indicated for transgender young people under eighteen.  Karasic, ¶41; Schechter, ¶30.

As with all medical care, no treatment is provided without discussing the risks and benefits of the treatment and informed consent.  Karasic, ¶50.  And, consistent with all medical standards, the WPATH Standards of Care and clinical guidelines recommend that clinicians take a case-by-case approach to evaluate whether and when the procedure is medically necessary for a particular patient.  Ettner, ¶37.

The consequences of untreated gender dysphoria are serious, including irreversible and harmful physical changes and irreparable mental harm.  Ettner, ¶¶32, 81; Karasic, ¶¶57, 81.  Denial of medically indicated gender-affirming care to transgender people frustrates treatment goals, exacerbates gender dysphoria and its associated depression and suicidality, imposes stigma, and has negative impacts on patients' mental health and well-being.  Ettner, ¶¶65-71.

3.     **The Gender Affirming Care Described in the WPATH Standards of Care Is Accepted by Every Major Medical Association in the United States.**

The country's major medical associations, including the American Academy of Pediatrics, American Medical Association, American Psychiatric Association, American Psychological Association, and Endocrine Society, among others, agree that gender-

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

affirming care is safe, effective, and medically necessary treatment that improves the health and wellbeing of transgender people who are experiencing gender dysphoria. Ettner, ¶¶30, 34, 43; Karasic, ¶43; Schechter, ¶27.  The treatment protocols for gender dysphoria are comparable to those for other mental health and medical conditions. Karasic, ¶42.  Indeed, these or similar procedures are provided for cisgender people with other diagnoses.  Karasic ,¶42; Schechter, ¶¶32, 36, 42.

**C.  BCBSIL Concludes that Gender-Affirming Care, Including Chest Surgery for Transgender Males, Is Medically Necessary.**

Treatment for gender dysphoria is provided pursuant to well-established guidelines, developed through decades of research and clinical practice.  Schechter, ¶¶23-33.  This is reflected in the BCBSIL medical policy governing gender-affirming care. *See* Dkt. No. 84-4,

BCBSIL's medical policy reflects the current consensus on the standards of care for treatment of gender dysphoria.  Dr. Kim Reed testified on behalf of BCBSIL as one of its Rule 30(b)(6) witnesses.  He also oversees the development of medical policies at BCBSIL.  Dkt. No. 84-1, p. 11:16-22.  Dr. Reed testified that "the foundation for our medical policies is based on the evidence-based clinical literature that's out in the scientific community" including a wide variety of scientific publications.  *Id.,* p. 12:17-23. "All of our [medical] policies, whether it's this policy or any other medical policy, are based on a review of the scientific literature."  *Id.,* p. 38:3-5.  When asked if HCSC uses different medical policies for different divisions, Dr. Reed emphatically demurred: "[W]e don't have different medical policies [for different states] … because the clinical evidence

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 13
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303 FAX (206) 223-0246

is what it is."[8]  *Id.*, p. 39:15-19.  According to BCBSIL, its medical policies, including its policy on coverage for gender-affirming care, are grounded firmly in the objective scientific and medical knowledge.

BCBSIL's decision to cover gender-affirming care was based upon scientific and medical evidence and a review of the medical literature.  *Id.*, pp. 37:24-38:9.  The review was based in part on consideration of the WPATH Standards of Care, 7th version.  *Id.*, pp. 38:10-39:8.  The review also considered the requirements of the ACA.  *Id.*, p. 46:11-21.  Based on the scientific and medical evidence and the requirements of the ACA, BCBSIL removed all gender-affirming care exclusions from its insured health plans, as well as from self-funded plans for which the employer had not requested an express exclusion.  *Id.*, p. 46:3-21; Dkt. No. 84-5; Dkt. No. 84-6, pp. 163:15-164:11.  Since 2015, BCBSIL has covered medically necessary gender-affirming care in its insured plans and in its self-funded plans without an express Exclusion.  *Id.*, Dkt. No. 84-6, p. 27:4-15.

BCBSIL's medical policy requiring coverage of medically necessary gender-affirming care is consistent with the WPATH Standards of Care.  Dkt. No. 84-1, p. 52:6-13; Dkt. No. 84-5, p. 5 (BCBSIL determined that it should "strictly follow" the WPATH Standards of Care); Dkt. No. 84-7, p. 5 ("We have decided as a company to follow WPATH").  BCBSIL's medical policy permits coverage of certain gender-affirming care

---

[8] BCBSIL tries to rebut its own Rule 30(b)(6) witness, when it asserts that "the science is inconclusive and the medical community is divided" regarding the clinical efficacy of gender-affirming care.  *Compare* Dkt. No. 87, p. 18:16 with Dkt. No. 84-1, 46:3-21.  BCBSIL has concluded, based upon the scientific and clinical evidence, that gender-affirming care can be medically necessary even for minors, consistent with WPATH.  Hamburger Decl., *Exh. 10*, pp. 38:10-40:11.  BCBSIL cannot recant this position by hiring an outside medical "expert" to disagree with its own medical policy, medical directors, and Rule 30(b)(6) testimony.  *See Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) ("[A] party cannot create an issue of fact by an affidavit contradicting [its]  prior deposition testimony"); *Munoz v. Giumarra Vineyards Corp.*, 2015 U.S. Dist. LEXIS 122450, at *14 (E.D. Cal. Sep. 11, 2015) ("Rule 30(b)(6) testimony can only be rebutted when there is an explanation for why the earlier testimony is mistaken.").

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 14
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

consistent with WPATH Standards of Care, including medically necessary chest surgery for transgender male youth. *See* Dkt. No. 84-4, p. 7 of 22 (hormone therapy, psychological services and chest surgery for transgender male individuals may be medically necessary for children and adolescents); *Exh. 10,* pp. 40:12-41:20.

BCBSIL's decision to follow the medical consensus for the standard of care for treatment of gender dysphoria for adults and minors is consistent with the positions taken by the major medical organizations in the United States and the National Academies of Sciences, Engineering, and Medicine.  *See*, *e.g.*, Hamburger Decl., *Exhs. 6-8*; Nat'l Acad. of Sciences, Engineering, and Medicine, *Understanding the Well-Being of LGBTQI+ Populations* (2020), at 12-14, https://perma.cc/XH5G-MT3L ("[A]vailable evidence generally indicates that gender-affirming medical interventions, including surgeries, are associated with improvements in gender dysphoria, mental health, and quality of life for transgender people") (last visited 10/6/2022).

**D.   Plaintiff C.P.'s Gender-Affirming Care was Medically Necessary under the BCBSIL Medical Policy.**

BCBSIL's medical director and Rule 30(b)(6) witness, Dr. Reed, agrees that C.P.'s Vantas implants (hormone therapy) and chest surgery met the medical necessity criteria under the BCBSIL medical policy.  Dkt. No. 84-1, pp. 52:19-53:9, 60:5-62:3.  *See also* Karasic, ¶¶65-75; Ettner, ¶¶72-81.  Nonetheless BCBSIL denied coverage of these services, solely due to BCBSIL's decision to administer the Exclusion for the CHI Plan. Dkt. No. 84-14.

The denial was not based on any objective medical or scientific evidence concerning the safety or efficacy of the treatment.  Both treatments are covered when medically necessary under BCBSIL medical policy. *See e.g.,* Dkt. No. 84-1, pp. 60:19-62:3. Rather, the denial was based solely on BCBSIL's administration of the arbitrary "individual preference" of Ms. Pritchard's employer to exclude all coverage for health

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 15
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303 FAX (206) 223-0246

services "for, or leading to, gender reassignment surgery" as treatment for gender dysphoria starting in 2018.  BCBSIL continues to administer the Exclusion to date and has no plans to stop.  Dkt. No. 84-6, p. 165:13-18.

### III.   LAW AND ARGUMENT

**A.   Legal Standard for Section 1557 Claims of Sex Discrimination.**

Section 1557 requires, in relevant part, that "[a]n individual shall not, on the ground prohibited under … title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*), … be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."  42 U.S.C. § 18116(a).  It is "an affirmative obligation not to discriminate in the provision of health care."  *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 955 (9th Cir. 2020).  Section 1557 "incorporates only the prohibited 'grounds' and 'the enforcement mechanisms provided for and available under'" the referenced civil rights statutes.  *Id.*, at 953.  As this Court has already held, to succeed on their Section 1557 claim, Plaintiffs and the proposed class must demonstrate that (1) the defendant is a health program or activity, any part of which receives federal funding; (2) the plaintiff was excluded from participation in, denied the benefits of, or subjected to discrimination under any a health program or activity; and (3) the latter occurred on the basis of sex.  *See* Dkt. No. 23, p. 7 (articulating standard for sex discrimination claim under Section 1557); *see also Fain v. Crouch*, 2022 U.S. Dist. LEXIS 137084, at *35 (S.D.W. Va. Aug. 2, 2022) (same); *Kadel v. Folwell*, 446 F. Supp. 3d 1, 12–13 (M.D.N.C. 2020) (same), *aff'd sub nom. Kadel v. N.C. State Health Plan Teachers & State Emples.*, 12 F.4th 422 (4th Cir. 2021), as amended (Dec. 2, 2021), *cert. denied*, 142 S. Ct. 861 (2022); *cf. Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) (applying the legal grounds from Title VII and Title IX to a Section 1557 claim for sex discrimination); *Schwake v. Arizona*

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT – 16
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

*Bd. of Regents*, 967 F.3d 940, 946 (9th Cir. 2020) (articulating the grounds for a claim under Title IX).

Taking the factors in reverse order, Plaintiffs demonstrate below that: (a) the Exclusions are facially discriminatory on the basis of sex; (b) when BCBSIL administered the Exclusions, it intentionally and independently engaged in discrimination on the basis of sex, even if the Exclusions were requested by its employer customers; and (c) BCBSIL is a covered entity because it is a "health program or activity, any part of which is receiving Federal financial assistance," and must therefore independently comply with Section 1557 in all of its activities, including the administration of employer-sponsored self-funded health plans.

BCBSIL continues to assert its defense under RFRA, despite the Court's rejection of this argument when denying BCBSIL's Motion to Dismiss.  *See* Dkt. No. 87, pp. 7-12. BCBSIL's second bite at the apple fares no better than its first.  *See* Dkt. No. 23, p. 9. To assert a RFRA claim, BCBSIL must demonstrate the involvement of the federal government, which is entirely absent from this litigation.  *See* 42 U.S.C. §§ 2000bb-1(a), (b) ; *Holt v. Hobbs,* 574 U.S. 352, 357 (2015).  BCBSIL offers no evidence to the contrary. Nor may BCBSIL "borrow" a defense under RFRA that a contracting employer might have because Congress specifically limited the parties that can assert a claim or defense under RFRA to only persons with sincerely held religious beliefs, something which BCBSIL cannot claim to have. *See, e.g., Nebraska v. United States HHS*, 877 F. Supp. 2d 777, 800 (D. Neb. 2012) (not even states may borrow third parties' rights under RFRA).

## B.   BCBSIL's Administration of Gender-Affirming Care Exclusions Unlawfully Discriminates on the Basis of Sex.

BCBSIL's standard gender-affirming care Exclusions and the "one-off" variations that it administers in ERISA self-funded plans unlawfully discriminate on the basis of sex in violation of Section 1557.   The Exclusions are administered as categorical

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT – 17
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

prohibitions of coverage for medically necessary treatment for gender dysphoria, or in some cases (as with CHI), for all medically necessary health services "for, or leading to, gender reassignment surgery" as treatment for gender dysphoria.

Courts considering similar categorical coverage exclusions have overwhelmingly concluded that they constitute illegal discrimination when designed or administered by an entity subject to Section 1557. *See Kadel v. Folwell*, 2022 U.S. Dist. LEXIS 103780, at *64 (M.D.N.C. June 10, 2022) (as corrected Aug. 10, 2022); *Fain v. Crouch*, 2022 U.S. Dist. LEXIS 137084, at *37 (S.D. W. Va. Aug. 2, 2022); *Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1027, 1030 (D. Alaska 2020); *Flack v. Wisconsin Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1019-22 (W.D. Wis. 2019); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 1002-03 (W.D. Wis. 2018). *Cf. Brandt v. Rutledge*, 47 F.4th 661, *13-18 (8th Cir. 2022) (finding a state law banning gender-affirming care for minors discriminates on the basis of sex).

This conclusion follows naturally from the Supreme Court's holding in *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1741 (2020).  *See Doe*, 28 F.4th at 114 (*Bostock*'s holding must be read to apply to Section 1557 claims related to gender-affirming care exclusions).  "[I]t is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex." *Bostock,* 140 S. Ct. at 1741.  Taking adverse action against "a transgender person who was identified as a male at birth but who now identifies as a female," while not taking such action against "an otherwise identical [person] who was identified as female at birth," "intentionally penalizes" the transgender person.  *Id.,* at 1741-42.

BCBSIL's administration of the Exclusions does precisely that.  When administering the Exclusions, BCBSIL scans health care claims to determine if they are submitted for "gender dysphoria."  *See* Dkt. No. 84-9, p. 40:17-22 (the application of the Exclusions is triggered by the diagnostic code for gender dysphoria).  If the health care

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 18
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

claim is submitted for that diagnosis, and the plan excludes the listed service on the claim when provided for that diagnosis, the claim is denied. *See id.; see e.g.,* Dkt. No. 84-9, pp. 22:2-24:11 (when BCBSIL's legal team identified plans that contained the Exclusions, it looked for denials of claims that included a gender dysphoria diagnosis).  At the same time, the service listed on the health care claim may be covered for a cisgender person for another condition.  Dkt. No. 84-6, pp. 124:10-125:14; 127:5-22; Dkt. No. 84-1, pp. 64:17-65:1.[9]  In other words, "sex plays an unmistakable and impermissible role" in BCBSIL's administration of the Exclusions, "intentionally penaliz[ing] a person … for traits or actions that it tolerates" in another individual simply because of sex assigned at birth. *See Bostock*, 140 S. Ct. at 1741–42.  This is a "straightforward" case of sex discrimination. *Boyden*, 341 F. Supp. 3d at 995.

As the *Boyden* court explained, administering a gender-affirming care exclusion "entrenches" the sex-stereotyped "belief that transgender individuals must preserve the genitalia and other physical attributes of their [sex assigned at birth] sex over not just personal preference, but specific medical and psychological recommendations to the contrary." *Id.*, 341 F. Supp. 3d at 997; *see also Flack*, 328 F. Supp. 3d at 951; *Kadel,* 2022 U.S. Dist. LEXIS 103780, at *65 ("This is textbook sex discrimination.").  Courts throughout the country have found similar discrimination against transgender people to be rooted in impermissible sex stereotyping.  *See, e.g., Kadel v. Folwell*, 446 F. Supp. 3d 1, 14 (M.D.N.C. 2020) (Exclusion "tethers Plaintiffs to sex stereotypes which, as a matter of

---

[9] This is the same discriminatory administration that courts have found to be illegal in other cases. *See Kadel*, 2022 U.S. Dist. LEXIS 103780 at *65 ("The Plan expressly limits members to coverage for treatments that align their physiology with their biological sex and prohibits coverage for treatments that 'change or modify' physiology to conflict with assigned sex."); *Fletcher*, 443 F. Supp. 3d at 1030; *cf. Brandt*, 2022 WL 3652745, at *2 ("A minor born as a male may be prescribed testosterone … but a minor born as a female is not permitted to seek the same medical treatment.").

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 19
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

medical necessity, they seek to reject"); *Toomey v. Arizona,* 2019 U.S. Dist. LEXIS 219781, at *17-18 (D. Ariz. Dec. 20, 2019)  (same).

Discrimination based on gender transition is necessarily discrimination based on sex.  *See Schroer v. Billington*, 577 F. Supp. 2d 293, 306-08 (D.D.C. 2008) (employer's "refusal to hire [plaintiff] after being advised that she planned to … undergo[] sex reassignment surgery was literally discrimination because of … sex"); *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 527 (D. Conn. 2016). The same is true here because the Exclusions expressly prohibit coverage for health services "for, or leading to, **gender reassignment** surgery." Dkt. No. 84-13, p. 67 of 142, (emphasis added); *see Flack*, 328 F. Supp. 3d at 949.

Discrimination "on the basis that an individual was going to, had, or was in the process of changing their sex … is still discrimination based on sex." *Flack,* 328 F. Supp. 3d at 949 (emphasis added).  Similarly, BCBSIL administers the Exclusions based solely on the presence of a diagnosis with "gender dysphoria" in combination with a request for related treatment for that condition.  BCBSIL's administration of the Exclusions explicitly classifies health care claims, and therefore coverage, based on sex.   "[O]ne cannot explain gender dysphoria 'without referencing sex' or a synonym." *Kadel,* 2022 U.S. Dist. LEXIS 103780, at *68. *See Fletcher,* 443 F. Supp. 3d at 1027, 1030; *see also Whitaker v. Kenosha Unified Sch. Dist. No.1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017).  Indeed, treatment for gender dysphoria is only sought by transgender individuals.  *See Brandt*, 47 F.4th 661, 669-70 ("The biological sex of the minor patient is the basis on which the law distinguishes between those who may receive certain types of medical care and those who may not"); *Kadel,* 2022 U.S. Dist. LEXIS 103780, at *68 ("Discrimination against individuals suffering from gender dysphoria is also discrimination based on sex and transgender status"); *Toomey v. Arizona,* 2019 U.S. Dist. LEXIS 219781, at *18 (D. Ariz.

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT – 20
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303 FAX (206) 223-0246

Dec. 20, 2019) ("[T]ransgender individuals are the only people who would ever seek gender reassignment surgery.").

BCBSIL argues that an alleged "lack of consensus" regarding the efficacy of gender-affirming care "establishes that the CHI Plan's Exclusion does not discriminate on the basis of sex."  Dkt. No. 87, p. 17.  BCBSIL's reasoning is difficult to parse but appears to be that: (1) an employer like CHI could have undertaken a medical necessity review of gender-affirming care; (2) that review could have resulted in findings similar to the outlier opinions expressed by Dr. Laidlaw; and (3) if that had happened, the employer could have continued to exclude gender-affirming care as not medically necessary.  *See id.* (describing how HHS in 2020 "delivered a sufficiently reasoned explanation" and "consulted scientific studies" when it modified its regulatory position on coverage for gender-affirming care).  But BCBSIL presents ***no evidence*** of any employer undertaking any medical necessity review of gender-affirming care before putting the Exclusions in place.

The undisputed facts are that BCBSIL never asked employers for any justification for the Exclusions.  Dkt. No. 84-6, pp. 72:21-73:7; Dkt. No. 84-9, p. 28:14-29:25.    And, BCBSIL testified it would administer the Exclusions even if the employer had an overtly discriminatory reason for including it.  *Id.,* p. 29:4-16.  Indeed, the only evidence of a scientific and medical analysis of the efficacy of gender-affirming care was the BCBSIL analysis that led Defendant in 2015 to change its medical policy and authorize coverage.  *See* Dkt. No. 84-4.  The fact that some people like Dr. Laidlaw disagree with the conclusions reached by BCBSIL's medical policy committee, Plaintiffs' experts, the AMA, APA, WPATH and other medical and scientific organizations, as well as numerous courts across the country, is ultimately irrelevant to the legal issues in this case.

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 21
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

To be clear, BCBSIL's bald assertion that there is no medical consensus regarding gender-affirming care is wrong and misleading. Dkt. No. 87, p. 17.  Gender-affirming care is well-established, widely accepted, and evidence-based.  *See* Ettner ¶¶34, 49, 53–54; Karasic ¶43; Schechter ¶27.  The Ninth Circuit has recognized that:

> [M]any of the major medical and mental health groups in the United States—including the American Medical Association, the American Medical Student Association, the American Psychiatric Association, the American Psychological Association, the American Family Practice Association, the Endocrine Society, the National Association of Social Workers, the American Academy of Plastic Surgeons, the American College of Surgeons, [GLMA:] Health Professionals Advancing LGBTQ Equality, the HIV Medicine Association, the Lesbian, Bisexual, Gay and Transgender Physician Assistant Caucus, and Mental Health America—recognize the WPATH Standards of Care as representing the consensus of the medical and mental health communities regarding the appropriate treatment for transgender and gender dysphoric individuals.

*Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019); *id.* at 771 ("In summary, the **broad medical consensus** in the area of transgender health care requires providers to individually diagnose, assess, and treat individuals' gender dysphoria … Treatment can and should include [gender-affirming care] when medically necessary") (emphasis added).  Other courts have similarly concluded that gender-affirming care as treatment for gender dysphoria represents the medical consensus in this area.  *Kadel*, 12 F.4th at 427–28 (noting the WPATH Standards of Care "have been adopted by health organizations across the country" and that gender-affirming treatments, including hormone therapy and surgical care, "are safe, effective, and often medically necessary"); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 595 (4th Cir. 2020), as amended (Aug. 28, 2020) ("WPATH Standards of Care … represent **the consensus** approach of the medical and mental health community.") (emphasis added), *cert. denied*, 141 S. Ct. 2878 (2021); *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 890 (E.D. Ark. 2021) ("The **consensus**

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 22
Case No. 3:20-cv-06145-RJB

Sirianni Youtz
Spoonemore Hamburger pllc
3101 Western Avenue, Suite 350
Seattle, Washington 98121
Tel. (206) 223-0303 Fax (206) 223-0246

recommendation of medical organizations is that the only effective treatment for individuals at risk of or suffering from gender dysphoria is to provide gender-affirming care.") (emphasis added), *aff'd*, 47 F.4th at 671 ("[T]here is substantial evidence to support the district court's conclusion that the Act prohibits medical treatment that conforms with the recognized standard of care."). "[A]ny attempt by defendant[] or their expert[] to contend that gender-confirming care -- including surgery -- is inappropriate, unsafe, and ineffective is unreasonable, in the face of the existing medical consensus." *Flack v. Wisconsin Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1018 (W.D. Wis. 2019).   As the district court in *Kadel* recognized,

> Plaintiffs' doctors, their experts, every major medical association, and **Defendant['s] own [medical policy]** all agree that, in certain cases, gender affirming medical and surgical care can be medically necessary to treat gender dysphoria. Defendant[] attempt[s] to create scientific controversy in this uniform agreement through [an] expert[] who mix[es] [his] scientific analysis with hypothetical speculation and political hyperbole. Only science that is relevant, reliable, and offered by a qualified expert is admissible, however, and the admissible portions of Defendant['s] expert's testimony, even when taken in the light most favorable to Defendant[], do not justify the exclusion at issue. Defendant['s] belief that gender affirming care is ineffective and unnecessary is simply not supported by the record. Consequently, their categorical sex-and transgender-based exclusion of gender affirming treatments from coverage unlawfully discriminates against Plaintiffs.

2022 U.S. Dist. LEXIS 103780, at *104 (emphasis added).  The same is true here.

BCBSIL argues that the Ninth Circuit's decision in *Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022) demonstrates that there is no such medical consensus regarding gender-affirming care.  Dkt. No. 87, p. 20.  BCBSIL takes *Doe* out of context.  In *Doe*, the Ninth Circuit concluded that the plaintiff had failed to meet his "heightened burden" for a mandatory preliminary injunction to compel coverage of his individual treatment and which would have altered the status quo.  *Id.*, 28 F.4th at 112.  The decision also noted

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 23
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

1   the lack of evidence of medical necessity for that particular plaintiff, stating that "Doe
2   failed to provide a declaration from any psychiatrist or medical doctor who is treating
3   him that attested to the necessity and suitability of the surgery in his particular case." *Id.*
4   Such is not the case here:

5       ***First***, and most importantly, BCBSIL, through Dr. Reed, its Rule 30(b)(6) witness,
6   agrees that gender-affirming care can be medically necessary, consistent with the
7   WPATH Standards of Care.  *See e.g., id.*, pp. 37:24-39:8, 39:15-19 ("the clinical evidence is
8   what it is").  Moreover, BCBSIL conceded that C.P.'s Vantas implants and chest surgery
9   met the medical necessity criteria under the BCBSIL medical policy.  Dkt. No. 84-1, pp.
10  52:19-53:9, 60:5-62:3.

11      ***Second***, the present case includes extensive medical necessity testimony of three
12  of C.P.'s health care providers, namely, Kevin Hatfield, M.D., who diagnosed C.P. with
13  gender dysphoria and recommended that he obtain gender-affirming care in the form of
14  a Vantas implant and chest surgery (Hamburger Decl., *Exh. 3)*; Sharon Booker, LMHC,
15  who independently verified C.P.'s gender dysphoria diagnosis and concluded that C.P.
16  was appropriate for gender-affirming care for his gender dysphoria, (*id., Exh.4)*; and
17  Jeffrey Kyllo, M.D., who concurred in the provision of such treatment and performed
18  C.P.'s gender-affirming chest surgery. *Id., Exh. 5.*

19      ***Third***, two of Plaintiffs' medical experts, both highly qualified and experienced in
20  treating gender dysphoria, reviewed the relevant records and independently examined
21  C.P.:  Dr. Ettner, a clinical psychologist with over 35 years of experience in the field of
22  transgender health, and Dr. Karasic, a psychiatrist with over 30 years of experience in
23  the field of transgender health.  Both verified C.P.'s gender dysphoria diagnosis, and
24  concurred with the recommended course of gender-affirming care, including the

25

26

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT – 24
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

provision of puberty-delaying medication, hormone therapy, and chest surgery.  *See id.*, *Exh. 6*, ¶¶81–83; *Exh. 7*, ¶¶76–77.

*Finally*, the posture of this case is much different from *Doe*.  Here, Plaintiffs move for summary judgment on a well-developed record, not a preliminary injunction.

In sum, there is no genuine material dispute between the parties over whether there is a "medical consensus" regarding the medical necessity of gender-affirming care.  BCBSIL cannot manufacture a dispute by relying upon *Doe* and Dr. Laidlaw's report.[10]

## C.   Both Plan Design and Administration of the Exclusions are Discriminatory.

BCBSIL seems to argue that even if the design of the Exclusions by its contracting employers is discrimination, BCBSIL's administration of the Exclusions is not.  *See* Dkt. No. 87, p. 5 ("BCBSIL is not responsible for the design of the CHI Plan, including the CHI Plan's Exclusion for gender reassignment surgery").  The problem for BCBSIL is that Section 1557 applies to both benefit design and claims administration -- both can be grounds for discrimination claims.  *See Tovar v. Essentia Health*, 857 F.3d 771, 778-779 (8th Cir. 2017) (TPA can be liable for discriminatory benefit design, if it had a role in the

---

[10] Nor can BCBSIL create an issue of material fact regarding the medical necessity of C.P.'s treatment by offering Dr. Laidlaw's unqualified and unreliable opinion that C.P.'s treatment is not medically necessary because he is a minor. *See* Dkt. No. 87, p. 7, 19-21; Dkt. No. 88-1, ¶180, pp. 271 of 304.  As will be explained in Plaintiffs' motion to exclude his testimony, Dr. Laidlaw, who is an ardent opponent of gender-affirming care under any circumstance, is not qualified to opine on these matters because he is not a mental health professional or a surgeon, and has never met with or evaluated C.P.  Hamburger Decl., *Exh. 15*, pp. 27:25-30:6; 49:11-15; 59:9-22; 184:8-13; *Exh. 21*, pp. 7:20-12:16; *see e.g., Kadel v. Folwell*, No. 1:19CV272, 2022 U.S. Dist. LEXIS 103780, at *31-35 (M.D.N.C. June 10, 2022) (excluding expert testimony on similar grounds).  Dr. Laidlaw did not apply the relevant BCBSIL Medical Policy to C.P.'s claims or consider whether C.P.'s claims met the definition of "medical necessity" in C.P.'s plan. *See* Hamburger Decl., *Exh. 15*, pp. 82:13-17, 193:5-9.    Dr. Laidlaw's personal opinions regarding whether GCS should be available to minors are irrelevant in this litigation where ***BCBSIL has concluded that this treatment is medically necessary and would cover it for C.P. and others***, but for its non-medical decision to administer the Exclusions.

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT – 25
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303 FAX (206) 223-0246

drafting of the exclusion, **and** for the administration of the claims, such as where it excludes claims based solely on transgender status); *see, e.g., Doe v. CVS Pharm., Inc.*, 982 F.3d 1204, 1210 (9th Cir. 2020) (litigation against TPA alleging disability discrimination in the administration of claims allowed to proceed). Such liability arises directly from the statutory text, not any particular regulation. *See King v. Burwell*, 759 F.3d 358, 367 (4th Cir. 2014) ("At *Chevron*'s first step, a court looks to the 'plain meaning' of the statute."), *aff'd*, 576 U.S. 473 (2015).[11]

BCBSIL may complain that even when an employer designs the Exclusion entirely on its own, there is no way BCBSIL can administer the Exclusion without making decisions to deny claims based on the presence of a diagnosis with "gender dysphoria." But that argument, of course, proves Plaintiffs' point: BCBSIL, as a covered entity, cannot administer a discriminatory benefit design for an employer, even when the employer might be able to implement such an exclusion on its own. As a covered entity, BCBSIL has an independent statutory duty under Section 1557 to not discriminate and therefore it must get out of the business of discrimination entirely—including as a TPA. That's the tradeoff BCBSIL made when it accepted federal financial assistance.

## D.     BCBSIL Is a "Health Program or Activity" that is Subject to the ACA's Non-Discrimination Requirements.

BCBSIL does not dispute that it is a "health program or activity" subject to Section 1557 in the programs for which it receives federal financial assistance. Dkt. No. 84-2, pp. 27:24-29:17; Dkt. No. 41, ¶51; Dkt. No. 88-1, *Exh. I*. But Section 1557's requirements are far broader.

---

[11] Even the HHS 2016 and 2022 regulations confirm that TPA activities can constitute illegal discrimination. *See* § III.E below.

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

If an entity is a "health program or activity" that receives federal financial assistance, then all of its operations are subject to Section 1557.  42 U.S.C. § 18116(a); *T.S. v. Heart of Cardon, LLC*, 43 F.4th 737, 743 (7th Cir. 2022).  As the Seventh Circuit recently concluded "[t]he phrase 'health program or activity' in section 1557 plainly includes all the operations of a business principally engaged in providing healthcare, and CarDon concedes that it is such an entity. That ends the inquiry."  *Id.* (emphasis added); *Fain v. Crouch*, 545 F. Supp. 3d 338, 343 (S.D.W. Va. 2021) ("[B]y virtue of its acceptance of federal assistance under its Medicare Advantage program, The Health Plan must comply with Section 1557 under its entire portfolio") (emphasis added).  Here BCBSIL admits it receives federal financial assistance that subjects it to Section 1557.  *See* Dkt. 88-1, *Exh. I* ("BCBSIL receives federal financial assistance for specific products, such as Medicare supplemental coverage, Medicaid, Medicare Advantage and Prescription Drug insurance coverage, and Medicare/Medicaid dual eligibility.").  And, as BCBSIL's Rule 30(b)(6) witness admitted, all of BCBSIL's activities are health related.  Hamburger Decl., *Exh. 17*, p. 12:17-23; Dkt. No. 84-2, pp. 16:20-17:10 ("we sell insured health products and uninsured health products").  In sum, BCBSIL is a "covered entity" under Section 1557. It must comply with anti-discrimination requirements in all of its operations.

BCBSIL attempts the same argument that defendants in *Heart of Cardon* made and lost—that only the part of operations that receive federal financial assistance are subject to the anti-discrimination protections.  *Compare* Dkt. No. 87, pp. 15-16 *with T.S.*, 43 F.4th at 742 ("Because the only part of its operations that receives federal aid is its patient care in the form of Medicare and Medicaid payments, CarDon contends that section 1557's zone of interests must be limited to its patients to avoid a "mismatch" between the federal funding and the individuals it benefits.").  The Seventh Circuit noted that the term "program or activity" was a term of art when the ACA was enacted, such that it

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 27
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303 FAX (206) 223-0246

must be interpreted consistent with the "prevailing understanding" at the time it was codified in Section 1557.  *T.S.*, 43 F.4th at 742 (*citing George v. McDonough*, 142 S. Ct. 1953, 1963 (2022)).  The meaning of "program or activity" in the civil rights laws referenced by Section 1557 reflect a "deliberate move by Congress through the Civil Rights Restoration Act of 1987" to expand the reach of the term "program or activity" beyond the part of the operations that actually receive federal financial assistance to include all operations of the entity.  *T.S.*, 43 F.4th at 742-743.  *Accord, Doe v. CVS Pharm., Inc.*, 2022 U.S. Dist. LEXIS 139684, at *27 (N.D. Cal. Aug. 5, 2022) (the term "all operations" in Section 1557 should be interpreted broadly, including beyond corporate entity lines); *Fain*, 545 F. Supp. 3d at 343 ("[I]ndividual plans are not programs with "parts" that receive federal financial assistance; health plans are the 'parts' that receive assistance within programs.").  The CRRA was enacted to amend four civil rights statutes to make clear, among other things, that if any part of a program or activity receives federal financial assistance, the entire program must comply with the applicable civil rights laws, not simply those aspects of covered entities directly receiving funding. *See* Pub. L. No. 100-259, 102 Stat. 28 (Mar. 22, 1998); *Doe v. Salvation Army in U.S.*, 685 F.3d 564, 571-72 (6th Cir. 2012) ("Congress passed the Civil Rights Restoration Act of 1987 to restore the previously broad scope of coverage of the four statutes that used the word 'program or activity'").

BCBSIL's Rule 30(b)(6) witness admitted that BCBSIL, like other divisions within HCSC, receives federal financial assistance for certain of its individual and small group market lines of business. Dkt. No. 84-2, pp. 17:14-18:9.  Every court to consider this issue has concluded that if a defendant is a "health program or activity" that receives federal financial participation that subjects it to the ACA, then all of its operations fall within the ACA's anti-discrimination requirements.  *See*, *e.g.*, *Briscoe v. Health Care Serv. Corp.*, 281

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 28
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

F. Supp. 3d 725, 730 (N.D. Ill. 2017) (health plans administered by BCBSIL and other HCSC divisions are "within the ACA's purview"); *see also Schmitt,* 965 F.3d at 948 ("Section 1557 … prohibits covered health insurers from discriminating based on various grounds including disability").   BCBSIL has provided written assurances to the federal government that it will comply with Section 1557,[12] and provided similar promises to C.P. and others.  *See* Dkt. No. 88-1, *Exh. I, exh. A;* Dkt. No. 84-14, p. 5 ("We do not discriminate on the basis of … sex, [or] gender identity…").[13] It must live up to those promises, even when it acts as a TPA.

BCBSIL argues that the Court should instead rely upon the soon-to-be-repealed HHS 2020 rulemaking that improperly and unlawfully (*see* n.14, *infra*) limited the application of "health program or activity" to only those programs that received federal financial assistance, and explicitly excluded health insurers other than in programs that operated on state exchanges.  *See* Dkt. No. 87, p. 18.  BCBSIL complains that it would be

---

[12] BCBSIL argues that since the written assurance is limited to only the programs for which BCBSIL receives federal funding, Section 1557 does not extend further.  Dkt. No. 87, p. 16.  The same limiting language appears in the document's assurances for Title VI, Section 504, Title IX and the Age Discrimination Act.  *See* Dkt. No. 88-1, *Exh. I, exh. A.*  Since passage of the Civil Rights Restoration Act of 1987, however, courts have held that the term "program or activity" in all of these civil rights statutes is not limited to just the operations for which federal assistance is received.  *T.S.,* 43 F.4th at 743.  This is true even in Title IX jurisprudence.  *See e.g., Fox v. Pittsburg State Univ.,* 257 F. Supp. 3d 1112, 1124 (D. Kan. 2017) (the term "program" in Title IX applies to all operations, not just those receiving federal funding).

[13] BCBSIL improperly references *Religious Sisters of Mercy v. Azar,* 513 F. Supp. 3d 1113, 1128 (D.N.D. 2021) for the proposition that "insurers and TPAs may only be subject to Section 1557 for the portions of their operations that receive federal funding." Dkt. No. 87, p. 18:5-6.  That citation merely recounts the changing regulatory landscape surrounding Section 1557.  Now, federal regulators propose to return to the 2016 rule that does not limit Section 1557 to just the operations that receive federal funding.  87 Fed. Reg. 47844 ("Unlike under the 2020 Rule, we propose to apply this rule to all the operations of a recipient entity principally engaged in the provision or administration of health insurance coverage or other health-related coverage.").

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 29
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

unfair to "retroactively impose" the 2022 rulemaking on BCBSIL.  *Id.*, n. 10.  BCBSIL's arguments about the 2020 rulemaking should be firmly rejected by the Court:

*First,* Plaintiffs seek enforcement of the Section 1557's statutory text, not the various iterations of federal rulemaking. Section 1557, which has been on the books since 2010, remained unchanged during the entire class period, even up to today.  Indeed, resolving the dispute over the meaning of "health program or activity" "begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989). Accordingly, the Court must first consider the plain language and intent of the statute before resorting to consideration of the variable federal rules.  *See* Dkt. No. 23, p. 8.  Here, the plain language of the statute supports the proposition that Section 1557 applies to all the operations of a health insurer any part of which receives federal financial assistance.  Indeed, courts applied Section 1557 to health insurance even prior to the 2016 HHS rule. *See East v. Blue Cross & Blue Shield of La.,* 2014 U.S. Dist. LEXIS 23916, at *6 n.1 (M.D. La. Feb. 24, 2014).

*Second,* the discrimination alleged in this case occurred while the original 2016 rulemaking was in effect (which required compliance by BCBSIL in all of its activities). *See* Dkt. No. 1 (describing BCBSIL's discriminatory actions towards Plaintiffs in 2016-2019).

*Third,* BCBSIL misrepresents the *amicus* briefing in *Washington v. United States Department of Health & Human Services.* Dkt. No. 87, p. 15:19-22.  Plaintiffs argued there, as they do here, that the 2020 Rule was unlawful under the Administrative Procedure Act because it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.  *See also* Dkt. No. 88-1, *Exh. J,* p. 1 ("This [2020 Rule]

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 30
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

cannot be squared with Congress' intent in enacting Section 1557.").[14]   The federal government has now recognized this error through its 2022 rulemaking, which involves "a wholesale revision of the 2020 Rule." *Kadel*, 2022 U.S. Dist. LEXIS 103780, at *96 (quotation omitted).

In any event, regardless of the various iterations of the federal regulations, under the plain language of Section 1557 and the ACA as a whole, Congress intended the term "health program or activity" to reach health insurers like BCBSIL in all of their operations.   The Court should reject BCBSIL's invitation to narrow the definition of "health program or activity" to exclude insurers because "only Congress can rewrite [a] statute." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 376 (1986).  Such redefinition by rule is not entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

Congress explicitly included health insurers that receive federal financial assistance within the purview of Section 1557:

> [A]n individual shall not, on the ground prohibited under … Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*) … be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, ***including*** credits, subsidies, or ***contracts of insurance***.

42 U.S.C. § 18116(a) (emphasis added).  This language was an intentional expansion over earlier anti-discrimination law that *exempted* "contracts of insurance."   *See* 45 C.F.R.

---

[14] "Various litigants have challenged [the 2020 Rule's] changed interpretation of the statute as arbitrary and capricious, and the question remains pending in multiple federal courts." *Kadel*, 2022 U.S. Dist. LEXIS 103780, at *95; *see also, e.g., Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1 (D.C. Cir. 2020); *Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health & Hum. Servs.*, No. 20-cv-11297, 2021 WL 3667760 (D. Mass.)..  These cases are stayed based on the 2022 rulemaking.

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

§ 84.3(h) (Section 504 regulation expressly excluded insurers from its reach).  Congress' expansion of anti-discrimination law to health insurers that receive federal financial assistance was express and deliberate.  *See United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985) (Congress's choice of words is presumed to be intentional).  After all, health coverage is what enables most Americans to access health care.  It defies logic to argue that *health* insurance might not be a *health* program or activity. "It is unclear to whom this clause would apply if not health insurance issuers." *Fain v. Crouch*, 545 F. Supp. 3d at 342.

In addition, this Court should not review the meaning of "health program or activity" in isolation; it should seek to ascertain the statutory term's meaning from its context. *See King v. Burwell*, 135 S. Ct. 2480, 2492 (2015); *Fain*, 545 F. Supp. 3d at 342 ("Although 'health program or activity' is not defined by the ACA, its meaning becomes evident as the Court widens its analytical lens beyond the phrase itself."). The Court therefore "must … interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into a harmonious whole." *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal quotations omitted).

That "health program or activity" includes health insurance and health plans is evident from definitions of "health program" and "health care" contained within the ACA, which repeatedly refers to "health programs" and "health care entities" as including insurers and health plans in other provisions.  *See Fain*, 545 F. Supp. 3d at 342 (noting "[o]ther sections of the ACA provide further support").  For example, Section 1331 permits states flexibility to provide a "basic *health program*" by offering "1 or more standard *health plans* providing at least the essential health benefits described in section 1302(b) to eligible individuals." 42 U.S.C. § 18051 (emphasis added). Similarly, Section 1553 defines "health care entity" to include "*a health maintenance organization, a*

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 32
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

*health insurance plan,* or any other kind of health care facility, organization, or *plan.*" 42 U.S.C. § 18113 (emphasis added).

Courts "must reject administrative constructions which are contrary to clear congressional intent." *Chevron*, 467 U.S. at 843 n.9. Here, the inclusion of health insurance and health plans within "health program or activity" is apparent from statements of Congressional intent. Senator Patrick Leahy explained that Section 1557's prohibition on discrimination was "necessary to remedy the shameful history of invidious discrimination and the stark disparities in outcomes in our health care system" and to "ensure that all Americans are able to reap the benefits of *health insurance* reform equally *without discrimination*."  Health Care and Education Reconciliation Act of 2010, 156 Cong. Rec. S. 1821, 1842 (daily ed. Mar. 23, 2010) (emphasis added).  Moreover, "when looking at the ACA as a whole, the Act clearly aims to increase the number of Americans covered by health insurance by transforming the health insurance industry." *Fain*, 545 F. Supp. 3d at 342 (quote omitted).  Indeed, the ACA is laser-focused on ending discrimination by health insurance companies.  *See* Hamburger Decl., *Exh. 18,* Blake, Valarie K., *An Opening for Civil Rights in Health Insurance After the Affordable Care Act,* 36 B.C. J.L. & Soc. Just. 235, 237 (June 2016).  In addition to Section 1557, the ACA prohibits health insurers from discrimination based upon health conditions in enrollment and re-enrollment.  *See* 42 U.S.C. §§ 300gg-1; 300gg-2; 300gg-4.  It ends the use of discriminatory pre-existing condition limitations in ACA-regulated health insurance.  42 U.S.C. § 300gg-3.  It prohibits insurers from using disability, health status and medical conditions as a basis of denying eligibility for coverage.  42 U.S.C. § 300gg-4(a).  "Given this context, … 'health program or activity' under Section 1557 necessarily includes health insurance issuers." *Fain*, 545 F. Supp. 3d at 342.

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 33
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

**E.      BCBSIL's TPA Activities are Subject to Section 1557.**

Under Section 1557, the term "all operations" includes all of an entity's activities, including those related to the administration of a self-funded group health plan. *T.S. v. Heart of CarDon*, 2021 U.S. Dist. LEXIS 49119, at *27 (S.D. Ind. Mar. 16, 2021).  All courts to consider this issue have concluded that Section 1557 applies to TPA activities. "Nothing in Section 1557, explicitly or implicitly, suggests that TPAs are exempt from the statute's nondiscrimination requirements." *Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 956 (D. Minn. 2018); *see also Boyden*, 341 F. Supp. 3d at 997 (TPA that administers a discriminatory exclusion may be liable for its discriminatory administration of a plan exclusion selected by a customer).

The Ninth Circuit implicitly reached this question in *Doe v. CVS Pharm., Inc.*, 982 F.3d 1204, 1212 (9th Cir. 2020).  In that case, disabled plaintiffs living with HIV/AIDS filed a Section 1557 claim of disability discrimination against CVS, a TPA that administered prescription benefit plans for employer-based health plans.  982 F.3d at 1207.  The Ninth Circuit confirmed that a Section 1557 claim may be pursued against a covered entity TPA that administers a benefit design that results in discrimination.  *Id.*, at 1212.  In sum, there is no exception under Section 1557 for TPAs.

**F.      HHS Rulemaking Does Not Permit BCBSIL to Administer a Discriminatory Exclusion.**

BCBSIL argues that under even the 2022 proposed HHS rulemaking, it is not responsible for its discriminatory actions when administering a discriminatory benefit designed by an employer.  Dkt. No. 87, p. 11.  BCBSIL is wrong for at least the following four reasons:

*First*, as this Court previously concluded, "[a] claim of discrimination in violation of Section 1557 does not depend on an HHS rule."  Dkt. No. 23, p. 8.  The Court must first consider the plain, unambiguous statutory language.  *Id.* (*citing Prescott v. Rady*

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT – 34
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

*Children's Hosp.-San Diego,* 265 F. Supp. 3d 1090, 1105 (S.D. Cal. 2017)).   Courts have repeatedly concluded that TPAs that are subject to Section 1557  may be liable for administering a discriminatory exclusion—even if they did not design it.  *See, e.g., Doe v. CVS Pharm.,* 982 F.3d at 1212; *Tovar,* 342 F. Supp. 3d at 956; *Boyden*, 341 F. Supp. 3d at 997.

**Second**, no actual or proposed federal rule allows BCBSIL to avoid liability for administering a discriminatory exclusion.  BCBSIL points to only previous and proposed commentary in regulatory preambles for support for its claim that it cannot be responsible for its administration of a discriminatory exclusion.  *See* Dkt. No. 87, p. 11.[15] As a result, BCBSIL's argument that this Court must defer to existing or proposed regulations is unavailing.  *See* Dkt. No. 87, pp. 11-12.  And, in any event, where, as here, the "plain, unambiguous language of the statute" does not excuse covered entities from liability when acting as a TPA, no deference to HHS's commentary is required.[16]  *Tovar,* 342 F. Supp. 3d at 957; *Prescott*, 265 F. Supp. 3d at 1105; *see also* Section III(D), *supra*.

**Third**, the proposed HHS commentary does not help BCBSIL. It states that covered entities are subject to Section 1557 in all operations—including in their TPA activities.  *See* 87 Fed. Reg. 47876 ("An issuer's … operations related to third party administrative services also would be subject to the rule when the issuer receives Federal financial assistance and is deemed to be principally engaged in the provision or

---

[15] For this reason, BCBSIL's claim that if the Court were to rule in favor of the Plaintiff and proposed Class it would "overturn" the 2020 Rule or 2022 proposed rulemaking, is wholly unfounded.  *See* Dkt. No. 87, p. 12:5-11.  No rule would be overturned if the Court decides in favor of the Plaintiffs and proposed class.

[16] BCBSIL argues that "Section 1557 leaves room for interpretation," but does not identify how the language of 42 U.S.C. § 18116(a) is ambiguous when it is applied to covered entities that perform TPA work for some of their business.  Dkt. No. 87, p. 12:14-15. As the Seventh Circuit recently concluded, Section 1557's plain language is unambiguous and clear on this score, applying to all activities of covered health care entities.  *See T.S.*, 43 F.4th at 743.

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 35
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303 FAX (206) 223-0246

administration of health programs or activities…").   HHS, as a practical matter, announced that it will not enforce Section 1557 against a TPA with regards to benefit design when it concludes that the TPA has "no control" over the discriminatory benefit design of the self-funded plan.[17] 87 Fed. Reg. 47877 ("[W]here the alleged discrimination relates to the benefit design of a self-insured group health plan that did not originate with the third party administrator but rather with the plan sponsor, HHS will refer the complaint to the EEOC or the DOJ for potential investigation.").   But HHS may hold a TPA liable under Section 1557 (1) "[w]here the alleged discrimination *relates to the administration of the plan by a covered third party administrator* … because it is the entity responsible for the decision or other action being challenged in the complaint," and (2) "when it is *responsible for the underlying discriminatory plan design feature* that is adopted by a group health plan."  87 Fed. Reg. 47876 (emphasis added); *see also id.* ("[W]here the discriminatory terms of the group health plan originated with the third party administrator rather than with the plan sponsor, the third party administrator could be liable for the discriminatory design feature").

Both types of TPA discrimination are present here.  *For one,* BCBSIL wrote the actual plan language for nearly all of the plans for which BCBSIL administered the Exclusions and the rest were based on the BCBSIL-drafted language even if not identical. Dkt. No. 84-6, p. 34:16-22; Dkt. No. 84-9, pp. 25:4-27:15 (378 plans use the precise BCBSIL-authored standard language for the Exclusion, while all the other variations in Addendum A are "represented uniquely in one plan" each); Dkt. No. 84-17, Addendum A, p. 13. *For another*, for all plans (including the CHI plan), BCBSIL controls

---

[17] HHS is just wrong when it contends that a TPA may be forced to administer a discriminatory benefit design for a contracting employer.  *See* 87 Fed. Reg. 47876.  ERISA *forbids* TPAs from administering plans in violation of federal law. *See* 29 U.S.C. § 1144(d); *Doe v. United Behavioral Health*, 523 F. Supp. 3d at 1127.

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 36
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

the administration of the Exclusions by scanning healthcare claims for the presence of "gender dysphoria," and then denying coverage on that basis.  Dkt. No. 84-6, pp. 69:8-71:4.  In sum, BCBSIL engaged in both types of TPA administrative activities expressly acknowledged by HHS to violate Section 1557.

**Fourth,** BCBSIL remains responsible for its discriminatory actions as an administrator.  *See, e.g., Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1297 (9th Cir. 2014); *N.Y. State Psychiatric Ass'n v. UnitedHealth Grp.*, 798 F.3d 125, 132 (2d Cir. 2015) (TPAs may be liable for improper denial of benefits in violation of ERISA or other federal law).  As noted above, HHS recognized TPAs' responsibility to administer plans in a non-discriminatory manner in the proposed commentary.  87 Fed. Reg. 47876.

Here, there is no dispute that BCBSIL administers all of the plans with the Exclusions in the same manner.  In those plans, BCBSIL treats claims received with a diagnosis of "gender dysphoria" differently from other claims—not because of any objective medical or scientific reasons, but because of the diagnosis of "gender dysphoria" itself.  As confirmed by BCBSIL, the trigger for the administration of the Exclusions is the submission of a claim with a diagnosis of "gender dysphoria."  Dkt. No. 84-9, p. 40:17-22.

BCBSIL administers these claims differently solely because they reflect treatment for transgender patients.  That is the very essence of discrimination.  *See Fain v. Crouch*, 2022 U.S. Dist. LEXIS 137084, at *35-36 (S.D. W. Va. Aug. 2, 2022) ("An exclusion that takes effect based upon diagnosis with gender dysphoria is discrimination on the basis of sex"); *see Fletcher*, 443 F. Supp. 3d at 1027, 1030; *Whitaker v. Kenosha Unified Sch. Dist. No.1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017).  *Cf. Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 689 (2010) (targeting same-sex intimate conduct necessarily targets the

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 37
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

status of being gay); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews.").

## G.  RFRA Does Not Protect BCBSIL From Liability.

Even if its administration of the Exclusions is a form of sex discrimination, BCBSIL claims that since CHI could implement the Exclusion under RFRA, so could BCBSIL. Dkt. No. 87, pp. 7-9.  BCBSIL is simply wrong.  Neither BCBSIL nor CHI can rely on RFRA as a defense in this litigation because the federal government is not a party.

### 1.    RFRA Does Not Apply When the Government Is Not a Party.

RFRA applies to the actions of two specific entities—someone with a sincerely held religious belief, and the federal government.  *See* 42 U.S.C. § 2000bb-1(c) ("***A person whose religious exercise has been burdened*** in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief ***against a government***.") (emphasis added); *see City of Boerne v. Flores*, 521 U.S. 507 (1997) (RFRA only provides a claim or defense against federal government action).  As noted by the Court, "RFRA provides relief against the government, but the government is not a party to this action."  Dkt. No. 23, p. 9.

After discovery, BCBSIL offers no new evidence to show that the government is a party to this litigation.  *See id.* On this basis alone, BCBSIL's RFRA defense fails. *See Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 841 (9th Cir. 1999) (A private party seeking to enforce a federal law is not subject to RFRA since "governmental compulsion in the form of a generally applicable law, without more, is [in]sufficient to deem a private entity a governmental actor."); *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 737 (7th Cir. 2015) ("RFRA does not apply when the "government," as defined in RFRA, is not a party to the action."); *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 411-12 (6th Cir. 2010) ("RFRA does not apply to suits between private parties").

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT – 38
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

RFRA cannot be invoked here without the involvement of government as a party.  The Court need not consider any remaining arguments regarding RFRA.

>    **2.     Additionally, BCBSIL is a Secular Entity and Cannot "Borrow" CHI's Alleged RFRA Protections.**

Ignoring the complete absence of any governmental party, BCBSIL argues that it can rely on CHI's sincerely held religious belief to borrow its RFRA defense.  *See* Dkt. No. 87, p. 11.  BCBSIL is not authorized by RFRA to exercise this defense.

RFRA permits only "[a] ***person whose religious exercise has been burdened*** … [to] assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief *against a government*."  42 U.S.C. § 2000bb-1(c) (emphasis added).  BCBSIL is neither a religious organization nor one closely held by religious individuals, such that its religious belief can be burdened.  *See* Dkt. No. 41, ¶14.  BCBSIL simply does not fall within the statutory protection of RFRA.

Presumably, BCBSIL claims it may rely upon CHI's religious defense by reason of its administrative services agreement with CHI.  But the contract between BCBSIL and CHI confirms that BCBSIL is ***not*** CHI's agent, representative or associate.  Dkt. No. 84-15, § 14.1 ("The Claim Administrator is an independent contractor with respect to the Client.  Neither party shall be construed, represented or held to be an agent, partner, associate, joint venturer nor employee of the other"); Hamburger Decl., *Exh. 1*, p. 38:4-21.  BCBCSIL cannot claim to be CHI's agent for purpose of making any RFRA argument.

Nor does BCBSIL somehow acquire CHI's religious interests through a general business interest in pleasing others.  *Fernandez*, 653 F.2d at 1277; *cf. Equal Emp. Opportunity Comm'n v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 586 (6th Cir. 2018) ("[W]e hold as a matter of law that a religious claimant cannot rely on customers' presumed biases to establish a substantial burden under RFRA."), *aff'd on other grounds sub nom., Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731 (2020).

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 39
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

BCBSIL mischaracterizes this argument as one involving "prudential standing." *See* Dkt. No. 87, pp. 9-12.  The doctrine of prudential standing simply does not apply. *See Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.,* 821 F.3d 352, 358 (2d Cir. 2016), *citing to Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 128 (2014) ("[P]rudential standing" principles do not apply where "Congress specified in the statute who may sue.").  RFRA's substantive law only permits a cause of action or defense between the government and entities whose sincerely held religious beliefs are alleged to be substantially burdened by governmental action.  *See Sutton,* 192 F.3d at 841; *Tomic v. Catholic Diocese of Peoria,* 442 F.3d 1036, 1042 (7th Cir. 2006) *cert. denied,* 549 U.S. 881 (2006); *see, e.g., Nebraska v. United States HHS*, 877 F. Supp. 2d 777, 800 (D. Neb. 2012) (rejecting claims of "prudential standing" to enforce RFRA by states because "RFRA protect[s] individual rights, not states' rights").[18]

The cases BCBSIL relies upon do not hold otherwise.  *See* Dkt. No. 87, p. 13.  Both cases cited, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,* 140 S. Ct. 2367, 2383 (2020), and *Whitman-Walker Clinic, Inc. v. United States HHS*, 485 F. Supp. 3d 1, 46 (D.C. 2020), stand for the unremarkable proposition that individual claims or defenses may be asserted by those whose religious beliefs are substantially burdened by the enforcement of certain ACA provisions against them by the government.  Neither case addresses the situation here, where private citizens challenge the practices of a secular TPA that is subject to Section 1557.  *See Clark v. Newman Univ., Inc.,* 2022 U.S. Dist. LEXIS 164360, at *37 (D. Kan. Sep. 12, 2022) (in sex discrimination case between a former

---

[18] Additionally, BCBSIL cannot rely on "prudential standing" to assert that the "CHI Plan is not illegal," *see* Dkt. No. 87, p. 12, because Plaintiffs do not challenge whether the literal CHI Plan terms can legally include the Exclusion.  Plaintiffs instead challenge whether the Exclusion can be administered by BCBSIL, a secular "covered entity" that must comply with Section 1557.

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 40
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

employee and a nongovernmental employer, "RFRA does not provide an alternative defense in lawsuits between private parties.").

BCBSIL misleadingly claims the "U.S. Supreme Court [ ] explained [that] TPAs may legally administer plans with exclusions of coverage that RFRA exempts from the ACA's requirements." Dkt. No. 87, p. 13, *citing Little Sisters,* 140 S. Ct. at 2395 (J. Alito, concurring). *First,* there is no such "explanation" in *Little Sisters. Little Sisters* involved an APA challenge to the promulgation of rules that affirmatively created an exemption for certain religious employers to the administratively created contraception mandate. The decision merely held that HHS did not violate the APA when it considered possible interactions between the contraception mandate and RFRA in formulating that regulatory exemption. Thus, BCBSIL merely assumes that since the Supreme Court upheld the regulatory religious exemption from the ACA's "contraception mandate" when administered by TPAs, the Supreme Court would also conclude that TPAs may ignore other ACA requirements when administering self-funded plans for religious employers. As shown below, that assumption is wrong.

*Second,* BCBSIL has an independent, statutory duty to abide by Section 1557. Section 1557 is therefore fundamentally different from the regulatory contraception mandate because it applies directly to BCBSIL. "Covered entities" like BCBSIL may not to engage in discriminatory activities in all of their operations, separate and apart from the actions of any employers with whom the covered entity contracts. In contrast, TPAs have no independent legal obligation to comply with the contraception mandate when administering health plans, as that requirement applies *only* to group health plans and issuers, not TPAs. *See* 42 U.S.C. § 300gg-13(a)(4). Thus, Section 1557 is fundamentally different from the contraception mandate in that it applies separately and in full force to certain TPAs, like BCBSIL, that fall within its broad reach. In sum, the Supreme Court

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 41
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

decision in *Little Sisters* does not "permit" TPAs to violate Section 1557 when administering the Exclusions for purported religious employers.  That issue has yet to be addressed, much less "explained," by the Supreme Court.  *See* Dkt. No. 87, p. 13.

### 3. The Court Should Decline to Adjudicate Whether CHI Has a RFRA Defense against Governmental Action.

BCBSIL seems to theorize that *if* the government were involved in this case, and *if* CHI was a defendant, the Court would conclude that the Exclusion was permissible, and therefore could be administered by BCBSIL.  *See* Dkt. No. 87, p. 7 (claiming that the CHI Exclusion as administered by BCBSIL is not illegal because "RFRA protects CHI's Exclusion based on its sincerely-held religious beliefs").  The Court should decline to rule on what might or might not happen in a hypothetical case between the government and a religious employer seeking to enforce a gender-affirming care exclusion. None of the parties of interest in such a case are present here. And, even if CHI could be successful with a RFRA defense in that hypothetical case—and as explained in § III.F.4 below, it would not—CHI's success would not permit BCBSIL to administer the Exclusions, since BCBSIL has a separate and independent legal duty to refrain from discrimination in all operations. *See Boyden v. Conlin*, 2018 U.S. Dist. LEXIS 79753, at *11 (W.D. Wis. May 11, 2018) ("[TPA's] execution of the policy makes it a proper

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 42
Case No. 3:20-cv-06145-RJB

Sirianni Youtz
Spoonemore Hamburger PLLC
3101 Western Avenue, Suite 350
Seattle, Washington 98121
Tel. (206) 223-0303 Fax (206) 223-0246

defendant"); *Boyden*, 341 F. Supp. 3d at 997-98 (TPA that administers discriminatory exclusions may be liable for its actions).[19]

### 4.     Assuming Arguendo, if the Court Were to Permit BCBSIL to "Borrow" CHI's RFRA Defense, Such a Defense Would Fail.

Even if the Court were to reach the RFRA defense—which it should not—the defense would fail.  "[W]hile [] religious and philosophical objections are protected, it is a general rule that such objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018).

The same general principle applies here. RFRA was enacted in 1993 to shield minority faiths against unjustified government action, not to license private parties to violate civil rights laws.

Under RFRA, the government may impose even a substantial burden on "a person's exercise of religion" if the "application of the burden to the person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). The test is met here.

---

[19] BCBSIL's unsupported claim that CHI is somehow prevented from vindicating its rights in this litigation, such that the Court should allow BCBSIL to do so on its behalf, *see* Dkt. No. 87, p. 11:10, is also unavailing. (1) If BCBSIL thought CHI was a necessary party, it could have interpleaded CHI; (2) BCBSIL identifies no reason why CHI, one of the nation's largest health systems, is powerless to assert its legal interests when it wants to; (3) the similarly situated Catholic Benefits Association is actively litigating this issue against HHS. *See Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1131 (D.N.D. 2021).  There is no "hindrance" when a "similarly situated third party was undeterred in litigating the same issue."  *Survjustice Inc. v. Devos*, 2019 U.S. Dist. LEXIS 54616, at *23 (N.D. Cal. Mar. 29, 2019).

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

**First,** Section 1557 serves the compelling interest of eradicating invidious discrimination in health care. *Cf. EEOC v. Pac. Press Publ'g Ass'n*, 676 F.2d 1272, 1280 (9th Cir. 1982) ("By enacting Title VII, Congress clearly targeted the elimination of all forms of discrimination as a 'highest priority.' Congress' purpose to end discrimination is equally if not more compelling than other interests that have been held to justify legislation that burdened the exercise of religious convictions."), *abrogation on other grounds recognized by Am. Friends Serv. Comm. Corp. v. Thornburgh*, 951 F.2d 957, 960 (9th Cir. 1991). "There is no question that elimination of discrimination … is a compelling state interest of the highest order" and "that exempting religious organizations would impede the [] objective of eliminating [] discrimination." *Werft v. Desert Sw. Ann. Conf. of United Methodist Church*, 377 F.3d 1099, 1102 (9th Cir. 2004). Here, "[f]ailing to enforce [Section 1557] against [BCBSIL] means … allowing a particular person—[C.P.]—to suffer discrimination, and such an outcome is directly contrary to the [] compelling interest in combating discrimination in [health care]." *R.G. & G.R. Harris Funeral Homes*, 884 F.3d at 591.

**Second,** requiring BCBSIL to comply with Section 1557's mandate "constitutes the least restrictive means of furthering the government's compelling interest in eradicating discrimination [in health care] on the basis of sex." *Id.,* at 597. BCBSIL ignores the substantive requirements of RFRA entirely, assuming without any analysis that all it must show is a customer with an alleged religious belief in order to engage in otherwise illegal discrimination. *See* Dkt. No. 87, pp. 9-12. But the proper inquiry for the "least restrictive means" element of a RFRA defense against a discrimination claim is simply whether the federal rule in question—here, Section 1557—forbids conduct other than discriminatory conduct. It does not.

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 44
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303 FAX (206) 223-0246

As the Supreme Court has acknowledged, "there may be instances where a need for uniformity precludes the recognition of exceptions to generally applicable laws under RFRA." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 421 (2006). This is such an instance.  Because the government has a compelling interest in preventing the harms inflicted by each instance of sex discrimination, there is no way to fulfill the government's compelling interest other than by enforcing civil rights statutes against those who discriminate.  *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2783 (2014) ("The Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal."); *N. Coast Women's Care Med. Grp., Inc. v. Super. Ct.*, 189 P.3d 959, 968 (Cal. 2008) (holding that a state law prohibiting discrimination in places of public accommodation "furthers California's compelling interest in ensuring full and equal access to medical treatment irrespective of sexual orientation, and there are no less restrictive means … to achieve that goal" other than enforcement of the statute).

In sum, there is no way to eradicate discrimination in health care but to prohibit discrimination in health care. This includes the discrimination suffered by C.P. and the proposed class at the hands of BCBSIL.[20]

---

[20] Plaintiffs, having established that there is a compelling interest in eradicating discrimination in health care, puts the burden on BCBSIL to articulate alternatives by which Section 1557's purpose can be achieved.  *See United States v. Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011) ("[T]he government's burden [under RFRA] is two-fold: it must support its choice of regulation, and it must refuse the alternative schemes *offered by the challenger*…. A statute that asks whether a regulation is the least restrictive means of achieving an end is not an open-ended invitation to the judicial imagination." (emphasis added)).  BCBSIL has not done so.

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – 45
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

**H.     Named Plaintiffs Are Entitled to Compensatory Damages of $12,122,50.**

The Amended Complaint seeks coverage of all "compensatory damages, including but not limited to out-of-pocket damages and consequential damages." Dkt. No. 38, ¶ 112. These damages are entirely proper and actionable under Section 1557, even after the Supreme Court's decision in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1571 (2022) (Section 1557 discrimination remedies are "the ***usual*** contract remedies in private suits") (emphasis in original). Plaintiffs' individual out-of-pocket damages total $12,122.50. Hamburger Decl., *Exh. 19*, p. 11. Although Plaintiffs allege to have suffered a wide variety of additional harms, including emotional distress, they only seek the available "compensatory damages" pursuant to Section 1557. In the Amended Complaint, Plaintiffs only seek compensatory damages on their own behalf and equitable relief on behalf of the proposed class. There is no basis to dismiss any claim for emotional distress damages.

## IV.  CONCLUSION

The Court should grant Plaintiffs' Cross-Motion for Summary Judgment on Liability in full. BCBSIL is a covered health program or activity that has accepted federal financial assistance. Accordingly, it cannot engage in discrimination in any of its operations, including when acting as a TPA. BCBSIL may not administer self-funded plan Exclusions of gender-affirming care for the treatment of gender dysphoria, since the administration of such an Exclusion necessarily involves discrimination on the basis of sex. BCBSIL's "just following orders" defense should be rejected in full.

The Court should deny Defendants' Motion for Summary Judgment in full on the same basis, and because BCBSIL cannot assert a defense under RFRA in litigation between two private parties, which include neither a governmental party, nor a party with a sincerely held religious belief.

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT – 46
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246

DATED: October 24, 2022.

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC

 _/s/ Eleanor Hamburger_
Eleanor Hamburger (WSBA #26478)
Daniel S. Gross (WSBA #23992)
3101 Western Avenue, Suite 350
Seattle, WA 98121
Tel. (206) 223-0303; Fax (206) 223-0246
Email: ehamburger@sylaw.com
        dgross@sylaw.com

LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.

 _/s/ Omar Gonzalez-Pagan_
Omar Gonzalez-Pagan, _pro hac vice_
120 Wall Street, 19th Floor
New York, NY 10005
Tel. (212) 809-8585; Fax (212) 809-0055
Email: ogonzalez-pagan@lambdalegal.org

Jennifer C. Pizer, _pro hac vice_
4221 Wilshire Boulevard, Suite 280
Los Angeles, California 90010
Tel. (213) 382-7600; Fax (213) 351-6050
Email: jpizer@lambdalegal.org

_Attorneys for Plaintiffs_

PLAINTIFFS' CONSOLIDATED CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT – 47
Case No. 3:20-cv-06145-RJB

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303  FAX (206) 223-0246