*C.P. v. Blue Cross Blue Shield of Illinois*
USDC (W.D. Wash.), No. 3:20-cv-06145-RJB

**<u>CONFIDENTIAL EXHIBIT</u>**

**Filed Under Seal
Pursuant to Protective Order (Dkt. No. 25)**

# Exhibit 5

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

_____

C.P., by and through his parents,  )
Patricia Pritchard and Nolle       )
Pritchard and PATRICIA PRITCHARD,  )
      Plaintiffs,                  )
  vs.                              ) No. 3:20-cv-06145-RJB
BLUE CROSS BLUE SHIELD OF          )
ILLINOIS,                          )
      Defendant.                   )
_____

ZOOM VIDEO DEPOSITION UPON ORAL EXAMINATION

OF

LAURA MALEC, 30(b)(6)

_____

9:30 a.m.

August 19, 2022

REPORTED BY:  Pat Lessard, CCR #2104

```
                                                              Page 2
 1                     A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFFS:
 4           MS. ELEANOR HAMBURGER
 5           Sirianni, Youtz, Spoonemore & Hamburger
 6           3101 Western Avenue, Suite 350
 7           Seattle, Washington 98121
 8           206.223.0303
 9           ele@sylaw.com
10
11           MR. OMAR GONZALEZ-PAGAN, pro hac vice
12           Lamda Legal Defense and Education Fund
13           120 Wall Street, 19th Floor
14           New York, NY 1005
15           212.809.9585
16           ogonzalez-pagan@lambdalegal.org
17
18
19
20
21
22
23
24
25
```

```
 1
 2               A P P E A R A N C E S
 3
 4   FOR THE DEFENDANT:
 5        MS. GWENDOLYN PAYTON
 6        MS. STEPHANIE BEDARD
 7        Kilpatrick Townsend
 8        1420 Fifth Avenue, Ste. 3700
 9        Seattle, WA 98101
10        206.467.9600
11        gpayton@kilpatricktownsend.com
12
13
14   ALSO PRESENT:
15        MR. TODD ELLMAN
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                    E X A M I N A T I O N
 2   ATTORNEY                                             PAGE
 3   BY MS. HAMBURGER:                                       7
 4                     E X H I B I T   I N D E X
 5   No.                    DESCRIPTION                    PAGE
 6   Exhibit 45   Amended Notice of Continuance of           9
 7                Rule 30(b)(6) Deposition of Blue
 8                Cross Blue Shield of Illinois.
 9   Exhibit 46   Fifth Supplemental Responses and          18
10                Objections to Plaintiffs' Second
11                Discovery Requests.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

 1                   P R O C E E D I N G S
 2               THE VIDEOGRAPHER:  We are on the record at
 3    9:30 a.m. on August 19th, 2022.
 4               This is the video-recorded deposition of
 5    Blue Cross 30(b)(6) Laura Malec in the matter of CP
 6    by and through his parents, et al., versus Blue Cross
 7    Blue Shield of Illinois, No. 3:20-cv-06145-RJB in the
 8    United States District Court, Western District of
 9    Washington at Tacoma.
10               This deposition is being held virtually and
11    was noticed by plaintiff.
12               Counsel, please introduce yourselves and
13    state whom you represent.
14               MS. HAMBURGER:  Good morning.  My name is
15    Eleanor Hamburger and I represent the plaintiffs in
16    this matter.
17               MR. GONZALEZ-PAGAN:  Good morning.  I'm Omar
18    Gonzalez-Pagan.  I'm from Lambda Legal and I represent
19    the plaintiffs in this matter.
20               MS. PAYTON:  Hello.  I'm Gwendolyn Payton.
21    I represent Blue Cross Blue Shield of Illinois.
22               MS. BEDARD:  Good morning.  My name is
23    Stephanie Beddard and I also represent Blue Cross
24    Blue Shield of Illinois.
25               MS. PAYTON:  Our client, Todd Ellman, is in

Page 6

1  the room with us as well from the legal department.
2           My name is Patrick Norton and I'm the legal
3  videographer.
4           The court reporter is Pat Lessard.  We are
5  with Seattle Deposition reporters.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  it.
2      Q.   All right.  And how did Blue Cross
3  Blue Shield of Illinois identify the denials that it
4  looked at to evaluate the list?
5           MS. PAYTON:  Object to the form of the
6  question.
7      A.   Denial, so it's in our records or we went
8  back and looked at where a denial was.  So we looked
9  in our systems and did a search on denials with this
10 type of a category on it.
11     Q.   (By Ms. Hamburger)  So I'm trying to drill
12 down on that.
13          Did you look for denials that had a
14 particular diagnostic code or treatment code?  How did
15 they find the denials?
16     A.   It would be a type of denial.  I'm not
17 exactly sure what it's called but is it a, you know, a
18 gender exclusion or a gender service, you know, type
19 of a benefit that was then denied.
20     Q.   But you don't know how they identified the
21 denials specifically, is that right?
22          MS. PAYTON:  Object to the form.
23     A.   I don't do claim denials.  That's not a team
24 that I manage, so I don't want to speak to that.
25          MS. PAYTON:  Can we take a five-minute

1   break?
2           MS. HAMBURGER:  Sure.
3           MS. PAYTON:  Okay.
4           THE VIDEOGRAPHER:  We're going off the
5   record at 9:57 a.m.
6               (Recess.)
7           THE VIDEOGRAPHER:  One moment, please.
8   We're back on the record at 10:01 a.m.
9       A.   So I believe I'm understanding your question
10  better.  If you would reask your question or if we
11  could reask it then I think I could answer it in a
12  better way.
13          MS. HAMBURGER:  Pat, would you mind reading
14  it back?
15          THE REPORTER:  "Question. But you don't know
16  how they identified the denials specifically, is that
17  right?"
18      A.   I do understand the analysis that was done.
19  Our legal team went in and looked at anything with a
20  gender dysphoria diagnosis.
21          And what were they doing was looking at
22  anything there that had been denied based on exclusion
23  in a plan.
24          And they did the matching of those and went
25  in and looked at, you know, matched the denial back to

1   the plan to make sure that there had been an exclusion
2   in the plan and we had actually denied that properly.
3        Q.   (By Ms. Hamburger)  Okay.  So they looked at
4   denials of services that had a gender dysphoria
5   diagnosis, is that right?
6        A.   Yes.
7        Q.   All right.  And did this review that was
8   done, it covered only Blue Cross Blue Shield of
9   Illinois administered self-funded plans, is that
10  right?
11       A.   Yes.
12       Q.   And it reviewed plans regardless of the
13  specific geographic location of the members?
14       A.   Yes.
15       Q.   Okay.  Is it fair to say that most of those
16  plans were located in the state of Illinois?
17       A.   The plans would be, I believe the term would
18  be sited out of Illinois.
19       Q.   Okay.  But their employees could be located
20  anywhere, is that right?
21       A.   Yes.
22       Q.   Okay.  And indeed some of the employees are
23  located across the country, is that right?
24       A.   Sure.
25       Q.   Blue Cross Blue Shield of Illinois would

1  administer plans with members beyond the state line of
2  Illinois, is that right?
3       A.   Yes.
4       Q.   I want to turn to the first topic 1.a. in
5  the deposition notice.  And that asks for the number
6  of self-funded ERISA plans administered by Blue Cross
7  Blue Shield of Illinois that contain gender affirming
8  care exclusions that have the language that is the
9  same or similar to the exclusions listed in
10 Addendum A.
11           Do you see that?
12      A.   I do.
13      Q.   Okay.  And I have numbered Exhibit 46, which
14 is the Addendum A, numbering from page 13, the very
15 first exclusion, numbering them -- I think it's one
16 through 18 or something.
17           And I can put my copy up on the screen or we
18 could -- I understand your counsel may have
19 handwritten the numbers in.
20      A.   Yes.
21      Q.   Which is easier for you?  Should I put it on
22 the screen or are you just going to read off the
23 handwritten copy that you have?
24      A.   The copy I have is fine.
25      Q.   Okay.  So the first one it says "Effective

1  Date 1/01/2017," and it says "Gender reassignment
2  Surgery (also referred to as transsexual Surgery, sex
3  reassignment Surgery or intersex Surgery) including
4  related services and supplies."
5          Do you see that?
6      A.  I do.
7      Q.  Okay.  And does that reflect one kind of
8  exclusion that appears in the self-funded group health
9  plans administered by Blue Cross Blue Shield of
10 Illinois?
11     A.  Yes.
12     Q.  Okay.  And how many plans have that
13 language?
14     A.  378.
15     Q.  Okay.  Now previously we had been told that
16 number one was the standard language when a Blue Cross
17 Blue Shield of Illinois plan -- standard language that
18 Blue Cross Blue Shield of Illinois offers to employers
19 when they want a gender affirming care exclusion.
20         Is that your understanding?
21     A.  It is.
22     Q.  So let's turn to number two.  This one is
23 dated 1/1/2019.
24         Do you see that?
25     A.  I do.

1    Q.   I'm not going to read it because it's too
2 long.
3         But how many plans have number two?
4    A.   One.
5    Q.   Okay.  Let's turn to number three.  That one
6 is dated 1/01/2020.
7         How many plans have that one?
8    A.   One.  For each of the next, if I may, two
9 through 17 are each represented uniquely in one plan.
10   Q.   Okay.  Thank you.  And what about 18 and 19?
11   A.   I didn't see them on the back.  They are
12 uniquely identified as well.
13   Q.   Okay.
14   A.   So through 19 are uniquely identified as one
15 plan as well.
16   Q.   Okay.  And then on 18, if you could take a
17 look at it, it uses an abbreviation FFL in three
18 places.
19        Do you know what that refers to?
20   A.   I do not but I'm happy to follow up.
21   Q.   Okay.  Thank you.  I appreciate that.
22        And does this Addendum A represent the
23 universe of Blue Cross Blue Shield of Illinois ERISA
24 self-funded plans that have gender affirming care
25 exclusions to the best of Blue Cross Blue Shield of

```
 1   going to stop making the objection.
 2             Go ahead and answer.
 3       A.    Can you just repeat the question then?
 4       Q.    (By Ms. Hamburger)  In the plans that
 5   include gender affirming care that are identified in
 6   Addendum A do those plans generally cover hormone
 7   therapy for other conditions than gender affirming --
 8   than gender dysphoria when medically necessary?
 9       A.    Yes.
10       Q.    In those plans that exclude gender affirming
11   care in Addendum A, do those plans generally cover
12   hysterectomies when medically necessary for conditions
13   other than gender dysphoria?
14       A.    Yes.
15       Q.    In those plans that exclude gender affirming
16   care in Addendum A, do those plans generally cover
17   chest reconstruction surgery for conditions other than
18   gender dysphoria when medically necessary?
19       A.    Yes.
20       Q.    How does Blue Cross Blue Shield know when to
21   cover a mastectomy in one of the plans identified in
22   Addendum A and when to exclude it?
23             MS. PAYTON:  Object to the form.  Way
24   outside the scope.
25       A.    We match the plan design which is done by
```

1    the self-funded group with any claims coming in.  And
2    if there's not an exclusion and it's medically
3    necessary we refer to our medical policy and process
4    claims or approvals in that way.
5        Q.   (By Ms. Hamburger)  Okay.  I want to just
6    drill down on this a bit more.
7             The analysis that's done by Blue Cross
8    Blue Shield to know when to cover a mastectomy and
9    when to exclude it, in those plans that have a
10   gender affirming care exclusion, is it based on a
11   diagnostic code of gender dysphoria, is that right?
12           MS. PAYTON:  Object to the form.  Scope.
13       A.   I'm not sure.  I don't remember or I don't
14   know that.
15       Q.   (By Ms. Hamburger)  Well, you testified
16   earlier that the way, the methodology that Blue Cross
17   Blue Shield of Illinois used to identify denials that
18   relate to gender affirming care was based on a
19   diagnosis in the claim with gender dysphoria, is that
20   right?
21       A.   Yes.
22       Q.   And so it would be the same way in the
23   claims processing, would it not?
24       A.   Yes.
25           MS. PAYTON:  I'm going to object to the form

1   and scope.
2       Q.   (By Ms. Hamburger)  Blue Cross Blue Shield
3   of Illinois would know when to cover a mastectomy and
4   when to exclude it in a plan that has gender affirming
5   care exclusions based upon a diagnosis code of gender
6   dysphoria, is that right?
7            MS. PAYTON:  Object to the form, scope.
8       A.   I'm not sure.
9       Q.   (By Ms. Hamburger)  If a plan that excludes
10  gender affirming care covers mastectomies, and a claim
11  comes in for a mastectomy, how would Blue Cross
12  Blue Shield know whether it is a covered mastectomy or
13  an excluded mastectomy?
14           MS. PAYTON:  Object to the form, scope.
15      A.   I imagine it's in the diagnostic code, I'm
16  sure.
17      Q.   (By Ms. Hamburger)  Okay.  So if it has a
18  diagnostic code of gender dysphoria it would be
19  excluded under the gender affirming care exclusion, is
20  that right?
21           MS. PAYTON:  Object to the form, scope.
22      A.   I'm not sure.
23      Q.   (By Ms. Hamburger)  Why wouldn't it be?
24           MS. PAYTON:  The same objection.
25           These are questions for a medical

```
 1            MS. PAYTON:  Object to the form.
 2       A.   I don't know what happened when the denials
 3  happened.
 4       Q.   (By Ms. Hamburger)  I believe you testified
 5  earlier that the denials that Blue Cross Blue Shield
 6  of Illinois pulled to determine which plans had
 7  gender-affirming exclusions all had a diagnostic code
 8  of gender dysphoria, is that right?
 9       A.   Yes.  We did do that pull and that's how we
10  got to our lists.
11       Q.   Okay.  And turning again to 1.f., which
12  again asks for under what conditions each of the
13  self-funded plans cover the same or similar treatment
14  when medically necessary for other conditions.
15            Do you see that question in 1.f.?
16       A.   Yes.
17       Q.   Okay.  Is the condition that triggers the
18  application of the gender affirming care exclusion
19  gender dysphoria?
20            MS. PAYTON:  Object to the form.  Asked and
21  answered, scope.
22       A.   Yes.
23            MS. HAMBURGER:  Okay.  I'm going to take a
24  five-minute break.
25            MS. PAYTON:  Okay.
```