# EXHIBIT C

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF F WASHINGTON

AT TACOMA

C.P., by and through his parents, )
Patricia Pritchard and Nolle )
Pritchard and PATRICIA PRITCHARD, )
Plaintiffs, )
vs. ) No. 3:20-cv-06145-RJB
BLUE CROSS BLUE SHIELD OF )
ILLINOIS, )
Defendant. )

ZOOM VIDEO DEPOSITION UPON ORAL EXAMINATION

OF

KIM REED 30(b)(6)

10:13 a.m.

June 2, 2022

REPORTED BY: Pat Lessard, CCR #2104

Recap," do you see that?
A. Yes.
Q. The second sentence reads "Following regulatory Inquiries/requirements, ACA requirements and ALCU (along with others such as GLAAD) involvement, the change policy became effective on 11/6/2015."
Do you see that?
A. I do.
Q. Is it fair to say that -- let me go back.
So any changes to the medical policy are based on scientific review and medical literature.
And you indicated that that included also a review of the WPATH standards of care, is that correct?
A. That's correct.
Q. And was there a discussion also about the nondiscrimination requirements contained in the Affordable Care Act?
A. That was part of the discussion as well, yes.
Q. But ultimately the policy is based on your assessment of the literature and the WPATH standards of care?
A. Yes.

Q. If we move on to the next sentence, it states "The senior management directive to MPO was to strictly follow the Version 7 2012 WPATH (World Association of Transgender Health) Standards of Care (SOC) Guidelines."
Did I read that correctly?
A. Yes.
Q. So does Blue Cross Blue Shield of Illinois -- well, scratch that.
Does HCSC follow the WPATH standards of care in formulating its medical policy?
MS. PAYTON: Object to the form.
A. WPATH is part of the consideration that's used in terms of developing the medical policy.
Q. (By Mr. Gonzalez-Pagan) And here it says that there's a directive to strictly follow that, is that right?
A. Yes. That's what's indicated in the minutes, yes.
Q. And thereafter, on the last sentence, it indicates that MPMDs of all five plans reviewed and approved the policy draft as written and established those five plans which includes New Mexico, Texas, Nevada, Illinois, et cetera.
So all of these plans approved the medical

Q. Since the enactment of the Affordable Care Act Section 1557 have all the changes to this medical policy gone through the Section 1557 workgroup?

A. I'm not able to answer that. I'm not aware.

Q. We previously established how HCSC looks to WPATH standards of care as one of multiple documents that it looks to in its assessment of its medical policy.

And that looking at the minutes, the minutes reflect a directive to follow the WPATH Standards of Care Version 7 strictly.

Did Blue Cross Blue Shield of Illinois consider the WPATH Standard of Care Version 7 to meet its medical necessity requirements?

MS. PAYTON: Object to the form of the question.

A. I believe that from a medical policy perspective the WPATH guidelines or recommendations were a significant part of the decision making but not exclusively.

The Medical Policy Committee looked at other clinical evidence as well which is documented in the policy itself in terms of the references that were considered.

Q. (By Mr. Gonzalez-Pagan) Sure.

A. WPATH was a significant consideration in developing the policy.
Q. Thank you. I appreciate that. I guess any question is a little bit different. Let me rephrase it.
Does Blue Cross Blue Shield of Illinois consider care provided in accordance with the WPATH Standards of Care to meet its medical necessity requirements?
MS. PAYTON: Object to the form.
A. To the extent that if you look at our medical policy it is in conformance with current WPATH guidelines and recommendations.
Q. (By Mr. Gonzalez-Pagan) Thank you. Let's turn to -- let me ask you one more question before we move on.
And we can even make reference to Exhibit 31, if you want.
We previously established that Exhibit 31, the 2016 medical policy, would have been the one in effect at the time that Plaintiff C.P. was prescribed a Vantas medical implant in November of 2016, is that correct?
A. Yes.
Q. So the use of a Vantas implant to treat

C.P.'s gender dysphoria would have been covered under the 2016 medical policy, is that correct?

MS. PAYTON: Object to the form.

A. Based on the medical records that I reviewed my opinion is that it would have been eligible for coverage based on the criteria.

Again, I didn't review the record. I didn't, you know, make a decision on that. But based on the records that I reviewed I think it would.

MR. GONZALEZ-PAGAN: Thank you.

If we could turn to Exhibit 33.

(Marked Deposition Exhibit No. 33.)

A. Okay.

Q. (By Mr. Gonzalez-Pagan) It's the Medical Policy -- well, do you recognize this document?

A. Yes, I do.

Q. Okay. And these are the Medical Policy Discussion Conference Call Minutes for February 23rd, 2021, is that correct?

A. Yes.

Q. If we go to the last page of the document.

A. Okay.

Q. On the third bullet point it reads "We have decided as a company to follow WPATH."

Did I read that correctly?

A. Yes.
Q. Does that accurately reflect Blue Cross Blue Shield of Illinois's position with regards to determinations of medical necessity and coverage of gender-affirming medical care?
MS. PAYTON: Object to the form.
A. I believe there was a decision made based on reviewing all the evidence out there in the clinical literature that we were going to remain in conformance with WPATH.
MR. GONZALEZ-PAGAN: Thank you.
Let's turn to Exhibit 35, if you will.
(Marked Deposition Exhibit No. 35.)
A. Okay. I have it.
Q. (By Mr. Gonzalez-Pagan) Do you recognize this document?
A. Yes.
Q. Is this a medical policy with -- is this a version of the medical policy with regards to gender assignment surgery and gender-reassignment surgery with related services?
A. Yes.
Q. The format is a little bit different.
Is that because this is more of an internal document, not outward facing?

C E R T I F I C A T E

STATE OF WASHINGTON )
) ss.
COUNTY OF KING )

I, the undersigned Washington Certified Court Reporter, hereby certify that the foregoing deposition upon oral examination of KIM REED was taken stenographically by me on June 2, 2022, and transcribed under my direction;

That the witness was duly sworn by me pursuant to RCW 5.28.010 to testify truthfully; that the transcript of the deposition is a full, true, and correct transcript to the best of my ability; that I am neither attorney for nor relative or employee of any of the parties to the action or any attorney or counsel employed by the parties hereto, nor am I financially interested in its outcome.

I further certify that in accordance with CR 30(e) the witness was given the opportunity to examine, read and sign the deposition within 30 days upon its completion and submission, unless waiver of signature was indicated in the record.

IN WITNESS WHEREOF, I have hereunto set my hand this 9th day of June, 2022.

Pat Lessard

------------------------
Pat Lessard,
pat@court-reporter.com

NDTCA Signed Electronic Transcript